IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. AND H. LUNDBECK A/S, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )    C.A. No. 25-188-JLH ) |
| ALVOGEN, INC. and ALMAJECT, INC., | ) ) |
| Defendants. | ) |

**ALVOGEN, INC.'S ANSWER, DEFENSES, AND COUNTERCLAIMS
TO PLAINTIFFS' COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Alvogen, Inc. ("Alvogen") hereby responds to Plaintiffs' Otsuka Pharmaceutical

Co., Ltd. ("Otsuka"), and H. Lundbeck A/S ("Lundbeck") (collectively, "Plaintiffs") Complaint

as follows:

**NATURE OF THE ACTION**

1.     This is a civil action for patent infringement of U.S. Patent Nos. 10,525,057 ("the '057 patent"), 10,980,803 ("the '803 patent"), 11,154,553 ("the '553 patent"), 11,344,547 ("the '547 patent"), 11,400,087 ("the '087 patent") and 11,648,347 ("the '347 patent") (collectively, "patents in suit"), arising under the United States patent laws, Title 35, United States Code, § 100 et. seq., including 35 U.S.C. §§ 271 and 281. This action relates to Defendants' filing of Abbreviated New Drug Application ("ANDA") No. 216913 under Section 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), seeking U.S. Food and Drug Administration ("FDA") approval to manufacture, use, import, offer to sell and/or sell aripiprazole vials, 300 mg and 400 mg ("Defendants' generic products"), which are generic versions of Otsuka's ABILIFY MAINTENA® (aripiprazole), for the treatment of schizophrenia in adults, and maintenance monotherapy treatment of bipolar I disorder in adults before the expiration of the patents in suit.

**ANSWER**:  Paragraph 1 contains legal conclusions and allegations to which no answer is

required.  To the extent that a response is required, Alvogen admits that the Complaint purports

to allege a civil action under the patent laws of the United States, Title 35 of the United States

Code, for infringement of U.S. Patent Nos. 10,525,057 ("the '057 patent"), 10,980,803 ("the

'803 patent"), 11,154,553 ("the '553 patent"), 11,344,547 ("the '547 patent"), 11,400,087 ("the '087 patent"), and 11,648,347 ("the '347 patent"), (collectively, "the patents-in-suit"), in response to Alvogen's submission of its Abbreviated New Drug Application ("ANDA") No. 216913 seeking approval to market a generic version of Abilify Maintena® (aripiprazole). Except as otherwise admitted, the allegations are denied.

## THE PARTIES

### Plaintiffs

2.    Otsuka is a corporation organized and existing under the laws of Japan with its corporate headquarters at 2-9 Kanda-Tsukasamachi, Chiyoda-ku, Tokyo, 101-8535, Japan.

**ANSWER**:  Alvogen lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 2, and, therefore, denies those allegations.

3.    Lundbeck is a corporation organized and existing under the laws of Denmark, with a place of business at Ottiliavej 9, DK-2500 Valby, Denmark. Otsuka has granted Lundbeck an exclusive license to the '057, the '803, the '553, the '547, the '087, and the '347 patents.

**ANSWER**:  Alvogen lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 3, and, therefore, denies those allegations.

4.    Otsuka and Lundbeck are engaged in the business of researching, developing and bringing to market innovative pharmaceutical products.

**ANSWER**:  Alvogen lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 4, and, therefore, denies those allegations.

### Defendants

5.    Upon information and belief, Alvogen, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 44 Whippany Rd. Suite 300, Morristown, NJ 07960.

**ANSWER**:  Admitted.

6.    Upon information and belief, Alvogen, Inc. is a wholly-owned subsidiary of Alvogen Pharma US, Inc.

**ANSWER**: Admitted.

7.      Upon information and belief, Almaject, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 44 Whippany Rd. Suite 300, Morristown, NJ 07960.

**ANSWER**: Alvogen lacks sufficient knowledge or information as to the allegations of

Paragraph 7, and, therefore, denies them.


8.      Upon information and belief, Almaject, Inc. is a wholly-owned subsidiary of Alvogen, Inc.

**ANSWER**: Denied.  In addition, Alvogen states that Almaject, Inc. is not a proper party.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER**: Paragraph 9 contains conclusions of law to which no response is required.  To the

extent Paragraph 9 contains allegations relating only to Defendant Almaject, Inc.; Almaject, Inc.

is not a proper party.  To the extent a response is required, Alvogen denies the allegations of

Paragraph 9.

10.     This Court has personal jurisdiction over Alvogen, Inc.  Alvogen, Inc. is incorporated in the State of Delaware.  Additionally, upon information and belief, Alvogen, Inc. is in the business of manufacturing, marketing, importing and selling pharmaceutical drug products, including generic drug products.  Upon information and belief, Alvogen, Inc. directly, or indirectly, develops, manufactures, markets and sells generic drugs throughout the United States and in this judicial district.  Upon information and belief, Alvogen, Inc. purposefully has conducted and continues to conduct business in this judicial district, and this judicial district is a likely destination of Defendants' generic products.

**ANSWER**: Paragraph 10 contains conclusions of law to which no response is required.  In

addition, Alvogen does not contest the issue of personal jurisdiction for purposes of this

litigation only.  To the extent that a response is required, denied.

11.     This Court also has personal jurisdiction over Alvogen, Inc. because it has previously been sued in this judicial district and has not challenged personal jurisdiction and/or it has affirmatively availed itself of the jurisdiction of this Court by filing counterclaims in this judicial district.  *See, e.g., Novo Nordisk Inc. et al. v. Alvogen, Inc.*, C.A. No. 22-299-CFC (D. Del.); *BioDelivery Scis. Int'l, Inc. et al. v. Alvogen PB Rsch. & Dev. LLC, et al.*,

C.A. No. 18- 1395-CFC (D. Del.); *Noven Pharms., Inc. v. Alvogen Pine Brook LLC, et al.*, C.A. No. 17-1429- LPS (D. Del.).

**ANSWER**:  Paragraph 11 contains conclusions of law to which no response is required.  In addition, Alvogen does not contest the issue of personal jurisdiction for purposes of this litigation only.  To the extent that a response is required, denied.

12.    Upon information and belief, Alvogen, Inc., either directly or indirectly, currently sells significant quantities of generic drug products in the United States and in this judicial district.  Alvogen, Inc.'s website states it is a "US-based company focused on developing, in-licensing, manufacturing and marketing pharmaceutical products." https://www.alvogen.com/company (accessed Feb. 13, 2025).  Alvogen, Inc.'s website further states under the product heading "Generics": "An experienced team of professionals from the generics and brand industry has built a strong profitable base and infrastructure for our generic and brand business in the U.S. Product formulations manufactured and sold by Alvogen include solid oral dose, tab-in-tab tablets, modified release tablets, soft gelatin capsules, powder capsules, bead capsules, oral suspension, oral thin film, transdermals, creams, ointments, and injectables—both pen and vial." https://www.alvogen.com/products (accessed Feb. 13, 2025).

**ANSWER**:  Alvogen admits that the website https://www.alvogen.com/company (accessed July 1, 2025) states that "Alvogen is a privately owned US-based company focused on developing, in-licensing, manufacturing and marketing pharmaceutical products."  Alvogen admits that the website https://www.alvogen.com/products (accessed July 1, 2025) states that "An experienced team of professionals from the generics and brand industry has built a strong profitable base and infrastructure for our generic and brand business in the U.S.  Product formulations manufactured and sold by Alvogen include solid oral dose, tab-in-tab tablets, modified release tablets, soft gelatin capsules, powder capsules, bead capsules, oral suspension, oral thin film, transdermals, creams, ointments, and injectables – both pen and vial."  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 12, and, therefore, denies them.

13.    Upon information and belief, Alvogen, Inc. states that it "grew rapidly into a world-leading generics organization, producing hundreds of products sold across four continents."  https://www.alvogen.com/company/meet-the-chairman (accessed Feb. 13, 2025).

**ANSWER**:  Alvogen admits that the website https://www.alvogen.com/meet-the-chairman

(accessed July 1, 2025) states that "Alvogen grew rapidly into a world-leading generics

organization, producing hundreds of products sold across four continents."  Alvogen lacks

sufficient knowledge or information as to any remaining allegations of Paragraph 13, and,

therefore, denies them.

14.     Upon information and belief, Alvogen, Inc. has an active pharmacy wholesale license in
the State of Delaware with the license number A4-0001942.

**ANSWER**:  Admitted.

15.     This Court has personal jurisdiction over Almaject, Inc.  Almaject, Inc. is incorporated in
the State of Delaware.  Additionally, upon information and belief, Almaject, Inc. is in the
business of manufacturing, marketing, importing and selling pharmaceutical drug
products, including generic drug products.  Upon information and belief, Almaject, Inc.
directly, or indirectly, develops, manufactures, markets and sells generic drugs
throughout the United States and in this judicial district.  Upon information and belief,
Almaject, Inc. purposefully has conducted and continues to conduct business in this
judicial district, and this judicial district is a likely destination of Defendants' generic
products.

**ANSWER**:  Paragraph 15 of the Complaint contains conclusions of law to which no response is

required.  Alvogen lacks sufficient knowledge or information as to the allegations of Paragraph

15, and, therefore, denies them. To the extent Paragraph 15 of the Complaint relates only to

Almaject, Inc.; Almaject, Inc. is not a proper party.

16.     Upon information and belief, Almaject, Inc. is a generic pharmaceutical company that, in
coordination with or at the direction of Alvogen, Inc., develops, manufactures, markets,
imports and distributes generic pharmaceutical products for sale in the State of Delaware
and throughout the United States.  Almaject, Inc.'s website states: "Almaject® Inc. is a
wholly owned subsidiary of Alvogen, specializing in the commercialization of generic
injectable pharmaceuticals for the acute and alternate site healthcare markets in the US."
https://www.almaject.com/ (accessed Feb. 13, 2025); see also
https://www.alvogen.com/products (accessed Feb. 13, 2025).

**ANSWER**:  To the extent Paragraph 16 of the Complaint relates only to Almaject, Inc.;

Almaject, Inc. is not a proper party.  Alvogen lacks sufficient knowledge or information as to the

remaining allegations of Paragraph 16, and, therefore, denies them..

17.     Upon information and belief, Almaject, Inc., either directly or indirectly, currently sells
significant quantities of generic drug products in the United States and in this judicial

district.  Almaject, Inc.'s website states: "Almaject® is focused on the development, acquisition, and commercialization of injectable generic pharmaceutical products.  The current portfolio of injectables covers a broad range of therapeutic areas." https://www.almaject.com/company-overview (accessed Feb. 13, 2025).

**ANSWER**:  To the extent Paragraph 17 of the Complaint relates only to Almaject, Inc.;

Almaject, Inc. is not a proper party.  Alvogen lacks sufficient knowledge or information as to the

allegations of Paragraph 17, and, therefore, denies them.

18.    Upon information and belief, Almaject, Inc. regularly imports drug products into the United States.  https://datadashboard.fda.gov/ora/cd/impentry-table.htm (searching manufacturer legal name: "Almaject Inc." yields 22 search results between May. 8, 2022 and Nov. 14, 2024) (last searched Feb. 13, 2025).

**ANSWER**:  To the extent Paragraph 18 of the Complaint relates only to Almaject, Inc.;

Almaject, Inc. is not a proper party.  Alvogen lacks sufficient knowledge or information as to the

allegations of Paragraph 18, and, therefore, denies them.

19.    Upon information and belief, Rama Yarasani is presently Alvogen, Inc. and Almaject, Inc.'s Chief Scientific Officer, and is "responsible for all aspects of Generics and Brand R&D, including Biopharmaceutics, Clinical Pharmacology, Project Management, product transfers and commercial validation at all internal and external sites." https://www.alvogen.com/team/rama-yarasani (accessed Feb. 13, 2025); see also https://www.almaject.com/team/rama-yarasani (accessed Feb. 13, 2025) ("Rama Yarasani joined Almaject in September 2018 and is responsible for management of all aspects of CMS, Clinical Pharmacology, Regulatory Affairs, Project Management, Commercial Validation and Product Transfers.").

**ANSWER**:  To the extent Paragraph 19 of the Complaint relates only to Almaject, Inc.;

Almaject, Inc. is not a proper party.  Alvogen lacks sufficient knowledge or information as to the

remaining allegations of Paragraph 19, and, therefore, denies them.

20.    Upon information and belief, Defendants hold themselves out as a unitary entity and operate as a single integrated business with respect to the regulatory approval, manufacturing, marketing, sale and distribution of generic pharmaceutical products throughout the United States, including in this judicial district and including for Defendants' generic products that are the subject of ANDA No. 216913.

**ANSWER**:  Paragraph 20 contains conclusions of law to which no response is required.  To the

extent Paragraph 20 relates only to Almaject, Inc.; Almaject, Inc. is not a proper party.  Alvogen

otherwise denies the allegations of Paragraph 20.

21.    Alvogen, Inc.'s website states that Alvogen's companies include: Alvogen generic business, Almatica brand products, Almaject injectables and Norwich US-based manufacturing. https://www.alvogen.com/company (accessed Feb. 13, 2025).

**ANSWER**:  Alvogen admits that the website https://www.alvogen.com/company (accessed July 1, 2025) states that "Alvogen's companies include: Alvogen generic business, Almatica brand products, Almaject injectables, Norwich US-based manufacturing."  Alvogen lacks sufficient knowledge or information as to the remaining allegations of Paragraph 21, and, therefore, denies those.

22.    Upon information and belief, Alvogen, Inc. describes itself as "a major force in difficult-to-make generics in the US, including its injectables division Almaject." https://www.alvogen.com/company/meet-the-chairman (accessed Feb. 13, 2025).

**ANSWER**:  Alvogen admits that the website https://www.alvogen.com/meet-the-chairman (accessed July 1, 2025) states that "Alvogen continue [sic] as a major force in difficult-to-make generics in the US, including its injectables division Almaject and Almatica branded business."  Alvogen lacks sufficient knowledge or information as to the remaining allegations of Paragraph 22, and, therefore, denies those.

23.    Defendants' ANDA filing regarding the patents in suit relates to this litigation and is substantially connected with this judicial district because it reliably and non-speculatively predicts Defendants' intent to market and sell Defendants' generic products in this judicial district.

**ANSWER**:  Paragraph 23 contains conclusions of law to which no response is required.  To the extent Paragraph 23 relates only to Almaject, Inc.; Almaject, Inc. is not a proper party.  Alvogen otherwise denies the allegations of Paragraph 23.

24.    Defendants have taken the significant step of applying to the FDA for approval to engage in future activities—including the marketing of its generic drugs—which, upon information and belief, will be purposefully directed at the District of Delaware and elsewhere throughout the United States.  Upon information and belief, Defendants intend to direct sales of their generic drugs in this judicial district, among other places, once Defendants receive the requested FDA approval to market their generic products.  Upon information and belief, Defendants will engage in marketing of their proposed generic

products in Delaware upon approval of their ANDA.

**ANSWER**:  Paragraph 24 contains conclusions of law to which no response is required.  To the

extent Paragraph 24 relates only to Almaject, Inc.; Almaject, Inc. is not a proper party.  Alvogen

otherwise denies the allegations of Paragraph 24.

25.      Upon information and belief, Defendants have thus been, and continue to be, joint and
         prime actors in the drafting, submission, approval and maintenance of ANDA No.
         216913 and intend to benefit from the ANDA.

ANSWER:  Paragraph 25 contains conclusions of law to which no response is required.  To the

extent Paragraph 25 relates only to Almaject, Inc.; Almaject, Inc. is not a proper party.  Alvogen

otherwise denies the allegations of Paragraph 25.

26.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), because
         Alvogen, Inc. is incorporated in Delaware.

**ANSWER**:  The allegations in this Paragraph relate solely to issues of venue and jurisdiction.

Because Alvogen is not disputing venue and jurisdiction for purposes of this litigation only,

based at least on the unique facts and procedural posture present here, no response is required.

To the extent that a response is required, denied.

27.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), because
         Almaject, Inc. is incorporated in Delaware.

**ANSWER**:  The allegations in this Paragraph relate solely to issues of venue and jurisdiction.

Because Alvogen is not disputing venue and jurisdiction for purposes of this litigation only,

based at least on the unique facts and procedural posture present here, no response is required.

To the extent that a response is required, denied.

## **BACKGROUND**

28.      Otsuka is the holder of New Drug Application ("NDA") No. 202971 for ABILIFY
         MAINTENA® (aripiprazole for extended-release injectable suspension) in strengths of
         300 mg and 400 mg vials and pre-filled syringes.

**ANSWER**:  Alvogen admits that the FDA's website lists "Otsuka Pharmaceutical Co. Ltd." as

the applicant corresponding to NDA No. 202971 for "ABILIFY MAINTENA KIT

(ARIPIPRAZOLE)" for "FOR SUSPENSION, EXTENDED RELEASE; INTRAMUSCULAR"

at "300MG/VIAL," "400MG/VIAL," "300MG," and "400MG."  Alvogen lacks sufficient

knowledge or information as to any remaining allegations of Paragraph 28, and, therefore, denies

them.

29.    The FDA approved NDA No. 202971 on February 28, 2013.

**ANSWER**:  Alvogen admits that the FDA's website lists an approval date for NDA No. 202971

of February 28, 2013.  Alvogen lacks sufficient knowledge or information as to any remaining

allegations of Paragraph 29, and, therefore, denies them.

30.    ABILIFY MAINTENA® is a prescription drug approved for the treatment of
schizophrenia and maintenance monotherapy treatment of bipolar I disorder.
Aripiprazole is the active ingredient in ABILIFY MAINTENA®.

**ANSWER**:  Admitted.

## THE PATENTS-IN-SUIT

31.    The United States Patent and Trademark Office ("PTO") issued the '057 patent on
January 7, 2020, titled "Method of Providing Aripiprazole to Patients Having Impaired
CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '057 patent is
attached as Exhibit A.

**ANSWER**:  Alvogen admits that the '057 patent is titled "Methods of Providing Aripiprazole to

Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function" and lists on its face an

issuance date of January 7, 2020.  Alvogen also admits that Exhibit A purports to be a copy of

the '057 patent.  Alvogen lacks sufficient knowledge or information as to any remaining

allegations of Paragraph 31 and, therefore, denies them.

32.    Otsuka owns the '057 patent through assignment as recorded by the PTO at Reel 033071,
Frame 0910.

**ANSWER**:  Alvogen admits that the USPTO's website lists "Otsuka Pharmaceutical Co., Ltd."

as assignee of the '057 patent via Reel 033071, Frame 0910.  Alvogen lacks sufficient

knowledge or information as to any remaining allegations of Paragraph 32 and, therefore, denies

them.

33.     The '057 patent currently expires on March 8, 2034, by virtue of 165 days of patent term
        adjustment granted to the '057 patent under 35 U.S.C. § 154(b).  A true and correct copy
        of the patent term adjustment is attached as Exhibit B.

**ANSWER**:  Alvogen admits that the Orange Book lists an expiration date for the '057 patent of

March 8, 2034.  Alvogen also admits that Exhibit B purports to be a copy of a term adjustment

for the '057 patent.  Alvogen lacks sufficient knowledge or information as to any remaining

allegations of Paragraph 33 and, therefore, denies them.

34.     The '057 patent is listed in Approved Drug Products with Therapeutic Equivalence
        Evaluations ("the Orange Book") in connection with NDA No. 202971 for ABILIFY
        MAINTENA®.

**ANSWER**:  Alvogen admits that the Orange Book lists the '057 patent in connection with the

drug product for NDA No. 202971 for "ABILIFY MAINTENA KIT."  Alvogen lacks sufficient

knowledge or information as to any remaining allegations of Paragraph 34, and, therefore, denies

them.

35.     The PTO issued the '803 patent on April 20, 2021, titled "Methods of Providing
        Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function."  A
        true and correct copy of the '803 patent is attached as Exhibit C.

**ANSWER**:  Alvogen admits that the '803 patent is titled "Methods of Providing Aripiprazole to

Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function" and lists on its face an

issuance date of April 20, 2021.  Alvogen also admits that Exhibit C purports to be a copy of the

'803 patent.  Alvogen lacks sufficient knowledge or information as to any remaining allegations

of Paragraph 35 and, therefore, denies them.

36.     Otsuka owns the '803 patent through assignment as recorded by the PTO for the '057
        patent at Reel 033071, Frame 0910.

**ANSWER**:  Alvogen admits that the USPTO's website lists "Otsuka Pharmaceutical Co., Ltd."

as assignee of the '803 patent via Reel 033071, Frame 0910.  Alvogen lacks sufficient

knowledge or information as to any remaining allegations of Paragraph 36 and, therefore, denies them.

37.    The '803 patent expires on September 24, 2033.

**ANSWER**:  Alvogen admits that the Orange Book lists an expiration date for the '803 patent of September 24, 2033.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 37 and, therefore, denies them.

38.    The '803 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Alvogen admits that the Orange Book lists the '803 patent in connection with the drug product for NDA No. 202971 for "ABILIFY MAINTENA KIT."  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 38, and, therefore, denies them.

39.    The PTO issued the '553 patent on October 26, 2021, titled "Methods of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function."  A true and correct copy of the '553 patent is attached as Exhibit D.

**ANSWER**:  Alvogen admits that the '553 patent is titled "Methods of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function" and lists on its face an issuance date of October 26, 2021.  Alvogen also admits that Exhibit D purports to be a copy of the '553 patent.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 39 and, therefore, denies them.

40.    Otsuka owns the '553 patent through assignment as recorded by the PTO for the '057 patent at Reel 033071, Frame 0910.

**ANSWER**:  Alvogen admits that the USPTO's website lists "Otsuka Pharmaceutical Co., Ltd." as assignee of the '553 patent via Reel 033071, Frame 0910.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 40 and, therefore, denies them.

41.     The '553 patent expires on September 24, 2033.

**ANSWER**:  Alvogen admits that the Orange Book lists an expiration date for the '553 patent of September 24, 2033.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 41 and, therefore, denies them.

42.     The '553 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Alvogen admits that the Orange Book lists the '553 patent in connection with the drug product for NDA No. 202971 for "ABILIFY MAINTENA KIT."  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 42, and, therefore, denies them.

43.     The PTO issued the '547 patent on May 31, 2022, titled "Methods of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '547 patent is attached as Exhibit E.

**ANSWER**:  Alvogen admits that the '547 patent is titled "Methods of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function" and lists on its face an issuance date of May 31, 2022.  Alvogen also admits that Exhibit E purports to be a copy of the '547 patent.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 43 and, therefore, denies them.

44.     Otsuka owns the '547 patent through assignment as recorded by the PTO for the '057 patent at Reel 033071, Frame 0910.

**ANSWER**:  Alvogen admits that the USPTO's website lists "Otsuka Pharmaceutical Co., Ltd." as assignee of the '547 patent via Reel 033071, Frame 0910.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 44 and, therefore, denies them.

45.     The '547 patent expires on September 24, 2033.

**ANSWER**:  Alvogen admits that the Orange Book lists an expiration date for the '547 patent of

September 24, 2033.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 45 and, therefore, denies them.

46.    The '547 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Alvogen admits that the Orange Book lists the '547 patent in connection with the drug product for NDA No. 202971 for "ABILIFY MAINTENA KIT."  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 46, and, therefore, denies them.

47.    The PTO issued the '087 patent on August 2, 2022, titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function."  A true and correct copy of the '087 patent is attached as Exhibit F.

**ANSWER**:  Alvogen admits that the '087 patent is titled "Methods of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function" and lists on its face an issuance date of August 2, 2022.  Alvogen also admits that Exhibit F purports to be a copy of the '087 patent.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 47 and, therefore, denies them.

48.    Otsuka owns the '087 patent through assignment as recorded by the PTO for the '057 patent at Reel 033071, Frame 0910.

**ANSWER**:  Alvogen admits that the USPTO's website lists "Otsuka Pharmaceutical Co., Ltd." as assignee of the '087 patent via Reel 033071, Frame 0910.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 48 and, therefore, denies them.

49.    The '087 patent expires on September 24, 2033.

**ANSWER**:  Alvogen admits that the Orange Book lists an expiration date for the '087 patent of September 24, 2033.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 49 and, therefore, denies them.

50.    The '087 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Alvogen admits that the Orange Book lists the '087 patent in connection with the drug product for NDA No. 202971 for "ABILIFY MAINTENA KIT."  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 50, and, therefore, denies them.

51.    The PTO issued the '347 patent on May 16, 2023, titled "Medical Device Containing a Cake Composition Comprising Aripiprazole as an Active Ingredient, and a Cake Composition Comprising Aripiprazole as an Active Ingredient." A true and correct copy of the '547 patent is attached as Exhibit G.

**ANSWER**:  Alvogen admits that the '347 patent is titled "Medical Device Containing a Cake Composition Comprising Aripiprazole as an Active Ingredient, and a Cake Composition Comprising Aripiprazole as an Active Ingredient" and lists on its face an issuance date of May 16, 2023.  Alvogen also admits that Exhibit G purports to be a copy of the '347 patent.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 51 and, therefore, denies them.

52.    Otsuka owns the'347 patent through assignment as recorded by the PTO at Reel 030905, Frame 0822.

**ANSWER**:  Alvogen admits that the USPTO's website lists "Otsuka Pharmaceutical Co., Ltd." as assignee of the '347 patent via Reel 030905, Frame 0822.  Alvogen lacks sufficient knowledge or information as to any remaining allegations of Paragraph 52 and, therefore, denies them.

53.    The '347 patent expires on April 6, 2034, by virtue of 257 days of patent term adjustment granted to the '347 patent under 35 U.S.C. § 154(b). A true and correct copy of the patent term adjustment is attached as Exhibit H.

**ANSWER**:  Alvogen admits that the Orange Book lists an expiration date for the '347 patent of April 6, 2034.  Alvogen also admits that Exhibit H purports to be a copy of a term adjustment for the '347 patent.  Alvogen lacks sufficient knowledge or information as to any remaining

allegations of Paragraph 53 and, therefore, denies them.

54.    The '347 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Alvogen admits that the Orange Book lists the '347 patent in connection with the

drug product for NDA No. 202971 for "ABILIFY MAINTENA KIT."  Alvogen lacks sufficient

knowledge or information as to any remaining allegations of Paragraph 54, and, therefore, denies

them.

## The ANDA

55.    Upon information and belief, Defendants submitted ANDA No. 216913 with the FDA under 21 U.S.C. § 355(j) seeking FDA approval to engage in the manufacture, use, and/or sale in the United States of aripiprazole vials, 300 mg and 400 mg (defined above as "Defendants' generic products"), which is a generic version of Otsuka's ABILIFY MAINTENA® (aripiprazole), for the treatment of schizophrenia in adults, and maintenance monotherapy treatment of bipolar I disorder in adults.

**ANSWER:**  Alvogen admits that Alvogen submitted ANDA No. 216913 with the FDA seeking

FDA approval for a proposed product formulated as aripiprazole for extended-release injectable

suspension, 300 mg/vial and 400 mg/vial.  Alvogen denies the remaining allegations of

Paragraph 55.

56.    Upon information and belief, ANDA No. 216913 contains certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("paragraph IV certifications"), alleging that the claims of the patents in suit are invalid, unenforceable and/or would not be infringed by Defendants' generic products.

**ANSWER:**  Alvogen admits that ANDA No. 216913 contains Paragraph IV certifications that

the claims of the patents-in-suit are invalid, unenforceable, and/or would not be infringed by

Alvogen's proposed products.  Alvogen denies the remaining allegations of Paragraph 56.

57.    Otsuka received a letter sent by Defendants, dated January 3, 2025, purporting to be a "Notification Pursuant to Section 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act for ANDA No. 216913," ("Defendants' Notice Letter").  Defendants' Notice Letter identified Defendants' ANDA as "ANDA No. 216913."  Defendants' Notice Letter included an enclosure purporting to be a "Detailed Factual and Legal Bases for Alvogen's Certification That It Will Not Infringe Any Valid or Enforceable Claim of [the patents in suit]."

**ANSWER:**  Alvogen admits that Alvogen sent a Notice of Paragraph IV Certification for

Alvogen's ANDA No. 216913 on January 3, 2025 ("Alvogen's Notice Letter") to Plaintiffs.

Alvogen admits that Alvogen's Notice Letter included an enclosure containing "Detailed Factual

and Legal Bases for Alvogen's Certification That It Will Not Infringe Any Valid or Enforceable

Claim of [the patents-in-suit]."

58.    Defendants' Notice Letter states that Defendants had filed ANDA No. 216913 seeking
       "to obtain approval to engage in the commercial manufacture, use, or sale" of
       Defendants' generic products before the expiration of the patents in suit.

ANSWER:  Alvogen admits that in Alvogen's Notice Letter, Alvogen stated that "Alvogen, Inc.

('Alvogen') has submitted to the United States Food and Drug Administration ('FDA'), and

FDA has received, Abbreviated New Drug Application No. 216913 ('the Alvogen ANDA')

under 21 U.S.C. § 355(j), which contains the required bioavailability or bioequivalence data or

information to obtain approval to engage in the commercial manufacture, use, or sale of

aripiprazole vials, 300 mg and 400 mg for the treatment of schizophrenia in adults, and

maintenance monotherapy treatment of bipolar I disorder in adults ('the Alvogen proposed

ANDA products')" prior to expiration of the patents-in-suit.

59.    Plaintiffs commenced this action within 45 days of receiving Defendants' Notice Letter.

**ANSWER:**  Admitted that Plaintiffs commenced this action within 45 days of receiving

Alvogen's Notice Letter.  Alvogen denies the remaining allegations of Paragraph 59.

## COUNT I
### (Alleged Infringement of the '057 Patent)

60.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER:**  Alvogen reincorporates fully herein its answers to each preceding Paragraph.

61.    Upon information and belief, Defendants filed ANDA No. 216913 seeking approval to
       manufacture, use, import, offer to sell and/or sell Defendants' generic products in the
       United States before the expiration of the '057 patent.

**ANSWER:**  Alvogen admits that Alvogen filed ANDA No. 216913 with the FDA seeking

approval of Alvogen's proposed aripiprazole drug products before the expiration date listed in

the Orange Book for the '057 patent.  Alvogen denies the remaining allegations of Paragraph 61

62.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '057 patent are invalid, unenforceable and/or not infringed.

**ANSWER:**  Alvogen admits that Alvogen filed a Paragraph IV certification explaining that the

claims of the '057 patent are invalid, unenforceable, and/or not infringed.  Alvogen denies the

remaining allegations of Paragraph 62.

63.    Upon information and belief, in their ANDA No. 216913, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER:**  Alvogen admits that, as explained in Alvogen's Notice Letter, FDA's ANDA No.

216913 "contains the required bioavailability or bioequivalence data or information."  Alvogen

denies the remaining allegations of Paragraph 63.

64.    Defendants have actual knowledge of the '057 patent, as evidenced by Defendants' Notice Letter.

**ANSWER:**  Paragraph 64 states a legal conclusion to which no response is required.  To the

extent that a response is required, Alvogen admits that Alvogen sent Alvogen's Notice Letter.

Alvogen denies the remaining allegations of Paragraph 64.

65.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '057 patent by submitting, or causing to be submitted, to the FDA ANDA No. 216913, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '057 patent.

**ANSWER:**  Denied.

66.    Upon information and belief, if ANDA No. 216913 is approved, Defendants will infringe one or more claims of the '057 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 216913 shall be no earlier than the expiration of the '057 patent and any additional periods of exclusivity.

**ANSWER:** Denied.

67.    Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 216913, and therefore will infringe at least one claim of the '057 patent.

**ANSWER:** Denied.

68.    Upon information and belief, Defendants have knowledge of the '057 patent and, by their proposed package insert for Defendant's generic products, know or should know that it will induce direct infringement of at least one claim of the '057 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Denied.

69.    Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '057 patent.

**ANSWER:** Denied.

70.    Upon information and belief, if ANDA No. 216913 is approved, Defendants intend to and will manufacture, use, import, offer to sell, and/or sell Defendants' generic products in the United States.

**ANSWER:** Denied.

71.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 216913 complained of herein were done by and for the benefit of Defendants.

**ANSWER:** Denied.

72.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER:** Denied.

73.    Plaintiffs do not have an adequate remedy at law.

**ANSWER:** Denied.

## COUNT II
### (Alleged Infringement of the '803 Patent)

74.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER:** Alvogen reincorporates fully herein its answers to each preceding Paragraph.

75.    Upon information and belief, Defendants filed ANDA No. 216913 seeking approval to manufacture, use, import, offer to sell and/or sell Defendant's generic products in the United States before the expiration of the '803 patent.

**ANSWER:** Alvogen admits that Alvogen filed ANDA No. 216913 with the FDA seeking approval of Alvogen's proposed aripiprazole drug products before the expiration date listed in the Orange Book for the '803 patent. Alvogen denies the remaining allegations of Paragraph 75.

76.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '803 patent are invalid, unenforceable and/or not infringed.

**ANSWER:** Alvogen admits that Alvogen filed a Paragraph IV certification explaining that the claims of the '803 patent are invalid, unenforceable, and/or not infringed. Alvogen denies the remaining allegations of Paragraph 76.

77.    Upon information and belief, Defendants concede infringement of at least one claim of the '803 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement for multiple claims.

**ANSWER**: Paragraph 77 of the Complaint contains conclusions of law to which no response is required. To the extent a response is required, Alvogen admits that Alvogen's Notice Letter states that the claims of the '803 patent are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Alvogen's ANDA Products. Alvogen denies the remaining allegations of Paragraph 77.

78.    Upon information and belief, in their ANDA No. 216913, Defendants have represented to the FDA that Defendant's generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER:** Alvogen admits that, as explained in Alvogen's Notice Letter, FDA's ANDA No. 216913 "contains the required bioavailability or bioequivalence data or information." Alvogen denies the remaining allegations of Paragraph 78.

79.    Defendants have actual knowledge of the '803 patent, as evidenced by Defendants' Notice Letter.

**ANSWER:** Paragraph 79 states a legal conclusion to which no response is required. To the extent that a response is required, Alvogen admits that Alvogen sent Alvogen's Notice Letter. Alvogen denies the remaining allegations of Paragraph 79.

80.     Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '803 patent by submitting, or causing to be submitted, to the FDA ANDA No. 216913, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '803 patent.

**ANSWER:** Denied.

81.     Upon information and belief, if ANDA No. 216913 is approved, Defendants will infringe one or more claims of the '803 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 216913 shall be no earlier than the expiration of the '803 patent and any additional periods of exclusivity.

**ANSWER:** Denied.

82.     Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 216913, and therefore will infringe at least one claim of the '803 patent.

**ANSWER:** Denied.

83.     Upon information and belief, Defendants have knowledge of the '803 patent and, by their proposed package insert for Defendants' generic products, know or should know that it will induce direct infringement of at least one claim of the '803 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Denied.

84.     Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '803 patent.

**ANSWER:** Denied.

85.     Upon information and belief, if ANDA No. 216913 is approved, Defendants intend to and will manufacture, use, import, offer to sell, and/or sell Defendants' generic products in the United States.

**ANSWER:** Denied.

86.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 216913 complained of herein were done by and for the benefit of Defendants.

**ANSWER:** Denied.

87.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER:** Denied.

88.    Plaintiffs do not have an adequate remedy at law.

**ANSWER:** Denied.

<u>**COUNT III**</u>
**(Alleged Infringement of the '553 Patent)**

89.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER:** Alvogen reincorporates fully herein its answers to each preceding Paragraph.

90.    Upon information and belief, Defendants filed ANDA No. 216913 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '553 patent.

**ANSWER:** Alvogen admits that Alvogen filed ANDA No. 216913 with the FDA seeking approval of Alvogen's proposed aripiprazole drug products before the expiration date listed in the Orange Book for the '553 patent.  Alvogen denies the remaining allegations of Paragraph 90.

91.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '553 patent are invalid, unenforceable and/or not infringed.

**ANSWER:** Alvogen admits that Alvogen filed a Paragraph IV certification explaining that the claims of the '553 patent are invalid, unenforceable, and/or not infringed.  Alvogen denies the remaining allegations of Paragraph 91.

92.    Upon information and belief, in their ANDA No. 216913, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER:** Alvogen admits that, as explained in Alvogen's Notice Letter, FDA's ANDA No.

216913 "contains the required bioavailability or bioequivalence data or information."  Alvogen

denies the remaining allegations of Paragraph 92.

93.    Defendants have actual knowledge of the '553 patent, as evidenced by Defendants'
       Notice Letter.

**ANSWER:**  Paragraph 93 states a legal conclusion to which no response is required.  To the

extent that a response is required, Alvogen admits that Alvogen sent Alvogen's Notice Letter.

Alvogen denies the remaining allegations of Paragraph 93.

94.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed
       one or more claims of the '553 patent by submitting, or causing to be submitted, to the
       FDA ANDA No. 216913, seeking approval to manufacture, use, import, offer to sell or
       sell Defendants' generic products before the expiration date of the '553 patent.

**ANSWER:**  Denied.

95.    Upon information and belief, if ANDA No. 216913 is approved, Defendants will infringe
       one or more claims of the '553 patent under § 271(a), either literally or under the doctrine
       of equivalents, by making, using, offering to sell, selling and/or importing Defendants'
       generic products, and/or by actively inducing infringement by others under § 271(b)
       and/or contributing to infringement under § 271(c), unless this Court orders that the
       effective date of any FDA approval of ANDA No. 216913 shall be no earlier than the
       expiration of the '553 patent and any additional periods of exclusivity.

**ANSWER:**  Denied.

96.    Upon information and belief, Defendants know, should know and intend that physicians
       will prescribe and patients will take Defendants' generic products for which approval is
       sought in ANDA No. 216913, and therefore will infringe at least one claim of the '553
       patent.

**ANSWER:**  Denied.

97.    Upon information and belief, Defendants have knowledge of the '553 patent and, by their
       proposed package insert for Defendants' generic products, know or should know that it
       will induce direct infringement of at least one claim of the '553 patent, either literally or
       under the doctrine of equivalents.

**ANSWER:**  Denied.

98.    Upon information and belief, Defendants are aware and/or have knowledge that their
       proposed package insert will recommend, suggest, encourage and/or instruct others how
       to engage in an infringing use because healthcare professionals and/or patients will use
       Defendants' generic products according to the instructions in the proposed package insert

in a way that directly infringes at least one claim of the '553 patent.

**ANSWER:** Denied.

99.     Upon information and belief, if ANDA No. 216913 is approved, Defendants intend to and will manufacture, use, import, offer to sell, and/or sell Defendants' generic products in the United States.

**ANSWER:** Denied.

100.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 216913 complained of herein were done by and for the benefit of Defendants.

**ANSWER:** Denied.

101.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER:** Denied.

102.    Plaintiffs do not have an adequate remedy at law.

**ANSWER:** Denied.

## <u>COUNT IV</u>
### (Alleged Infringement of the '547 Patent)

103.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER:** Alvogen reincorporates fully herein its answers to each preceding Paragraph.

104.    Upon information and belief, Defendants filed ANDA No. 216913 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '547 patent.

**ANSWER:** Alvogen admits that Alvogen filed ANDA No. 216913 with the FDA seeking

approval of Alvogen's proposed aripiprazole drug products before the expiration date listed in

the Orange Book for the '547 patent.  Alvogen denies the remaining allegations of Paragraph

104.

105.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '547 patent are invalid, unenforceable and/or not infringed.

**ANSWER:** Alvogen admits that Alvogen filed a Paragraph IV certification explaining that the

claims of the '547 patent are invalid, unenforceable, and/or not infringed.  Alvogen denies the

remaining allegations of Paragraph 105.

106.    Upon information and belief, in their ANDA No. 216913, Defendants have represented to
        the FDA that Defendants' generic products are pharmaceutically and therapeutically
        equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER:**  Alvogen admits that, as explained in Alvogen's Notice Letter, FDA's ANDA No.

216913 "contains the required bioavailability or bioequivalence data or information."  Alvogen

denies the remaining allegations of Paragraph 106.

107.    Defendants have actual knowledge of the '547 patent, as evidenced by Defendants'
        Notice Letter.

**ANSWER:**  Paragraph 107 states a legal conclusion to which no response is required.  To the

extent that a response is required, Alvogen admits that Alvogen sent Alvogen's Notice Letter.

Alvogen denies the remaining allegations of Paragraph 107.

108.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed
        one or more claims of the '547 patent by submitting, or causing to be submitted, to the
        FDA ANDA No. 216913, seeking approval to manufacture, use, import, offer to sell or
        sell Defendants' generic products before the expiration date of the '547 patent.

**ANSWER:**  Denied.

109.    Upon information and belief, if ANDA No. 216913 is approved, Defendants will infringe
        one or more claims of the '547 patent under § 271(a), either literally or under the doctrine
        of equivalents, by making, using, offering to sell, selling and/or importing Defendants'
        generic products, and/or by actively inducing infringement by others under § 271(b)
        and/or contributing to infringement under § 271(c), unless this Court orders that the
        effective date of any FDA approval of ANDA No. 216913 shall be no earlier than the
        expiration of the '547 patent and any additional periods of exclusivity.

**ANSWER:**  Denied.

110.    Upon information and belief, Defendants know, should know and intend that physicians
        will prescribe and patients will take Defendants' generic products for which approval is
        sought in ANDA No. 216913, and therefore will infringe at least one claim of the '547
        patent.

**ANSWER:**  Denied.

111.    Upon information and belief, Defendants have knowledge of the '547 patent and, by their

proposed package insert for Defendants' generic products, know or should know that it will induce direct infringement of at least one claim of the '547 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Denied.

112.    Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '547 patent.

**ANSWER:** Denied.

113.    Upon information and belief, if ANDA No. 216913 is approved, Defendants intend to and will manufacture, use, import, offer to sell, and/or sell Defendants' generic products in the United States.

**ANSWER:** Denied.

114.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 216913 complained of herein were done by and for the benefit of Defendants.

**ANSWER:** Denied.

115.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER:** Denied.

116.    Plaintiffs do not have an adequate remedy at law.

**ANSWER:** Denied.

## COUNT V
### (Alleged Infringement of the '087 Patent)

117.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER:** Alvogen reincorporates fully herein its answers to each preceding Paragraph.

118.    Upon information and belief, Defendants filed ANDA No. 216913 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '087 patent.

**ANSWER:** Alvogen admits that Alvogen filed ANDA No. 216913 with the FDA seeking

approval of Alvogen's proposed aripiprazole drug products before the expiration date listed in

the Orange Book for the '087 patent.  Alvogen denies the remaining allegations of Paragraph

118.

119.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '087 patent are invalid, unenforceable and/or not infringed.

**ANSWER:**  Alvogen admits that Alvogen filed a Paragraph IV certification explaining that the

claims of the '087 patent are invalid, unenforceable, and/or not infringed.  Alvogen denies the

remaining allegations of Paragraph 119.

120.    Upon information and belief, Defendants concede infringement of at least one claim of the '087 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement for multiple claims.

ANSWER:  Paragraph 120 contains conclusions of law to which no response is required.  To the

extent a response is required, Alvogen admits that Alvogen's Notice Letter states that the claims

of the '087 patent are invalid, unenforceable, and/or will not be infringed by the commercial

manufacture, use, or sale of Alvogen's ANDA Products.  Alvogen denies the remaining

allegations of Paragraph 120.

121.    Upon information and belief, in their ANDA No. 216913, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER:**  Alvogen admits that, as explained in Alvogen's Notice Letter, FDA's ANDA No.

216913 "contains the required bioavailability or bioequivalence data or information."  Alvogen

denies the remaining allegations of Paragraph 121.

122.    Defendants have actual knowledge of the '087 patent, as evidenced by Defendants' Notice Letter.

**ANSWER:**  Paragraph 122 states a legal conclusion to which no response is required.  To the

extent that a response is required, Alvogen admits that Alvogen sent Alvogen's Notice Letter.

Alvogen denies the remaining allegations of Paragraph 122.

123.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed

one or more claims of the '087 patent by submitting, or causing to be submitted, to the FDA ANDA No. 216913, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '087 patent.

**ANSWER:** Denied.

124.    Upon information and belief, if ANDA No. 216913 is approved, Defendants will infringe one or more claims of the '087 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 216913 shall be no earlier than the expiration of the '087 patent and any additional periods of exclusivity.

**ANSWER:** Denied.

125.    Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 216913, and therefore will infringe at least one claim of the '087 patent.

**ANSWER:** Denied.

126.    Upon information and belief, Defendants have knowledge of the '087 patent and, by their proposed package insert for Defendants' generic products, knows or should know that it will induce direct infringement of at least one claim of the '087 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Denied.

127.    Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '087 patent.

**ANSWER:** Denied.

128.    Upon information and belief, if ANDA No. 216913 is approved, Defendants intend to and will manufacture, use, import, offer to sell, and/or sell Defendants' generic products in the United States.

**ANSWER:** Denied.

129.    Upon information and belief, Defendants' actions relating to Defendant's ANDA No. 216913 complained of herein were done by and for the benefit of Defendants.

**ANSWER:** Denied.

130.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER:**  Denied.

131.    Plaintiffs do not have an adequate remedy at law.

**ANSWER:**  Denied.

<u>**COUNT VI**</u>
**(Alleged Infringement of the '347 Patent)**

132.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER:**  Alvogen reincorporates fully herein its answers to each preceding Paragraph.

133.    Upon information and belief, Defendants filed ANDA No. 216913 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '347 patent.

**ANSWER:**  Alvogen admits that Alvogen filed ANDA No. 216913 with the FDA seeking approval of Alvogen's proposed aripiprazole drug products before the expiration date listed in the Orange Book for the '347 patent.  Alvogen denies the remaining allegations of Paragraph 133.

134.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '347 patent are invalid, unenforceable and/or not infringed.

**ANSWER:**  Alvogen admits that Alvogen filed a Paragraph IV certification explaining that the claims of the '347 patent are invalid, unenforceable, and/or not infringed.  Alvogen denies the remaining allegations of Paragraph 134.

135.    Upon information and belief, in their ANDA No. 216913, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER:**  Alvogen admits that, as explained in Alvogen's Notice Letter, FDA's ANDA No. 216913 "contains the required bioavailability or bioequivalence data or information."  Alvogen denies the remaining allegations of Paragraph 135.

136.    Defendants have actual knowledge of the '347 patent, as evidenced by Defendants'

Notice Letter.

**ANSWER:** Paragraph 136 states a legal conclusion to which no response is required.  To the

extent that a response is required, Alvogen admits that Alvogen sent Alvogen's Notice Letter.

Alvogen denies the remaining allegations of Paragraph 136.

137.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '347 patent by submitting, or causing to be submitted, to the FDA ANDA No. 216913, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '347 patent.

**ANSWER:**  Denied.

138.    Upon information and belief, if ANDA No. 216913 is approved, Defendants will infringe one or more claims of the '347 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 216913 shall be no earlier than the expiration of the '347 patent and any additional periods of exclusivity.

**ANSWER:**  Denied.

139.    Upon information and belief, if ANDA No. 216913 is approved, Defendants intend to and will manufacture, use, import, offer to sell, and/or sell Defendants' generic products in the United States.

**ANSWER:**  Denied.

140.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 216913 complained of herein were done by and for the benefit of Defendants.

**ANSWER:**  Denied.

141.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER:**  Denied.

142.    Plaintiffs do not have an adequate remedy at law.

**ANSWER:**  Denied.

## <u>RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF</u>

Alvogen denies that Plaintiffs are entitled to the relief requested in the Complaint or to

any relief whatsoever. Any allegation in Plaintiffs' Complaint not expressly admitted is hereby denied.

## SEPARATE DEFENSES TO PLAINTIFFS' COMPLAINT

Without prejudice to the denials set forth in its Answer and without admitting any allegations of the Complaint not expressly admitted, Alvogen states the following separate defenses to the Complaint without assuming the burden of proof on any such defense that would otherwise rest with Plaintiffs.

### FIRST DEFENSE

Plaintiffs fail to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs fail to state a claim against any Defendant.

### THIRD DEFENSE

Almaject is not a proper party to this action.

### FOURTH DEFENSE

The claims of the '057, '803, '553, '547, '087, and/or '347 patents are invalid and/or unenforceable for failure to satisfy the requirements of Title 35 of the United States code, including, without limitation, one or more of 35 U.S.C. §§ 101, 102, 103, 112, double patenting, or other judicially created doctrines.

### FIFTH DEFENSE

Alvogen has not infringed, is not infringing, and will not infringe, directly or indirectly, any valid or enforceable claims of the '057, '803, '553, '547, '087, and/or '347 patents, either literally or under the doctrine of equivalents.

### SIXTH DEFENSE

Even if Alvogen were to infringe claims of the '057, '803, '553, '547, '087, and/or '347 patents, Plaintiffs would not be entitled to injunctive relief, at least because Plaintiffs cannot

show irreparable harm.

## SEVENTH DEFENSE

Alvogen's activities in relation to its proposed aripiprazole drug product have solely been for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs. *See* 35 U.S.C. § 271(e)(1).

## EIGHTH DEFENSE

Plaintiffs fail to state a claim for an exceptional case.

## NINTH DEFENSE

The claims of the '057, '803, '553, '547, and '087 patents are unenforceable as a result of inequitable conduct during prosecution before the U.S. Patent & Trademark Office ("Patent Office"), as particularly explained and alleged in the Thirteenth Counterclaim.

## TENTH DEFENSE

The claims of the '057, '803, '553, '547, and '087 patents are unenforceable for incorrect inventorship under at least 35 U.S.C. §§ 101 and 115, as particularly explained and alleged in the Twentieth Counterclaim.

## ELEVENTH DEFENSE

The claims of the '057, '803, '553, '547, and '087 patents are invalid for incorrect inventorship under at least 35 U.S.C. §§ 101 and 115, as particularly explained and alleged in the Twenty-First Counterclaim.

## TWELFTH DEFENSE

Any additional defenses that discovery may reveal.

## RESERVATION OF RIGHTS

Alvogen reserves all defenses, at law or equity, that may now exist or in the future be available on discovery and further factual investigation in this case, including, without limitation, all defenses governed by Rules 8, 9, and 12 of the Federal Rules of Civil Procedure. Alvogen

further reserves the right to supplement and/or amend these defenses.

## ALVOGEN'S COUNTERCLAIMS

Alvogen asserts the following counterclaims against Counterclaim Defendants Otsuka Pharmaceutical Co., Ltd. ("Otsuka") and H. Lundbeck A/S ("Lundbeck") (collectively, "Plaintiffs"):

## THE PARTIES

1.     Alvogen is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 44 Whippany Road, Suite 300, Morristown, New Jersey 07960.

2.     On information and belief and according to Plaintiffs' allegations in the Complaint, Otsuka is a corporation organized and existing under the laws of Japan with its corporate headquarters at 2-9 Kanda-Tsukasamachi, Chiyoda-ku, Tokyo, 101-8535, Japan.

3.     On information and belief and according to Plaintiffs' allegations in the Complaint, Lundbeck is a corporation organized and existing under the laws of Denmark, with a place of business at Ottiliavej 9, DK-2500 Valby, Denmark.

4.     On information and belief and according to Plaintiffs' allegations in the Complaint, Otsuka has granted Lundbeck an exclusive license to U.S. Patent Nos. 10,525,057 ("the '057 patent"), 10,980,803 ("the '803 patent"), 11,154,553 ("the '553 patent"), 11,344,547 ("the '547 patent"), 11,400,087 ("the '087 patent"), and 11,648,347 ("the '347 patent") (collectively, "the Asserted Patents").

## NATURE OF THE ACTION

5.     Alvogen seeks declaratory judgment that (a) the Asserted Patents are invalid and/or unenforceable, (b) the Asserted Patents are not infringed by Alvogen's submission of Abbreviated New Drug Application ("ANDA") No. 216913 to the United States Food & Drug Administration ("FDA") seeking approval for its extended-release injectable aripiprazole

suspension, 300 mg/vial and 400 mg/vial ("Alvogen's Proposed Products") and will not be infringed by the making, use, sale, offer for sale, or importation into the United States of Alvogen's Proposed Products, and (c) Plaintiffs are not entitled to injunctive relief even if the Asserted Patents were infringed.

## JURISDICTION AND VENUE

6.      This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 101 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

7.      The Court has jurisdiction over the subject matter of this counterclaim under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 because Plaintiffs continue to maintain this action in this judicial district.

8.      Further, the Court has jurisdiction over the subject matter of this counterclaim under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 because there is an immediate and real controversy regarding the validity of the Asserted Patents.

9.      The Court has personal jurisdiction over Plaintiffs for purposes of these counterclaims at least because Plaintiffs maintain this action in this judicial district.

10.     Venue is proper in this judicial district for purposes of these counterclaims under 28 U.S.C. §§ 1391 and 1400(b) at least because Plaintiffs continue to maintain this action in this judicial district.

## BACKGROUND

11.     Plaintiffs have alleged in this action that they hold all substantial rights in the Asserted Patents.

12.     On information and belief, and according to Plaintiffs' allegations in the Complaint, Otsuka holds New Drug Application ("NDA") No. 202971 for aripiprazole for

extended-release injectable suspension, 300 mg/vial and 400 mg/vial, referred to as ABILIFY

MAINTENA KIT.

13.     On information and belief, and according to Plaintiffs' allegations in the

Complaint, the Asserted Patents are listed in the Orange Book in association with ABILIFY

MAINTENA KIT.

14.     Alvogen submitted Abbreviated New Drug Application ("ANDA") No. 216913 to

the United States Food & Drug Administration ("FDA") seeking approval for its extended-

release injectable aripiprazole suspension, 300 mg/vial and 400 mg/vial ("Alvogen's Proposed

Products").

15.     In accordance with 21 U.S.C. § 355(j)(2)(B), Alvogen timely notified Plaintiffs in

writing ("Alvogen's Notice Letter") that Alvogen had filed ANDA No. 216913 with the FDA

including certifications provided for in 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV

Certifications") regarding the Asserted Patents.

16.     In accordance with 21 U.S.C. § 355(2)(B), Alvogen's Notice Letter included a

detailed statement of the factual and legal basis for the certification regarding the Asserted

Patents in connection with ANDA No. 216913.

17.     Plaintiffs filed the present action against Alvogen for infringement of the Asserted

Patents.

## COUNT I:
## (Declaratory Judgment of Non-Infringement of the '057 Patent)

18.     Alvogen incorporates by reference the allegations in the previous paragraphs of

its counterclaims.

19.     On information and belief, Plaintiffs are the owners of all legal rights, title, and

interests in the '057 patent, including the right to enforce the '057 patent.  Plaintiffs have

asserted their alleged rights against Alvogen by filing an infringement action.

20.     Alvogen's Proposed Products have not infringed, will not infringe, and are not infringing, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '057 patent.

21.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '057 patent have not been, are not, and will not be infringed by Alvogen's Proposed Products.

22.     Unless Plaintiffs are enjoined, Alvogen believes that Plaintiffs will continue to assert that Alvogen's Proposed Products are infringing the claims of the '057 patent and will continue to interfere with Alvogen's business with respect to Alvogen's Proposed Products.

23.     Alvogen will be irreparably harmed if Plaintiffs are not enjoined from continuing to assert the '057 patent and from interfering with Alvogen's business.

24.     A definite and concrete, real and substantial, justiciable controversy exists between Alvogen and Plaintiffs concerning Alvogen's noninfringement of the '057 patent, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

25.     Alvogen is entitled to a declaratory judgment that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '057 patent.

### COUNT II:
### (Declaratory Judgment of Invalidity of the '057 Patent

26.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

27.     There is an actual, substantial, continuing, and justiciable controversy between Plaintiffs and Alvogen regarding whether the claims of the '057 patent are invalid.

28.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '057 patent are invalid, including at

least because they are anticipated or obvious over the Abilify Maintena Label in view of one or more of Remenar, Park, Hendset, Abilify 2012 Label, Kostanski, Abilify Maintena Review, and/or the knowledge of a POSA.

29.     Alvogen is entitled to a declaration that claims of the '057 patent are invalid under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

**COUNT III:**
**(Declaratory Judgment of Non-Infringement of the '803 Patent)**

30.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

31.     On information and belief, Plaintiffs are the owners of all legal rights, title, and interests in the '803 patent, including the right to enforce the '803 patent.  Plaintiffs have asserted their alleged rights against Alvogen by filing an infringement action.

32.     Alvogen's Proposed Products have not infringed, will not infringe, and are not infringing, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '803 patent.

33.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '803 patent have not been, are not, and will not be infringed by Alvogen's Proposed Products.

34.     Unless Plaintiffs are enjoined, Alvogen believes that Plaintiffs will continue to assert that Alvogen's Proposed Products are infringing the claims of the '803 patent and will continue to interfere with Alvogen's business with respect to Alvogen's Proposed Products.

35.     Alvogen will be irreparably harmed if Plaintiffs are not enjoined from continuing to assert the '803 patent and from interfering with Alvogen's business.

36.     A definite and concrete, real and substantial, justiciable controversy exists between Alvogen and Plaintiffs concerning Alvogen's noninfringement of the '803 patent, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

37.     Alvogen is entitled to a declaratory judgment that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '803 patent.

## COUNT IV:
### (Declaratory Judgment of Invalidity of the '803 Patent

38.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

39.     There is an actual, substantial, continuing, and justiciable controversy between Plaintiffs and Alvogen regarding whether the claims of the '803 patent are invalid.

40.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '803 patent are invalid, including at least because they are anticipated by the Abilify Maintena Label or obvious over the Abilify Maintena Label in view of one or more of Gray, Remenar, Park, Hendset, Abilify 2012 Label, Kostanski, Abilify Maintena Review, and/or the knowledge of a POSA .

41.     Alvogen is entitled to a declaration that claims of the '803 patent are invalid under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

## COUNT V:
### (Declaratory Judgment of Non-Infringement of the '553 Patent)

42.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

43.     On information and belief, Plaintiffs are the owners of all legal rights, title, and interests in the '553 patent, including the right to enforce the '553 patent.  Plaintiffs have asserted their alleged rights against Alvogen by filing an infringement action.

44.     Alvogen's Proposed Products have not infringed, will not infringe, and are not infringing, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '553 patent.

45.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '553 patent have not been, are not, and will not be infringed by Alvogen's Proposed Products.

46.     Unless Plaintiffs are enjoined, Alvogen believes that Plaintiffs will continue to assert that Alvogen's Proposed Products are infringing the claims of the '553 patent and will continue to interfere with Alvogen's business with respect to Alvogen's Proposed Products.

47.     Alvogen will be irreparably harmed if Plaintiffs are not enjoined from continuing to assert the '553 patent and from interfering with Alvogen's business.

48.     A definite and concrete, real and substantial, justiciable controversy exists between Alvogen and Plaintiffs concerning Alvogen's noninfringement of the '553 patent, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

49.     Alvogen is entitled to a declaratory judgment that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '553 patent.

## COUNT VI:
### (Declaratory Judgment of Invalidity of the '553 Patent

50.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

51.    There is an actual, substantial, continuing, and justiciable controversy between Plaintiffs and Alvogen regarding whether the claims of the '553 patent are invalid.

52.    Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '553 patent are invalid, including at least because they are anticipated by the Abilify Maintena Label or obvious over the Abilify Maintena Label in view of Kostanski.

53.    Alvogen is entitled to a declaration that claims of the '553 patent are invalid under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

## COUNT VII:
### (Declaratory Judgment of Non-Infringement of the '547 Patent)

54.    Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

55.    On information and belief, Plaintiffs are the owners of all legal rights, title, and interests in the '547 patent, including the right to enforce the '547 patent.  Plaintiffs have asserted their alleged rights against Alvogen by filing an infringement action.

56.    Alvogen's Proposed Products have not infringed, will not infringe, and are not infringing, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '547 patent.

57.    Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '547 patent have not been, are not, and will not be infringed by Alvogen's Proposed Products.

58.    Unless Plaintiffs are enjoined, Alvogen believes that Plaintiffs will continue to assert that Alvogen's Proposed Products are infringing the claims of the '547 patent and will continue to interfere with Alvogen's business with respect to Alvogen's Proposed Products.

59.     Alvogen will be irreparably harmed if Plaintiffs are not enjoined from continuing to assert the '547 patent and from interfering with Alvogen's business.

60.     A definite and concrete, real and substantial, justiciable controversy exists between Alvogen and Plaintiffs concerning Alvogen's noninfringement of the '547 patent, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

61.     Alvogen is entitled to a declaratory judgment that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '547 patent.

## COUNT VIII:
### (Declaratory Judgment of Invalidity of the '547 Patent

62.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

63.     There is an actual, substantial, continuing, and justiciable controversy between Plaintiffs and Alvogen regarding whether the claims of the '547 patent are invalid.

64.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '547 patent are invalid, including at least because they are anticipated by the Abilify Maintena Label or obvious over the Abilify Maintena Label in view of Kostanski.

65.     Alvogen is entitled to a declaration that claims of the '547 patent are invalid under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

## COUNT IX:
### (Declaratory Judgment of Non-Infringement of the '087 Patent)

66.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

67.     On information and belief, Plaintiffs are the owners of all legal rights, title, and interests in the '087 patent, including the right to enforce the '087 patent.  Plaintiffs have asserted their alleged rights against Alvogen by filing an infringement action.

68.     Alvogen's Proposed Products have not infringed, will not infringe, and are not infringing, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '087 patent.

69.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '087 patent have not been, are not, and will not be infringed by Alvogen's Proposed Products.

70.     Unless Plaintiffs are enjoined, Alvogen believes that Plaintiffs will continue to assert that Alvogen's Proposed Products are infringing the claims of the '087 patent and will continue to interfere with Alvogen's business with respect to Alvogen's Proposed Products.

71.     Alvogen will be irreparably harmed if Plaintiffs are not enjoined from continuing to assert the '087 patent and from interfering with Alvogen's business.

72.     A definite and concrete, real and substantial, justiciable controversy exists between Alvogen and Plaintiffs concerning Alvogen's noninfringement of the '087 patent, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

73.     Alvogen is entitled to a declaratory judgment that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '087 patent.

## COUNT X:
## (Declaratory Judgment of Invalidity of the '087 Patent

74.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

75.    There is an actual, substantial, continuing, and justiciable controversy between Plaintiffs and Alvogen regarding whether the claims of the '087 patent are invalid.

76.    Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '087 patent are invalid, including at least because they are anticipated by the Abilify Maintena Label or obvious over the Abilify Maintena Label in view of Kostanski.

77.    Alvogen is entitled to a declaration that claims of the '087 patent are invalid under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

## COUNT XI:
## (Declaratory Judgment of Non-Infringement of the '347 Patent)

78.    Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

79.    On information and belief, Plaintiffs are the owners of all legal rights, title, and interests in the '347 patent, including the right to enforce the '347 patent.  Plaintiffs have asserted their alleged rights against Alvogen by filing an infringement action.

80.    Alvogen's Proposed Products have not infringed, will not infringe, and are not infringing, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the '347 patent.

81.    Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '347 patent have not been, are not, and will not be infringed by Alvogen's Proposed Products.

82.    Unless Plaintiffs are enjoined, Alvogen believes that Plaintiffs will continue to assert that Alvogen's Proposed Products are infringing the claims of the '347 patent and will continue to interfere with Alvogen's business with respect to Alvogen's Proposed Products.

83.     Alvogen will be irreparably harmed if Plaintiffs are not enjoined from continuing to assert the '347 patent and from interfering with Alvogen's business.

84.     A definite and concrete, real and substantial, justiciable controversy exists between Alvogen and Plaintiffs concerning Alvogen's noninfringement of the '347 patent, which is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

85.     Alvogen is entitled to a declaratory judgment that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '347 patent.

## COUNT XII:
### (Declaratory Judgment of Invalidity of the '347 Patent)

86.     Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

87.     There is an actual, substantial, continuing, and justiciable controversy between Plaintiffs and Alvogen regarding whether the claims of the '347 patent are invalid.

88.     Alvogen incorporates by reference Alvogen's Notice Letter, which contains exemplary and nonlimiting explanations that claims of the '347 patent are invalid.

89.     Alvogen is entitled to a declaration that claims of the '347 patent are invalid under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

## COUNT XIII:
### (Declaratory Judgment of Unenforceability of the '057 Patent, the '803 Patent, the '553 Patent, the '547 Patent, and the '087 Patent Due to Inequitable Conduct)

I.     **INTRODUCTION**

90.     An applicant has a duty of candor and good faith to the Patent Office that prohibits applicants from making a misrepresentation of material fact, failing to disclose

information that is material to an application, or willfully misrepresenting information to the Patent Office.

91.     U.S. Patent Nos. 10,525,057 (the "'057 patent"), 10,980,803 (the "'803 patent"), 11,154,553 (the "'553 patent"), 11,344,547 (the "'547 patent"), and 11,400,087 (the "'087 patent") (collectively, the "CYP Patents") concern aripiprazole dose adjustments depending on patients' CYP2D6 or CYP3A4 enzyme function and if these patients are on CYP2D6 and/or CYP3A4 inhibitors or inducers.

92.     In or around June 2012, during their review of Otsuka's proposed labeling for its NDA 202971 seeking approval of Abilify Maintena, FDA's Office of Clinical Pharmacology ("OCP") Review team noted various deficiencies.  Specifically, Otsuka had not accounted for certain dose adjustments for CYP2D6 poor metabolizers and for patients receiving CYP2D6 and/or CYP3A4 inhibitors.  FDA also noted that Otsuka had not considered any dosage adjustments for patients on CYP3A4 inducers.  FDA further and repeatedly noted that Otsuka had failed to even collect data regarding some of these patient populations.   To fill these gaps in Otsuka's work, FDA itself added specific CYP dose adjustments to the Abilify Maintena labeling.

93.     Nine months later, Otsuka received FDA approval of its Abilify Maintena NDA, with its labeling containing the exact dosage adjustments and administration instructions that FDA had added.  Seven months after that, and fifteen months after FDA's OCP Review team made their labeling changes, Otsuka submitted applications for patents that would cover its Abilify Maintena drug.  The dosage adjustments and administration instructions conceived by FDA's OCP Review team were incorporated, unchanged, into the claims of U.S. Application No. 14/034,727 (the "'727 application"), just as they had been incorporated, unchanged, into the Abilify Maintena Label.

94.     Otsuka was successful, ultimately obtaining the five CYP patents asserted against Alvogen in this action, which concern long-acting aripiprazole and many of the same dosage adjustments and administration instructions from FDA regarding when a patient is a CYP2D6 poor metabolizer, on a CYP2D6 and/or CYP3A4 inhibitor or stopping administration of aripiprazole (or of the CYP3A4 inducer itself) when a patient is also on a CYP3A4 inducer.

95.     But Otsuka did not have a clean path to issuance of these patents.  Immediately during prosecution of this first patent, the first USPTO Examiner rejected all claims as anticipated and obvious over various prior art, including the Abilify Maintena drug product label itself.

96.     Rather than acknowledging that Otsuka had waited too long to obtain their patents in light of the prior art or attempting to develop more narrow claims, Dr. Arash Raoufinia (Director of Clinical Pharmacology, Global Clinical Development at Otsuka Pharmaceutical Development & Commercialization, Inc.), on behalf of his employer Otsuka, engaged in a campaign of deceit, hiding key information to convince the Examiners that the material prior art could not be properly considered prior art under the statutory safe harbor because the information purportedly originated with Dr. Raoufinia, the person named as the inventor on each of the patent applications.  In fact, many of the key CYP dosing limitations originated with FDA's employees and not with Dr. Raoufinia.

97.     The Examiners relied on Dr. Raoufinia's sworn statements that every CYP dosing limitation originated with him, and were never informed that many in fact originated with FDA's employees.

98.     Had the Examiners known that several of the CYP dosing limitations originated with FDA personnel rather than with Dr. Raoufinia, the Examiners would have understood that

Dr. Raoufinia's sworn statements were false, and maintained that all five patents were anticipated and/or obvious over material prior art.

99.     The single most reasonable inference able to be drawn from the evidence collected to date is that Dr. Raoufinia made a deliberate decision to withhold the proper inventorship and misrepresent the scope of inventorship to defeat various material invalidity arguments.  These deliberate decisions were so material that, had the truth had been provided to the USPTO, none of the five patents would have issued.

## II.    **ABILIFY MAINTENA**

### A.    **Submissions to FDA**

100.    On September 26, 2011, Otsuka filed NDA 202971 to FDA, seeking approval of Abilify Maintena.  (Ex. 1 (Abilify Maintena Approval Letter) at 1.)

101.    Otsuka filed various amendments between October 2011 and February 2013 as part of its submission.  (Ex. 1 (Abilify Maintena Approval Letter) at 1; (Ex. 2 (Other Action Letters, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/202971Orig1s000OtherActionLtrs.pdf) at 1.)

102.    On February 28, 2013, FDA approved Abilify Maintena.  (Ex. 1 (Abilify Maintena Approval Letter).)

### B.    **FDA's Clinical Review**

103.    Approximately six weeks after FDA approved Abilify Maintena, on April 11, 2013, FDA placed the "Drug Approval Package" detailing the process for FDA's approval of Abilify Maintena online:

https://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/202971s000TOC.cfm

104.    These documents are accessible on Drugs@FDA by clicking "Review" for

Abilify Maintena:

https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process



(Ex. 3 (Screenshot of Drugs@FDA Page for NDA 202971).)

### 1.    FDA's Clinical Pharmacology Review

105.    Nine months after the initial submission of the Abilify Maintena NDA, around

June 4, 2012, FDA's OCP Review team (consisting of at least Huixia Zhang, Satjit Brar, Mike

Pacanowski, Atul Bhattaram, and Hao Zhu) signed the Clinical Pharmacology Review for

Abilify Maintena, which contained the OCP Review team's thoughts on why the Abilify

Maintena NDA could not be approved at that time.  (Ex. 4 (Abilify Maintena Clinical

Pharmacology Review) at 1, 21-22, 76.)  This Clinical Pharmacology Review was published

online as part of the "Drug Approval Package" on April 11, 2013, as discussed above.

106.    During the *Otsuka v. Mylan* litigation (discussed in Section V below), Otsuka's

Rule 30(b)(6) witness, Mary Hobart, testified that the Clinical Pharmacology Review was drafted

by FDA, and although sponsors propose information and FDA responds, sponsors do not

contribute to the drafting of the Clinical Pharmacology Review.  (Ex. 5 (*Otsuka v. Mylan*, D.I.

246-10), at G-1, at 30:1-32:1, 133:2-13, 135:7-136:1, 139:2-6.)

107.    Mary Hobart also testified that the Clinical Pharmacology Review appeared on

FDA's website one to three months after FDA approval, and that the italicized information in the

Clinical Pharmacology Review was FDA's recommendation.  (Ex. 5 (*Otsuka v. Mylan*, D.I. 246-

10), at G-1, at 133:14-19, 138:14-15.)  As noted above, the "Drug Approval Package" placed online on April 11, 2013 was within this one to three months-range after its February 28, 2013 approval of Abilify Maintena.

108.    In the Clinical Pharmacology Review, FDA's OCP Review team noted that although certain parts of the Abilify Maintena label were approvable, "[f]urther dose adjustments in CYP2D6 poor metabolizers and in patients receiving CYP2D6 and/or CYP3A4 inhibitors are recommended (Table 1).  In addition, aripiprazole IM injection is not recommended to be used with long-term coadministration of CYP3A4 inducers."  (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 3.)

109.    FDA's OCP Review team's "Overall" decision was that Abilify Maintena was acceptable "Pending labeling."  (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 3.) Specifically, the "Proposed dose for adult patients" was not acceptable and FDA's OCP Review team referred Otsuka to Table 1.  (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 3.) Further, the "Labeling" was not acceptable to OCP "Pending satisfactory agreement with the sponsor."  (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 3.)

110.    Table 1 of the Abilify Maintena Clinical Pharmacology Review stated as follows:

**Table 1: Dose Adjustments in Patients Taking Concomitant CYP2D6 inhibitors, 3A4 inhibitors, and/or CYP3A4 inducers for greater than 14 days** (b) (4)

| | Adjusted Dose |
|---|---|
| **Patients Taking 400 mg of ABILIFY** (b) (4) | |
| Strong CYP2D6 inhibitors **or** strong CYP3A4 inh bitors | 300 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Taking 300 mg of ABILIFY** (b) (4) | |
| strong CYP2D6 OR strong CYP3A4 inhibitors | 200 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Who are Poor Metabolizers of CYP2D6** | |
| Poor Metabolizers of CYP2D6 | 300 mg |
| Poor Metabolizers of CYP2D6 taking concomitant strong CYP3A4 inhibitors | 160 mg |

When the inhibitor or inducer is withdrawn, change the ABILIFY MAINTENA dose *[see Dosage and Administration (2.1)]*.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 4.)

111.    In "Table 1: Sponsor-Proposed and FDA-Recommended Dosing of Aripiprazole IM Depot," FDA's OCP Review team wrote:

| (b) (4) | We recommend the following dosing regimen based on pharmacokientic simulations. |
|---|---|
| | *For patients taking 300 mg dose:* |
| | *Patients taking aripiprazole concomitantly with long term (≥14 days) CYP 2D6 and/or CYP3A4 inhibitors require a dose adjustment.* |
| | • *200 mg IM every 4 weeks with concomitant strong CYP3A4 inhibitor* |
| | • *200 mg IM every 4 weeks with concomitant strong CYP2D6 inhibitor* |
| | • *160 mg IM every 4 weeks with both concomitant CYP2D6 and CYP3A4 inhibitor.* |
| (b) (4) | We recommend the following: |
| | *Long term coadministration of CYP3A4 inducer with Aripiprazole IM depot injection is not recommended.* |
| **Dosing Recommendations for CYP 2D6 Poor Metabolizer Status Patients** | |
| (b) (4) | We recommend the following dosing regimen based on pharmacokinetic simulations: |
| | *For patients who are known to be CYP2D6 poor metabolizers, the recommended dose is 300 mg.* |

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 6.)

112.    The italicized recommendations reflect FDA's OCP Review team's recommended revisions to the Abilify Maintena label that Otsuka had not proposed in their original labeling requests. (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 5.)

113.    FDA's OCP Review team further wrote:

> Under the regular maintenance dose of 400 mg, the dose should be reduced to 300 mg IM if given concomitantly with either a strong CYP3A4 *or* CYP2D6 inhibitor. Moreover, a 200 mg IM Depot dose should be given with concomitant CYP3A4 *and* CYP2D6

inhibitor. The sponsor's recommendation is appropriate. Similarly, for patients receiving 300 mg maintenance dose, **we recommend the dose should be reduced to 200 mg IM if given concomitantly with either a strong CYP3A4 or CYP2D6 inhibitor. In addition, the dose should be further reduced to 160 mg if given concomitantly with both CYP3A4 and CYP2D6 inhibitors**.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 12-13; *see also id.* at 34) (emphasis added).

114.    FDA's OCP Review team further wrote:

For CYP2D6 PMs, **we recommend that the dose be further reduced to 160 mg if given concomitantly with CYP3A4 inhibitors**.  Similar aripiprazole exposure increase is expected in CYP2D6 PMs concomitantly receiving long-term CYP3A4 inhibitors as compared to CYP2D6 EMs receiving long-term CYP3A4 and CYP2D6 inhibitors. Therefore, **a dose reduction to 160 mg IM depot is necessary to ensure the exposure falls within the established therapeutic window**.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 15) (emphasis added).

115.    FDA's OCP Review team further wrote:

As 400 mg is the largest dosage form for the IM Depot formulation, dosing adjustment for this interaction may not be feasible and **it is suggested that patients be warned not to use a combination of CYP3A4 inducers with this formulation**.

. . .

Based on simulations, an approximate four-fold decrease in steady state aripiprazole plasma concentrations is evident upon long-term concomitant administration of a CYP3A4 inducer with 400 mg IM Depot (Figure 8). Individuals in the pivotal clinical trial were not permitted to take concomitant CYP3A4 inducers, so it is unsure of what the clinical implications are of this interaction. **The current proposal for the label does not suggest any dosing recommendations for this interaction**.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 15) (emphasis added).

116.    FDA's OCP Review team further wrote:

*Aripiprazole is mainly metabolized by two enzymes CYP3A4 and*

*CYP2D6, and poor metabolizers of CYP2D6 are expected to have higher level of exposure of aripiprazole. No genotype information of the enrolled subjects were collected for this study, therefore, the effect of CYP2D6 genotype on the exposure of aripiprazole after IM depot injection could not be evaluated.*

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 26.)

117.    The OCP Review team further wrote:

*CYP2D6 genotype information of the enrolled subjects were collected on an optional basis in this study, therefore, no evaluation was performed to assess the effect of CYP2D6 poor metabolizers on the exposure of aripiprazole and dehydro-aripiprazole after multiple aripiprazole IM depot administration.*

118.    (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 30.) FDA's OCP

Review team further wrote:

As 400 mg is the largest dosage form for the IM Depot formulation, dosing adjustment for this interaction may not be feasible **and it is suggested that patients be warned not to use a combination of CYP3A4 inducers with this formulation**. Based on the original label for oral aripiprazole (Abilify®), concomitant administration of a CYP3A4 inducer greatly decreases the exposure of plasma aripiprazole. For example, the coadministration of carbamazepine (200 mg BID), a potent CYP3A4 inducer, with aripiprazole (30 mg/day) resulted in an approximate 70% decrease in Cmax and AUC values of both aripiprazole. In this case, doubling the dose is recommended. Based on simulations, an approximate four-fold decrease in steady state aripiprazole plasma concentrations is evident upon long-term concomitant administration of a CYP3A4 inducer with 400 mg IM Depot (Figure 9). Individuals in the pivotal clinical trial were not permitted to take concomitant CYP3A4 inducers, so it is unsure of what the clinical implications are of this interaction. **The current proposal for the label does not suggest any dosing recommendations for this interaction**.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 40) (emphasis added).

119.    FDA's OCP Review team provided their label edits in a side-by-side document,

but those edits have been redacted in their entirety in the publicly available version published by

FDA:



**1.3    Label Statements**

Labeling statements to be removed are shown in ~~red strikethrough font~~ and suggested labeling to be included is shown in <u>underline blue font</u>.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 41.)

120.    The OCP Review team further wrote:

> *There is inconsistency in the dosing recommendation for those patients taking concomitant strong CYP2D6 inhibitors on a long term basis compared to individuals who are CYP2D6 poor metabolizing status. If given a CYP2D6 inhibitor long term (>14 days) the dosing recommendation is to decrease the dose to 300 mg (and further reduced to 200 mg if taken along with a CYP3A4 inhibitor).*
>
> *. . .*
>
> *Understanding the influence of CYP2D6 polymorphism on aripiprazole exposure, in conjunction with the small number of CYP2D6 PM subjects within the pivotal trial, warrants a dosing adjustment in this population that is consistent with the dosing recommendation for concomitant administration of a CYP2D6 inhibitor long term (>14 days) to an initial and maintenance dose of 300 mg.*

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 59-60.)

121.    The OCP Review team further wrote:

***The influence [sic] concomitant administration of a CYP3A4
inducer on aripiprazole exposures has not been assessed nor has
an adequate recommendation been given on the dosing
adjustment required for the concomitant administration***.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 60) (emphasis added).

122.    The OCP Review team further wrote: "An independent simulation analysis was

conducted to resolve the aforementioned outstanding issues."  (Ex. 4 (Abilify Maintena Clinical

Pharmacology Review) at 60.)

123.    The OCP Review team further wrote:

Analysis objectives are: . . .

3. To ascertain the degree of exposure differences between
CYP2D6 poor metabolizer and extensive metabolizer status
patients requires the need for a dose adjustment that is similar to
the recommendation of the concomitant administration of long
term CYP2D6 inhibitors.

4. To evaluate of [sic] the potential exposures of aripiprazole after
concomitant administration of a CYP3A4 inducer.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 60.)

124.    The OCP Review team further wrote:

Simulations, using the sponsor's population PK model, were
performed to assess different dosing regimens, and compared with
the therapeutic window, for the following scenarios:

. . .

2) Dosing of 300 mg or 400 mg IM to CYP 2D6 [sic] poor
metabolizing status subjects.

3) Dosing of the proposed regimen of 400 mg IM concomitantly
with a CYP3A4 inducer.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 60-61.)

125.    The OCP Review team further wrote:

Overall, limited efficacy and safety data are available in the subgroup of patients who are genetic CYP2D6 PMs. **The labeling should therefore specify dose reduction for patients who are known to be genetic CYP2D6 PMs** to be consistent with IMD dose reductions recommended for patients receiving CYP2D6 inhibitors, considering 1) the high concentrations observed in this subgroup, 2) the potential risk for concentration-related adverse events, 3) the presence of genotype-specific dosing recommendations for the oral formulation, and 4) the persistence of the drug in the circulation following IMD administration.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 62) (emphasis added).

126. The OCP Review team further wrote:

**The sponsor** has proposed dose reduction for patients receiving CYP2D6 inhibitors, but **has not proposed dose adjustment for CYP2D6 PMs**, on the basis that differential safety by genotype was not observed. The purpose of this review is to evaluate the appropriateness of dosing recommendations of this new aripiprazole formulation for CYP2D6 PMs.

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 62) (emphasis added).

127. The OCP Review team further wrote:

3.1 Does aripiprazole IMD require dose adjustment based on CYP2D6 genotype?

*Yes. Limited efficacy and safety data are available in the subgroup of patients who are genetic CYP2D6 PMs.* **_The labeling should specify dose reduction for patients who are known to be genetic CYP2D6 PMs_** *to be consistent with dose adjustments for CYP2D6 inhibitor use considering 1) the high concentrations observed in this subgroup, 2) the potential risk for concentration-related adverse events, 3) presence of genotype-specific dosing recommendations for the oral formulation administration, and 4) the persistence of the drug in the circulation following IMD.*

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 65) (emphasis added).

128. The OCP Review team further wrote: "subjects who are known to be CYP2D6 PMs should be started on a lower IMD dose (i.e., 300 mg). Dose reductions to 300 mg

aripiprazole IMD are recommended for chronic use of CYP2D6 inhibitors[.]"  (Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 70.)

### 2.  Other Drug Approval Package Documents

129.    In addition to the Clinical Pharmacology Review placed online on April 11, 2013 for Abilify Maintena, the Drug Approval Package contains additional documents, including: Approval Letter(s), Other Action Letters, Printed Labeling, Summary Review, Officer/Employee List, Cross Discipline Team Leader Review, Medical Review(s), Chemistry Review(s), Pharmacology Review(s), Statistical Review(s), Microbiology Review(s), Proprietary Name Review(s), Other Review(s), and Administrative Document(s) & Correspondence.

130.    In the Summary Review, FDA wrote on February 28, 2013: "Labeling has been negotiated and agreement reached."  (Ex. 6 (Summary Review) at 2.)

131.    In the Officer/Employee List, FDA wrote: "The following officers or employees of FDA participated in the decision to approve this application and consented to be identified on this list:

Atrakchi, Aisar
Brar, Satjit
Ceresa, Carrie
Cole, Jessica
Duer, Robin
Duran, Joseph
Hutchins, Shawna
Laughren, Tom
Mathis, Mitch
Saini, Sonny
Tabacova, Sonia
Yang, Peiling
Zedong, Dong
Zhang, Jing
Zhu, Hao

,"

(Ex. 7 (Officer/Employee List) at 2.)

132.    In the Cross Discipline Team Leader Review (dated July 5, 2012, and signed by Jing Zhang), Jing Zhang wrote: "Huixia Zhang, PhD. and Satjit Brar PhD. are clinical pharmacology reviewers for this NDA."  (Ex. 8 (Cross Discipline Team Leader Review) at 3, 13.)

133.    Jing Zhang further wrote:

> Aripiprazole is extensively metabolized by CYP3A4 and CYP2D6. However, a dose adjustment is necessary in patients who are taking aripiprazole IM depot concomitantly with CYP2D6 and/or CYP3A4 inhibitors, CYP3A4 induces [sic] and who are CYP2D6 poor metabolizers.  **The OCP review team has made several specific recommendations which are summarized in section 5.1.3 Dose identification/selection and limitations in this review**.

(Ex. 8 (Cross Discipline Team Leader Review) at 3) (emphasis added).

134.    Jing Zhang further wrote:

> Aripiprazole is extensively metabolized by CYP3A4 and CYP2D6. A dose adjustment in patients taking aripiprazole IM depot concomitantly with CYP2D6 and/or CYP3A4 inhibitors, CYP3A4 inducers or patients who are a CYP2D6 poor metabolizer should be considered.  **Our clinical pharmacological reviewers had several specific comments regarding these issues**.

(Ex. 8 (Cross Discipline Team Leader Review) at 8) (emphasis added).

135.    Jing Zhang further wrote:

> For patients who take aripiprazole IM depot concomitantly with long term (≥14 days) CYP2D6 and/or CYP3A4 inhibitors, a dose adjustment is required . . . **the sponsor did not provide specific instruction for patients who take 300 mg dose**.  Both OCP reviewers have no objection to the proposed 400 mg dose adjustment.  **Additionally, they provided further dose recommendations for patients who take 300 mg every 4 weeks based on PK simulation: 200 mg IM every 4 weeks with concomitant strong CYP3A4 or CYP2D6 inhibitor, and 160 mg IM every 4 weeks with concomitant CYP2D6 and CYP3A4 inhibitor**.

(Ex. 8 (Cross Discipline Team Leader Review) at 8) (emphasis added).

136.    Jing Zhang further wrote: "the sponsor proposed . . . us[ing] clinical judgment for long term co-administration" "with a CYP3A4 inducer," but "[b]oth OCP reviewers . . . suggest[ed] 'avoid use' instead of [redacted] for long term co-administration because [redacted] is too vague to provide any useful advice to the health providers."  (Ex. 8 (Cross Discipline Team Leader Review) at 8.)

137.    Jing Zhang further wrote:

> For patients who are CYP2D6 poor metabolizers (PM), [Redacted] the safety profile collected in study 31-07-246.  **OCP reviewers disagree with the sponsor and suggest 300 mg IM every [Redacted] for CYP2D6 PM** because the exposures of CYP2D6 PM are consistent with that observed in long-term concomitant CYP2D6 inhibitors and 300 mg is the recommended dose for concomitant use of CYP2D6 inhibitors.  Additionally, study 31-07-246 is relapse prevention study with a randomized withdrawal design.  Only patients who had been tolerated the drug and were stable with the drug were selected to continue the study.  **Therefore, the safety profile of CYP2D6 PM in this study can not be used as the basis for dose selection**.

(Ex. 8 (Cross Discipline Team Leader Review) at 9) (emphasis added).

138.    The Cross Discipline Team Leader Review further stated:

> **There are extensive physician labeling revisions recommended** by the Division, the Study Endpoints and Labeling Development (SEALD), the Pediatric Maternal Health Staff (PMHS), the Division of Professional Promotion/Office of Prescription Drug Promotion (OPDP), and the Patient Labeling Team (PLT)/the Office of Medical Policy Initiatives.  **We are in the process negotiating the labeling with the sponsor. The final agreed upon labeling will be attached to the action letter when this NDA is approved**.

(Ex. 8 (Cross Discipline Team Leader Review) at 11) (emphasis added).

139.    Other Review(s) contains a document dated July 16, 2012 from FDA to Otsuka, where Appendix A (redacted in its entirety) contained "Recommended revisions for Abilify Maintena Labeling."  (Ex. 9 (Other Review) at 14.)

140.    Administrative and Correspondence Documents contains multiple documents, one of which is a June 29, 2012 Email from Sonny Saini (at FDA) to David Goldberger (at Otsuka), attaching "the labeling for ABILIFY MAINTENA that includes our revisions."  (Ex. 10 (Administrative and Correspondence Documents) at 25.)

141.    The Administrative and Correspondence Documents further contains the Memorandum of Meeting Minutes between FDA and Otsuka on June 7, 2011.  (Ex. 10 (Administrative and Correspondence Documents) at 72.)  FDA participants are: Thomas Laughren, Mitchell Mathis, Jing Zhang, Greg Dubitsky, Maju Mathews, Aisar Atrakchi, Sonia Tabacova, Andrejus Parfionovas, Jogarao Gobburu, Huixia Zhang, Peiling Yang, David Claffey, Kellie Taylor, and Sonny Saini.  (*Id.*)

142.    These Meeting Minutes contain a set of questions from Otsuka, including Question 8, which asked:

> Based upon the recent labeling change for ABILIFY® to modify dosing resulting from concomitant administration of CYP2D6 and/or CYP3A4 inhibitors, Otsuka is planning to use simulation modeling to assess transient and chronic concomitant administration of CYP2D6 and/or CYP3A4 inhibitors for aripiprazole IM depot.  This evaluation will be used to provide guidance for dose adjustments.  Does the Division agree?

(Ex. 10 (Administrative Documents and Correspondence) at 83.)

143.    FDA responded:

> *Yes, your proposed approach is acceptable.  We also recommend that you simulate the worst case scenario where there is a complete dumping at the injection site, i.e., all the doses are dissolved and released to the systemic circulation.*

(Ex. 10 (Administrative Documents and Correspondence) at 83.)

## C.    Abilify Maintena's Label

144.    After receiving approval on February 28, 2013, the original Abilify Maintena Label's "INDICATIONS AND USAGE" stated: "ABILIFY MAINTENA is an atypical

antipsychotic indicated for the treatment of schizophrenia[.]" (Ex. 11 (Abilify Maintena 2013 Label).)

145.    The original Abilify Maintena Label's "DOSAGE AND ADMINISTRATION" stated: "Recommended starting and maintenance dose is 400 mg administered monthly as a single injection[.]" (Ex. 11 (Abilify Maintena 2013 Label).)

146.    The original Abilify Maintena Label further stated: "Some patients may benefit from a reduction to a 300 mg dose[.]" (Ex. 11 (Abilify Maintena 2013 Label).)

147.    The original Abilify Maintena Label further stated:

Dosage adjustment for patients who are CYP2D6 poor metabolizers and for patients taking CYP2D6 inhibitors, CYP3A4 inhibitors, or CYP3A4 inducers for greater than 14 days:

|  | Adjusted Dose |
|---|---|
| **CYP2D6 Poor Metabolizers** | |
| CYP2D6 Poor Metabolizers | 300 mg |
| CYP2D6 Poor Metabolizers taking concomitant CYP3A4 inhibitors | 200 mg |
| **Patients Taking 400 mg of ABILIFY MAINTENA** | |
| Strong CYP2D6 **or** CYP3A4 inhibitors | 300 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid use |
| **Patients Taking 300 mg of ABILIFY MAINTENA** | |
| Strong CYP2D6 **or** CYP3A4 inhibitors | 200 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid use |

(Ex. 11 (Abilify Maintena 2013 Label).)

148.    This table contains the dosage adjustments provided by FDA's OCP Review team as discussed in Table 1 provided in the Clinical Pharmacology Review, with Otsuka not providing any modifications:

| | Adjusted Dose |
|---|---|
| **Table 1: Dose Adjustments in Patients Taking Concomitant CYP2D6 inhibitors, 3A4 inhibitors, and/or CYP3A4 inducers for greater than 14 days** (b) (4) | |
| **Patients Taking 400 mg of ABILIFY** (b) (4) | |
| Strong CYP2D6 inhibitors **or** strong CYP3A4 inhibitors | 300 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Taking 300 mg of ABILIFY** (b) (4) | |
| strong CYP2D6 OR strong CYP3A4 inhibitors | 200 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Who are Poor Metabolizers of CYP2D6** | |
| Poor Metabolizers of CYP2D6 | 300 mg |
| Poor Metabolizers of CYP2D6 taking concomitant strong CYP3A4 inhibitors | 160 mg |
| When the inhibitor or inducer is withdrawn, change the ABILIFY MAINTENA dose *[see Dosage and Administration (2.1)]*. | |

(Ex. 4 (Abilify Maintena Clinical Pharmacology Review) at 4.)

149.    Section 2.3 of the original Abilify Maintena Label stated:

> Dosage adjustments are recommended in patients who are CYP2D6 poor metabolizers and in patients taking concomitant CYP3A4 inhibitors or CYP2D6 inhibitors for greater than 14 days (see Table 1). If the CYP3A4 inhibitor, or CYP2D6 inhibitor is withdrawn, the ABILIFY MAINTENA dosage may need to be increased *[see Dosage and Administration (2.1)]*.

(Ex. 11 (Abilify Maintena 2013 Label) at 4.)

150.    Section 7.1 of the original Abilify Maintena Label stated:

> Concomitant use of ABILIFY MAINTENA with carbamazepine or other CYP3A4 inducers decreases the concentrations of aripiprazole. Avoid use of ABILIFY MAINTENA in combination with carbamazepine and other inducers of CYP3A4 for greater than 14 days *[see Dosage and Administration (2.3) and Clinical Pharmacology (12.3)]*.

(Ex. 11 (Abilify Maintena 2013 Label) at 26.)

151.    Section 8.6 of the original Abilify Maintena Label stated:

> Approximately 8% of Caucasians and 3–8% of Black/African Americans cannot metabolize CYP2D6 substrates and are classified as poor metabolizers (PM). Dosage adjustment is

recommended in CYP2D6 poor metabolizers due to high aripiprazole concentrations *[see Dosage and Administration (2.3) and Clinical Pharmacology (12.3)]*.

(Ex. 11 (Abilify Maintena 2013 Label) at 30.)

## III.    THE CYP PATENTS

152.    The '057 patent, '803 patent, '553 patent, '547 patent, '087 patent are collectively referred to as the "CYP Patents" because they concern dose adjustments depending on patients' CYP2D6 or CYP3A4 enzyme function and if these patients are on CYP2D6 and/or CYP3A4 inhibitors or inducers.

153.    The CYP Patents all claim an earliest filing date of September 24, 2013. This is more than one year after FDA's OCP Review team's labeling suggestions were provided in the Clinical Pharmacology Review, seven months after the Abilify Maintena label was approved with the NDA, and more than five months after the Clinical Pharmacology Review was placed online.

### A.    U.S. PATENT NO. 10,525,057

#### 1.    Background

154.    The '057 patent is titled "Method of providing aripiprazole to patients having impaired CYP2D6 or CYP3A4 enzyme function." (Ex. 12 (the '057 patent) at Title.)

155.    The inventor listed on the face of the '057 patent is "Arash Raoufinia." (Ex. 12 (the '057 patent) at Inventor.)

156.    The Abstract of the '057 patent states: "[t]he disclosed embodiments relate to methods of initiating aripiprazole treatment in a patient who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, or both." (Ex. 12 (the '057 patent) at Abstract.)

157.    There are two Figures in the '057 patent specification. (Ex. 12 (the '057 patent) at Figures 1, 2.) Figure 1 is:



Figure 1

(Ex. 12 (the '057 patent) at Figure 1.)

158.   Figure 2 is:

Figure 2

(Ex. 12 (the '057 patent) at Figure 2.)

### 2.   Specification

159.   The '057 patent specification states:

In various embodiments, the present invention is directed to methods of systemically delivering aripiprazole to a patient, particularly patients having impaired CYP2D6 or CYP3A4 enzyme function. In one embodiment, the present invention comprises administering intramuscularly to a patient, a starting dose of a long-acting drug-containing suspension which systemically releases therapeutic plasma levels of aripiprazole over a period of about one month to a patient, wherein said patient has impaired CYP2D6 or CYP3A4 enzyme function. Patients with impaired CYP2D6 or CYP3A4 enzyme function include, for example a patient who is a CYP2D6 or CYP3A4 poor metabolizer, a patient concomitantly administered a strong CYP3A4 and/or CYP2D6 inhibitor, or a patient who is a CYP2D6 or CYP3A4 poor metabolizer and is concomitantly administered a strong CYP3A4

and/or CYP2D6 inhibitor. In various embodiments, the dose of long-acting drug-containing suspension providing therapeutic plasma levels of aripiprazole administered to such patient with impaired CYP2D6 or CYP3A4 enzyme function is adjusted such that the starting dose provides no more than about 75%, about 75%, no more than about 50%, about 66% to about 75%, or about 50%, of the amount of aripiprazole compared to an initial dose recommended for a patient with normal CYP2D6 and CYP3A4 enzyme function (i.e., who is neither a CYP2D6 poor metabolizer nor a CYP3A4 poor metabolizer and is not concomitantly administered a CYP2D6 or CYP3A4 inhibitor or inducer, or other agents which modify CYP2D6 or CYP3A4 function). In other embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function is a CYP2D6 or CYP3A4 poor metabolizer. In still other embodiments the patient with impaired CYP2D6 or CYP3A4 enzyme function is a CYP2D6 poor metabolizer. In still other embodiments the patient with impaired CYP2D6 or CYP3A4 function is a CYP3A4 poor metabolizer. In some embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function is an extensive metabolizer who has been concomitantly administered a strong CYP2D6 inhibitor or a strong CYP3A4 inhibitor. In some embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function is an extensive metabolizer who has been concomitantly administered both a strong CYP2D6 inhibitor and a strong CYP3A4 inhibitor.

(Ex. 12 (the '057 patent) at col. 1, ll. 23-65.)

160.    The '057 patent specification states:

> Doses which are too low can provide ineffective treatment of, e.g. schizophrenic symptoms, which can be disastrous to a patient's quality of life, while doses which are too high can cause serious and sometimes irreversible side effects. Because the plasma levels of aripiprazole can be significantly affected by the rate at which the drug is metabolized in the patient, it is important to account for the CYP2D6 and CYP3A4 isozyme function of a patient in order to achieve the desired, clinically effective plasma levels of aripiprazole, while minimizing side effects.

(Ex. 12 (the '057 patent) at col. 3, ll. 10-19.)

161.    The '057 patent specification states:

> Most patients can be characterized as having "normal" CYP2D6 or CYP3A4 enzyme function, and readily ("extensively") metabolize drugs such as aripiprazole. However, some patients have little or no CYP2D6 or CYP3A4 enzyme function, and can be considered

"poor metabolizers" – i.e., have a substantially reduced ability to metabolize aripiprazole, and therefore do not eliminate it as efficiently as extensive metabolizers. Such "poor metabolizers" may have about an about 63-112% increase in aripiprazole exposure (an average of about 80%) and about a 35% decrease in exposure to the active metabolite of aripiprazole, compared to the extensive metabolizers

(Ex. 12 (the '057 patent) at col. 3, ll. 25-36.)

162.    The '057 patent specification states:

Similar to the effects observed for poor metabolizers, above, extensive metabolizers concomitantly administered CYP2D6 inhibitors and/or CYP3A4 inhibitors also exhibit an approximately 63-112% increase in aripiprazole exposure (average of about 80%) and about a 35% decrease in exposure to the active metabolite of aripiprazole.

(Ex. 12 (the '057 patent) at col. 3, ll. 43-49.)

163.    The '057 patent specification states:

Concomitant administration of such inhibitors with compositions which release aripiprazole (e.g., long-acting intramuscular depot compositions which systemically release aripiprazole) can be particularly important when the patient is also a CYP2D6 or CYP3A4 poor metabolizer, since the metabolism of aripiprazole will be suppressed by the poor metabolizer's innately low CYP2D6 or CYP3A4 enzyme activity, as well as the further inhibition provided by the CYP2D6 or CYP3A4 inhibitor. Poor metabolizers concomitantly administered CYP2D6 and/or CYP3A4 inhibitors exhibit a correspondingly greater increase in aripiprazole exposure up to 4 fold in aripiprazole concentrations.

(Ex. 12 (the '057 patent) at col. 3, ll. 49-60.)

164.    The '057 patent specification states:

Alternatively, some drugs can significantly increase the activity of the enzyme (e.g., act as "inducers" of the CYP2D6 or CYP3A4 enzyme), and thereby substantially increase the rate of aripiprazole metabolism. Even for patients who are CYP2D6 or CYP3A4 poor metabolizers, the increased rate of metabolism of aripiprazole provided by concomitantly administered "inducers" may be such that intramuscular administration of an aripiprazole-releasing suspension never provides a patient with clinically effective levels of aripiprazole.

(Ex. 12 (the '057 patent) at col. 3, l. 61 – col. 4, l. 3.)

165.    The '057 patent specification states:

> In yet other embodiments, the patient with impaired CYP2D6 or
> CYP3A4 enzyme function can be an extensive metabolizer (rather
> than a CYP2D6 or CYP3A4 poor metabolizer), who is
> concomitantly administered both a strong CYP2D6 and a strong
> CYP3A4 inhibitor. If the recommended initial dose for a patient
> with normal CYP2D6 or CYP3A4 enzyme function is 400 mg of
> aripiprazole, the starting dose for a patient with impaired CYP2D6
> or CYP3A4 enzyme function who is an extensive metabolizer
> concomitantly administered both a strong CYP2D6 and a strong
> CYP3A4 inhibitor according to the present method would be about
> 50% of the recommended initial dose (i.e., about 200 mg,
> expressed as the equivalent weight of aripiprazole ). If the
> recommended initial dose for a patient with normal CYP2D6 or
> CYP3A4 enzyme function is 300 mg of aripiprazole, the starting
> dose for a patient with impaired CYP2D6 or CYP3A4 enzyme
> function who is an extensive metabolizer concomitantly
> administered both a strong CYP2D6 and a strong CYP3A4
> inhibitor according to the present method would be about 53% of
> the recommended initial dose (i.e., about 160 mg, expressed as the
> equivalent weight of aripiprazole ).

(Ex. 12 (the '057 patent) at col. 6, ll. 1-23.)

### 3.    Prosecution History

166.    The '727 application was filed on September 24, 2013.  (Ex. 12 (the '057 patent)
at (21) Appl. No., (22) Filed.)  The '727 application matured into the '057 patent on January 7,
2020.  (Ex. 12 (the '057 patent).)

167.    Thomas A. Blinka of Cooley LLP and his team originally handled prosecution of
the '727 application. (Ex. 13 (the '057 patent file history) at Sept. 24, 2013 Petition for 12-Month
Accelerated Examination at 2.)

168.    The '727 application originally had 20 claims (1 independent claim and 19
dependent claims), with original independent claim 1 stating:

> A method of initiating aripiprazole treatment in a patient with
> impaired CYP2D6 or CYP3A4 enzyme function, comprising:

administering intramuscularly to said patient a starting dose of a
long-acting drug containing suspension which provides therapeutic
plasma levels of aripiprazole over a period of about one month;

wherein said starting dose provides no more than about 75% of the
amount of aripiprazole compared to an initial dose recommended
for a patient with normal CYP2D6 and CYP3A4 enzyme function.

(Ex. 14 (the '057 patent file history) at Sept. 24, 2013 Claims.)

169.    On September 24, 2013, Applicant filed two "Declaration[s] (37 CFR 1.63) For

Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)."  (Ex. 15 (the

'057 patent file history) at Sept. 24, 2013 Oath or Declaration Filed.)

170.    The first declaration was signed by Robert McQuade[1], dated August 29, 2013,

and he wrote: "I believe that I am the original inventor or an original joint inventor of a claimed

invention in the application.  I hereby acknowledge that any willful false statement made in this

declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5)

years, or both."  (Ex. 15 (the '057 patent file history) at Sept. 24, 2013 Oath or Declaration

Filed.)

171.    The second declaration was signed by Arash Raoufinia, with no date provided,

and he wrote: "I believe that I am the original inventor or an original joint inventor of a claimed

invention in the application.  I hereby acknowledge that any willful false statement made in this

declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5)

years, or both."  (Ex. 15 (the '057 patent file history) at Sept. 24, 2013 Oath or Declaration

Filed.)

172.    On September 24, 2013, Applicant filed its Information Disclosure Statement.

(Ex. 16 (the '057 patent file history) at Sept. 24, 2013 Information Disclosure Statement.)  The

---

[1] As discussed in more detail below, Robert McQuade worked at Otsuka Pharmaceutical
Development and Commercialization, Inc.

Information Disclosure Statement began: "In accordance with the duty of disclosure set forth in 37 C.F.R. § 1.56, Applicant(s) hereby submit the following information in conformance with 37 C.F.R. §§ 1.97 and 1.98." (Ex. 16 (the '057 patent file history) at Sept. 24, 2013 Information Disclosure Statement.)

173.    The Information Disclosure Statement only cited U.S. Patent Nos. 7,115,587; 7,807,680; 8,338,427; and 8,431,576; U.S. Publication No. 2009-0022823; a 2012 Abilify Label; and a 2007 article by Hendset et al. (Ex. 16 (the '057 patent file history) at Sept. 24, 2013 Information Disclosure Statement.)

174.    The Information Disclosure Statement did not cite the Clinical Pharmacology Review, the Abilify Maintena label, or any of the Abilify Maintena Drug Package documents discussed in Section I.B. above. (Ex. 16 (the '057 patent file history) at Sept. 24, 2013 Information Disclosure Statement.)

175.    On February 3, 2014, the Examiner issued a Non-Final Rejection. (Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection.)

176.    The Examiner rejected claims 1-12 and 14-19 as anticipated by "Gopalakrishna et al. (Long-Acting Injectable Aripiprazole: How Might It Fit Into Our Tool Box?, July 10, 2013, Clinical Schizophrenia and Related Psychoses, pages 87-92)." (Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 7.)

177.    The Examiner wrote:

> Gopalakrishna et al. focuses on analyzing a long-acting injectable aripiprazole for the treatment of schizophrenia (see abstract). They specifically teach a long-acting injectable aripiprazole as "Abilify Maintena" and teach that it is available as a lyophilized powder to be reconstituted with a specific amount of sterile water to form a suspension:

> Long-acting injectable aripiprazole was approved by the U.S. FDA on 28th February 2013 and will be marketed under the name Abilify Maintena. Like its oral predecessor it carries the same warnings including the black box warning of increased mortality in elderly patients with dementia-related psychosis (13). The medication is available as a lyophilized powder which needs to be reconstituted with the specific amount of sterile water included in the kit to form an opaque milky-white suspension. After reconstitution, the suspension can be stored in the vial but cannot be stored in the syringe. While not as convenient as LAIs distributed in pre-constituted vials, the ability to use a single vial to constitute a number of dose options is an advantage. To reconstitute, a specific volume of the sterile water must be injected into the vial to achieve either the 400-mg or 300-mg suspension dose. A 300-mg vial can be used to inject 300-mg, 200-mg or 160-mg doses, whereas a 400-mg vial can be used to inject all of the above and the 400-mg dose (see Table 2). This implies that, assuming the cost of 400-mg vial being higher than 300-mg vial, the 400-mg vial should be used only for doses of 400 mg to be cost effective. The reconstitution and administration, though complicated, provides flexibility for prescribers to modify the dose in smaller increments compared to preset fixed dosages in other available second-generation LAIs.
>
> (see page 90, column 2)

(Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 8-9.)

178.    The Examiner further wrote:

> They further teach that dosages of 200mg, 300mg and 400mg were used in a clinical trial as reported at the 2011 Annual Meeting of the American Psychiatric Association and that they were found to achieve comparable aripiprazole plasma concentrations with oral dosing (see page 89, column 2, first paragraph).
>
> They also specifically mention that dose modifications are emphasized for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors:

> Dose modifications have been emphasized in the package insert among patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors for more than 14 days. It also advises to avoid using ALAI in the presence of a CYP3A4 inducer for more than 14 days, as the aripiprazole serum concentration drops to sub-therapeutic levels due to faster metabolism. This may pose constraints for prescribers using this long-acting antipsychotic over others. At the time of writing this review, pricing information is not available so any advantages or disadvantages from a cost perspective cannot be evaluated.
>
> (page 91, column 2)

(Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 9-10.)

179.    The Examiner further wrote:

> They also teach that care must be taken to review concomitant medications for the presence of metabolic inducers or inhibitors (see page 92, column 1) and thus they clearly teach the need to modify the dosage for patients who are poor metabolizers as well as for patients who are taking CYP3A4 inhibitors. They do not explicitly calculate a percentage to be reduced but they teach four dosages: 400mg, 300mg, 200mg and 160mg. All of the dosages except 400mg are less than about 75% of the 400mg dosage. Clearly if the dosage was to be modified it would a lower dosage than the highest dosage available. Further, applicant specifically claims dosages of 300mg (claim 15), 200mg (claim 16 or 17) or 160mg (claim 18) and all of those claims depend from claim 1 and thus must be encompassed in claim 1. Thus Gopalakrishna teaches methods of treating patients, including specifically patients with impaired CYP2D6 enzyme function or taking CYP3A4 inhibitors, with dosages of a long-acting suspension of aripiprazole in dosages of 300mg, 200mg and 160mg and specifically teaches adjusting the dosage based on the enzyme function or inhibitor. Each of those amounts alone would anticipate claim 1. Thus claim 1 is anticipated by Gopalakrishna et al.

(Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 10.)

180.    The Examiner further wrote:

> As mentioned above applicant claims specific dosages of 300mg (claim 15), 200mg (claim 16 or 17) or 160mg (claim 18) and each is taught by Gopalakrishna and thus claims 15-18 are anticipated by Gopalakrishna et al.
>
> In claim 2 applicant claims the patient is a CYP2D6 "poor

metabolizer". As mentioned above, Gopalakrishna specifically teaches adjusting the dosage for patients who are poor CYP2D6 metabolizers and thus anticipates claim 2.

In claims 4, 6 and 10 applicant claims that patient is concomitantly administering a strong CYP3A4 inhibitor (claims 4 and 6) or merely a CYP3A4 inhibitor (claim 10). As indicated above, the term "strong" is unclear and for the purposes of this rejection claims 4, 6 and 10 are being interpreted as reading upon concomitant treatment with a CYP3A4 inhibitor. As mentioned above, Gopalakrishna specifically teaches modifying dosages if a patient is on concomitant CYP2D or CYP3A4 inhibitors for more than 14 days. Thus claims 4, 6 and 10 are anticipated by Gopalakrishna et al.

In claims 3, 5, 7-9 and 11, applicant claims the starting dose of claim 1 is "about 75%" (claims 3 and 8), about 66-75% (claim 7), about 66% (claim 9) or about 50% (claim 5 or 11) of the initial dose recommended for a patient with normal enzyme function. As discussed above it is unclear what dosages are actually encompassed by the claimed percentages. However, Gopalakrishna specifically teaches 160mg, 200mg, 300mg and 400mg. The lowest dosage of 160mg is 40% of 400mg and 200mg is 50% of 400mg. The dosage of 300mg is 75% of 400mg, and the dosage of 200mg is 66% of the 300mg dosage. Thus Gopalakrishna teaches dosages which can be reasonably interpreted as 50, 66 or 75% of a normal dose and anticipates claims 3, 5, 7-9 and 11.

In claim 12, applicant claims the patient is schizophrenic. As discussed above, Gopalakrishna is focused on treating schizophrenia and thus anticipates claim 12.

In claim 14 applicant claims the administration is intramuscularly and injected into the gluteal muscle of the patient. Gopalakrishna specifically teaches that injections are recommended only in the gluteal region (see page 91, column 1). Thus claim 14 is anticipated by Gopalakrishna et al.

In claim 19, applicant claims the suspension comprises aripiprazole or prodrug thereof. Gopalakrishna teaches treatment with aripiprazole and thus anticipates claim 19.

(Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 11-12.)

181.    The Examiner further rejected claims 1-19 as obvious over "Gopalakrishna et al.

(Long-Acting Injectable Aripiprazole: How Might It Fit Into Our Tool Box?, July 10, 2013,

Clinical Schizophrenia and Related Psychoses, pages 87-92) in view of (Abilify label dated

February 22, 2012, cited on applicant's IDS)."  (Ex. 17 (the '057 patent file history) at Feb. 3,

2014 Non-Final Rejection at 13.)

> 182.    The Examiner further wrote:
>
>> Gopalakrishna teaches methods of treating patients, including specifically patients with impaired CYP2D6 enzyme function or taking CYP3A4 inhibitors, with dosages of a long-acting suspension of aripiprazole in dosages of 300mg, 200mg and 160mg and specifically teaches adjusting the dosage based on the enzyme function or inhibitor.  Abilify explicitly directs the practitioner on how to adjust the dosage for poor CYP3A4 metabolizers and thus it would be obvious to use that package insert as the one referenced in Gopalakrishna. Thus claim 1 is unpatentable over Gopalakrishna et al. in view of Abilify.

(Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 18.)

> 183.    The Examiner also wrote:
>
>> Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

(Ex. 17 (the '057 patent file history) at Feb. 3, 2014 Non-Final Rejection at 13.)

> 184.    However, Raoufinia did not advise the Examiner of any other inventors or

invention dates of any claims that were not commonly owned.

> 185.    On April 3, 2014, Applicant submitted an Amendment/Request for

Reconsideration After Non-Final Rejection.  (Ex. 18 (the '057 patent file history) at Apr. 3, 2014

Amendment/Request for Reconsideration After Non-Final Rejection.)

> 186.    Applicant amended their claims.  (Ex. 19 (the '057 patent file history) at Apr. 3,

2014 Claims.)

187.    Applicant wrote: "Applicants submit that *Gopalakrishna* is not properly prior

art." (Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant Arguments/Remarks Made

in an Amendment at 13) (citing 35 U.S.C. § 102(b)(1)).

188.    Applicant further wrote:

> On its face, *Gopalakrishna* was published in "Summer 2013" and
> thus was necessarily disclosed "1 year or less before the effective
> filing date" of the present application (September 24, 2013). The
> aripiprazole doses cited in *Gopalakrishna* are embodied in Table 2,
> which cites to footnote 13 therein. Footnote 13 references the
> ABILIFY MAINTENA package insert published by Otsuka
> Pharmaceutical Company Ltd. (OPC) in February of 2013, prior to
> the disclosure of *Gopalakrishna*. A copy of the ABILIFY
> MAINTENA package insert is submitted herewith in an IDS.

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant
Arguments/Remarks Made in an Amendment at 14.)

189.    Applicant further wrote:

> The inventors, Robert McQuade and Arash Raoufinia, are
> employees of Otsuka Pharmaceutical Development and
> Commercialization, Inc. (OPDC), a subsidiary of OPC. The subject
> matter relied upon by the Examiner in the rejection *(i.e.,* long-
> acting, injectable aripiprazole doses), and disclosed by
> *Gopalakrishna* was obtained from the ABILIFY MAINTENA
> package insert published by OPC, which at least indirectly
> obtained such subject matter from the inventors. *See 132
> Declaration,* paragraph 7. Accordingly, the disclosure of
> *Gopalakrishna* relied upon by the Examiner is not prior art under
> the exception of 35 USC 102(b)(1)(A).

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant
Arguments/Remarks Made in an Amendment at 14.)

190.    Applicant further wrote:

> Alternatively, since the ABILIFY MAINTENA package insert was
> published by OPC less than 1 year the effective filing date of the
> present invention prior to the disclosure of *Gopalakrishna,* and
> OPC at least indirectly obtained such subject matter from the
> inventors *(132 Declaration,* paragraph 7), the disclosure of
> *Gopalakrishna* relied upon by the Examiner is not prior art under
> the exception of 35 USC 102(b)(1)(B).

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant Arguments/Remarks Made in an Amendment at 14.)

191.    Applicant further wrote:

Moreover, even if *Gopalakrishna* were considered to be prior art under 35 USC 102(a) (which it is not for the reasons stated above), *Gopalakrishna* would still fail to anticipate the claimed invention. As amended, the present claims are directed to doses administered to patients who are (a) CYP2D6 poor metabolizers not concomantly administered a strong CYP26 or CYP3A4 inhibitor, (b) extensive metabolizers concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor, (c) CYP2D6 poor metabolizers concomitantly administered a strong CYP3A4 inhibitor, or (d) extensive metabolizers concomitantly administered a strong CYP3A4 **and** a strong CYP2D6 inhibitor. These doses are *relative* ("compared") to the doses that would be administered to an otherwise identical patient, except with "normal" CYP2D6 or CYP3A4 enzyme function (which as discussed above and in the specification, are patients who are not poor metabolizers and/or are not administered concomitant CYP2D6 or CYP3A4 inhibitors). *See 132 Declaration,* paragraph 13.

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant Arguments/Remarks Made in an Amendment at 14-15.)

192.    Applicant further wrote:

Thus, while *Gopalakrishna* does disclose patients who are CYP2D6 poor metabolizers or (presumably) extensive metabolizers administered concomitant CYP2D6 or CYP3A4 inhibitors, *Gopalakrishna* does not disclose the dose reduction for such patients *relative* to a patient with normal CYP2D6 and CYP3A4 enzyme function as required by the present claims. Rather, the doses disclosed in *Gopalakrishna* are simply various "intended" doses *(See* Table 2 of *Gopalakrishna)* and are not directed to any particular patient population, nor expressed relative to any other dose, in particular to doses for patients with "normal" enzyme function, nor is any particular dose identified as suitable for a patient who is a CYP2D6 poor metabolizers or an extensive metabolizer administered concomitant CYP2D6 or CYP3A4 inhibitors.

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant Arguments/Remarks Made in an Amendment at 16.)

193.    Applicant further wrote:

> Further, the simple disclosure of varying doses in *Gopalakrishna* does not inherently meet the limitation of the claimed method - which requires specific doses for specific patient populations having reduced enzyme function "compared" to a patient with normal enzyme function – because an inherent feature "may not be established by probabilities or possibilities" (MPEP 2163.07(a)) but must be "necessarily present" (MPEP 2112(IV)) in the prior art. Since the doses disclosed in *Gopalakrishna* reasonably reflect the usual variation in doses for normal patients based on body weight, clinical needs, etc., *Gopalakrishna* cannot, as a matter of well-settled law, be considered to inherently disclose aripiprazole dose adjustments for poor metabolizers or extensive metabolizers concomitantly administered CYP2D6 or CYP3A4 inhibitors relative to patients with normal enzyme function.

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant Arguments/Remarks Made in an Amendment at 16-17.)

194.    Applicant further wrote:

> As noted above, *Gopalakrishna* is not properly prior art under the exception of 35 USC 102(b)(1)(A), as the disclosure relied upon by the Examiner therein was obtained from the ABILIFY MAINTENA package insert published by OPC, which at least indirectly obtained such subject matter from the inventors. Alternatively, the disclosure of *Gopalakrishna* relied upon by the Examiner is not prior art under the exception of 35 USC 102(b)(1)(B) since the ABILIFY MAINTENA package insert was published by OPC before the disclosure of *Gopalakrishna,* and OPC at least indirectly obtained such subject matter from the inventors. The remaining reference, the *Abilify Label,* cannot support *prima facie* obviousness as it fails to disclose (1) long-acting drug-containing suspensions which provide therapeutic plasma levels of aripiprazole over a period of about one month, (2) the specific dose adjustments for specific patient populations, relative to patients with "normal" CYP2D6 or CYP3A4 enzyme function as claimed. Accordingly, *prima facie* obviousness has not been established, and for this reason alone, the rejection cannot be sustained.

(Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant Arguments/Remarks Made in an Amendment at 19.)

195.    Applicant further wrote: "Even if *Gopalakrishna* is considered prior art (which it is not), *Gopalakrishna* does not specify **what** dose adjustment would be appropriate for any

particular patient population." (Ex. 20 (the '057 patent file history) at Apr. 3, 2014 Applicant

Arguments/Remarks Made in an Amendment at 20.)

196.    On April 3, 2014, Applicant submitted an Affidavit Traversing Rejections or

Objections Under Rule 132. (Ex. 21 (the '057 patent file history) at Apr. 3, 2014 Raoufinia

Declaration.) This Affidavit contained the Declaration of Arash Raoufinia, Pharm.D., Under 37

C.F.R. § 1.132, dated April 2, 2014. (Ex. 21 (the '057 patent file history) at Apr. 3, 2014

Raoufinia Declaration.)

197.    On information and belief, Thomas A. Blinka (of Cooley LLP) was involved in

preparing Raoufinia's April 3, 2014 Declaration, which he submitted with the April 3, 2014

Applicant Arguments/Remarks Made in an Amendment. (Ex. 20 (the '057 patent file history) at

Apr. 3, 2014 Applicant Arguments/Remarks Made in an Amendment at 27.)

198.    In his Declaration, Raoufinia wrote:

> I am a co-inventor of the subject matter described and claimed in
> the above-captioned application, which is assigned to Otsuka
> Pharmaceutical Co., Ltd. (hereinafter "Otsuka"). I presently serve
> as the Director of Clinical Pharmacology, Global Clinical
> Development at Otsuka Pharmaceutical Development &
> Commercialization, Inc., a subsidiary of Otsuka. Otsuka has
> developed an injectable, long-acting suspension of aripiprazole
> currently marketed as ABILIFY MAINTENA.

(Ex. 21 (the '057 patent file history) at Apr. 3, 2014 Raoufinia Declaration at ¶ 1.)

199.    Raoufinia further wrote:

> I have a Pharm. D. from the Medical College of Virginia, and have
> 12 years of experience in clinical pharmacology,
> pharmacokinetics, and the development of drugs for the treatment
> of mental illness. During this period, I have carried out research in
> the area of Alzheimer's disease, schizophrenia, and depression. I
> also had the responsibility to draft the clinical pharmacology
> sections related to ABILIFY MAINTENA, a long-acting
> aripiprazole suspension intended for monthly administration.

(Ex. 21 (the '057 patent file history) at Apr. 3, 2014 Raoufinia Declaration at ¶ 2.)

200.    Raoufinia further wrote:

> I have reviewed the specification, claims, and pending Office
> Action in the above-captioned application, as well as the references
> cited therein.

(Ex. 21 (the '057 patent file history) at Apr. 3, 2014 Raoufinia Declaration at ¶ 3.)

201.    Raoufinia further wrote:

> The dose adjustments in the ABILIFY MAINTENA package insert
> (published by Otsuka Pharmaceutical Company Ltd.) (OPC), as
> referenced in Table 2 of *Gopalakrishna* (Gopalakrishna et al.,
> Clinical Schizophrenia and Related Psychoses, Summer 2013, pp.
> 87-82) were provided to OPC by myself and my coinventor,
> Robert McQuade.

(Ex. 21 (the '057 patent file history) at Apr. 3, 2014 Raoufinia Declaration at ¶ 7.)

202.    On information and belief, many of Raoufinia's statements to USPTO were those
that FDA's OCP Review team provided to Otsuka.  (Ex. 21 (the '057 patent file history) at Apr.
3, 2014 Raoufinia Declaration at ¶¶ 4, 8-13, 16-20.)

203.    Raoufinia concluded his Declaration by stating:

> I declare that all statements made herein on my own knowledge are
> true and that all statements made on information and belief are
> believed to be true and further that these statements are made with
> the knowledge that willful false statements and the like are
> punishable by fine or imprisonment, or both, under § 1001 of Title
> 18 of the United States Code, and that such willful false statements
> may jeopardize the validity of the above-referenced application or
> any patent issuing thereon.

(Ex. 21 (the '057 patent file history) at Apr. 3, 2014 Raoufinia Declaration at ¶ 21.)

204.    On May 8, 2014, the Examiner issued a Final Rejection.  (Ex. 22 (the '057 patent
file history) at May 8, 2014 Final Rejection.)

205.    The Examiner rejected claims 1, 4, 12, 15-16, 19, 22-23, and 27 as anticipated by
"Gopalakrishna et al. (Long-Acting Injectable Aripiprazole), already of record, for the reasons
set forth at pages 7-12 of previous office action dated February 3, 2014, of which reasons are

herein incorporated by reference." (Ex. 22 (the '057 patent file history) at May 8, 2014 Final

Rejection at 8.)

    206.    The Examiner wrote:

> Applicant has argued that Gopalakrishna is not properly prior art
> and has argued that the 35 USC 102(b)(1)(B) exception applies.
> Applicant indicates that Gopalakrishna was published in the
> "summer 2013" and is thus within the 1 year grace period that
> extends back to September 27, 2012. They indicate that the doses
> cited in Gopalakrishna are embodied in table 2 which cites to
> footnote 13 and that footnote 13 references the Abilify Maintena
> package insert which was published by Otsuka Pharmaceutical
> Company Ltd in February 2013 (also within the grace period).
> They state that the inventors are employees of Ostuka (OPDC) and
> that the subject matter relied upon by the examiner "i.e., long-
> acting, injectable aripiprazole doses" (see arguments page 14, 2nd
> paragraph) disclosed by Gopalakrishna was obtained from the
> Abilify Maintena label which is at least indirectly obtained from
> the inventors. Applicants arguments have been considered and the
> material in table 2 is no longer prior art, however only the material
> in which applicant identifies as being obtained by them is part of
> the exception, the rest of the reference still applies.

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 8.)

    207.    The Examiner further wrote: "Applicant has only identified table 2 and the 'long-

acting injectable aripiprazole doses' as being material obtained from the inventors.

Gopalakrishna still anticipates the rejection without that material." (Ex. 22 (the '057 patent file

history) at May 8, 2014 Final Rejection at 8-9.)

    208.    The Examiner further wrote:

> As mentioned above, for the purposes of this rejection the claims
> are being interpreted as encompassing at least from 75mg to
> 300mg of aripiprazole (based on 75% of 100mg and 400mg) for
> claim 1 and at least 50mg to 200mg for claim 4. Applicant claims
> 300mg (claim 15) and 200mg (claim 16) specifically and thus
> 200mg or 300mg reads upon all of the claimed ranges. Applicant
> has amended the claims and they still encompass some of the same
> subject matter, including encompassing administration to a subject
> that is either a poor metabolizer of CYP2D6 and not concomitantly
> administered a strong CYPe inhibitor or an extensive metabolizer
> administered a strong CYPe inhibitor with aripiprazole in a long-

acting injectable suspension with a dosage from 200-300mg.

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 9.)

209.    The Examiner further wrote:

> Although the Abilify Maintena recommended dosages in table 2 are no longer prior art, Gopalakrishna also reports the study of Fleischhacker et al.[2] which studied the effect of long-acting injectable forms of aripiprazole. Fleischhacker studied the effects of once-monthly ALAI[3] on patients with schizophrenia and they reported administering 400mg, 300mg and 200mg:

> > Aripiprazole LAI (ALAI) is a lyophilized powder that needs to be reconstituted with sterile water to form an injectable suspension without affecting the original molecule (33, 34). Fleischhacker et al. reported on a Phase 2, open-label, parallel-arm, multiple-dose, multicenter study evaluating the clinical stability, tolerability and pharmacokinetics of several doses of once-monthly ALAI. Forty-one patients with schizophrenia (ages 19–62) were studied and presented in abstract form at the 2011 Annual Meeting of the American Psychiatric Association (APA) (35). Following a 14-day titration/stabilization on oral aripiprazole (10 mg/day), 41 patients were randomized and administered ALAI either 400 mg (n=14), 300 mg (n=16) or 200 mg (n=11). On measures of efficacy and tolerability there was no worsening of symptoms from transition to the LAI and side effects were mild to moderate. Monthly administration of 300 mg and 400 mg ALAI (but not the 200 mg) was able to attain mean steady-state maximum aripiprazole plasma concentrations comparable with those achieved with multiple oral daily dosing of aripiprazole between 10–30 mg.
> >
> > (page 89, ¶ bridging columns 1-2)

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 9-10.)

210.    The Examiner wrote in footnote 2: "Fleischhacker et al. was published in 2011 and no exclusion can apply, see copy cited in previous office action and this office action."  (Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 9 n.2.)

211.    The Examiner wrote in footnote 3: "LAI refers to long-acting injectable antipsychotics (see page 88, column 1, 1st paragraph) and ALAI is the long-acting injectable aripiprazole as indicated by Gopalakrishna in page 89."  (Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 9 n.3.)

212.    The Examiner further wrote:

As seen above, they found that the 300mg and 400mg ALAI attained steady-state plasma concentrations comparable with the oral dosing of 10-30mg. Thus they clearly teach using a long-acting injectable aripiprazole (ALAI) in 300-400mg was effective and comparable to the standard oral dosing. Applicant can rely upon table 2 and argue that "long-acting, injectable aripiprazole doses" were obtained from applicant however in the case of the material above which directly references a study published in 2011 (and also cited herein, see below) that material most definitely did not come from applicant via the Abilify Maintena label. Thus those doses were already known in the prior art previous to the start of the grace-period and are not removed merely because applicant removes table 2.

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 10.)

213.    The Examiner further wrote:

Further, Applicant did not identify the section about dosage modifications:

Dose modifications have been emphasized in the package insert among patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors for more than 14 days. It also advises to avoid using ALAI in the    (page 91, col 2)

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 10-11.)

214.    The Examiner further wrote:

Additionally, table 3 which is also not excluded teaches that the long-acting injectable aripiprazole monohydrate had a dosage range of 160 to 400mg with a maximum recommended dosage of 400mg:

| Table 3 | Comparison Among Available LAIs in the United States | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Fluphenazine decanoate | Haloperidol decanoate | Risperidone microspheres | Paliperidone palmitate | Olanzapine pamoate | Aripiprazole monohydrate |
| Available dosage strengths | 25 mg/mL (injectable dose) | 50 mg/mL, 100 mg/mL (injectable dose) | 12.5 mg, 25 mg, 37.5 mg, 50 mg | 39 mg, 78 mg, 117 mg, 156 mg, 234 mg | 210 mg, 300 mg, 405 mg | 300 mg, 400 mg |
| Dose range | 12.5 to 100 mg | 20 to 450 mg | 12.5 to 50 mg | 39 to 234 mg | 150 to 405 mg | 160 to 400 mg |
| Maximum recommended dose | 100 mg every 2 weeks | 450 mg every 4 weeks | 50 mg every 2 weeks | 234 mg every 4 weeks | 300 mg every 2 weeks or 405 mg every 4 weeks | 400 mg |
| Injection site | Deltoid or gluteal | Deltoid or gluteal | Deltoid or gluteal | Deltoid or gluteal | Gluteal only | Gluteal only |
| Injection technique | Z-track | Z-track | Standard | Standard | Standard | Standard |
| Solubilization and vehicle | Ester in sesame seed oil | Ester in sesame seed oil | Microsphere matrix in aqueous suspension | Nanoparticle in aqueous suspension | Nanoparticles in aqueous suspension | Lyophilized powder reconstituted with sterile water to form an injectable suspension |
| Initiation or loading | Loading possible | Loading possible | None | Initiation required | Initiation required | None |
| Time to peak | 8–24 hours | 3–9 days | 4–5 weeks | 13 days | <1 week | 5–7 days |
| Overlap with oral | 1 week | 4 weeks (none if loading) | 3 weeks | None | None | 2 weeks |
| Time to steady state | 2–3 months | 2–3 months | 6–8 weeks | 36 days | 3 months | 3–4 months |

(page 91,

aripiprazole in last column on right)

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 11.)

215.  The Examiner further wrote:

> Thus clearly Gopalakrishna teaches both dosages of 160mg, 200mg, 300mg and 400mg for long-acting injectable aripiprazole as well as directly teaching that dosage modifications are necessary for poor CYP2D6 metabolizers or those on concomitant CYPe inhibitors. Thus they clearly teach using dosages such as 200mg and 300mg which read upon all of the claimed dosages as well as teaching administering to poor metabolizers and those on CYPe inhibitors with a reduced dosage.

> Newly added claims 22-23 and 27 recite limitations that are addressed above such as the patient is schizophrenic (claim 22), the suspension comprises aripiprazole (claim 23) or the patient is a CYP2D6 poor metabolizer (claim 27). As shown above, Gopalakrishna teaches dosages of 200mg and 300mg or [sic] aripiprazole were used to treat patients with schizophrenia and also teaches treating subjects who are poor metabolizers of CYP2D6 with a reduced dosage.

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 11-12.)

216.  The Examiner also wrote:

Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 17-18.)

217.    The Examiner further rejected claims 1, 4, 12-13, 15-16, 19, 22-23, and 26-30 as obvious over "Gopalakrishna et al. (Long-Acting Injectable Aripiprazole) in view of (Abilify label), each already of record, for the reasons set forth at pages 13-20 of previous office action dated February 3, 2014, of which reasons are herein incorporated by reference."  (Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 18.)

218.    The Examiner stated:

Applicant has argued that Gopalakrishna is not properly prior art and has argued that the 35 USC 102(b)(1)(B) exception applies. Applicant indicates that Gopalakrishna was published in the "summer 2013" and is thus within the 1 year grace period that extends back to September 27, 2012. As indicated above with respect to the anticipation rejection, the reasons of which are herein incorporated by reference, applicant only identifies table 2, so that material is excluded however the rest of Gopalakrishna is still applicable.

(Ex. 22 (the '057 patent file history) at May 8, 2014 Final Rejection at 18.)

219.    On May 30, 2014, Applicant entered a Power of Attorney, signed by Seiji Ejima, Director, IP Department of Otsuka Pharmaceutical Co., Ltd.  (Ex. 23 (the '057 patent file history) at May 30, 2014 Power of Attorney.)

220.    On November 7, 2014, Applicant filed a "Request to Correct Inventorship" to remove Robert McQuade as an inventor who "was erroneously named as an inventor without deceptive intention on his part."  (Ex. 24 (the '057 patent file history) at Nov. 7, 2014 Request Under Rule 48 Correcting Inventorship.)

221.    On June 8, 2015, Applicant filed a Request for Continued Examination.  (Ex. 25

(the '057 patent file history) at June 8, 2015 Request for Continued Examination.)

222.    Applicant canceled all 30 pending claims and added 30 new claims.  (Ex. 26 (the

'057 patent file history) at June 8, 2015 Claims.)

223.    Applicant responded to the May 18, 2014 Final Rejection by stating:

> The claims have been rejected as anticipated by *Gopalakrishna*
> (Gopalakrishna et al., Clinical Schizophrenia and Related
> Psychoses, Summer 2013, pp. 87-82).  Applicant thanks the
> Examiner for her indication that the "material in table 2 is no
> longer prior art" as it was derived from the ABILIFY MAINTENA
> package insert which is at least indirectly obtained from the
> inventor. However, the Examiner has still maintained her rejection
> based on a citation to *Gopalakrishna 's* disclosure at page 91,
> column 2, lines 1-11, and Table 3.

> Applicant respectfully submits that *Gopalakrishna's* disclosure at
> page 91, column 2, lines 1-11 is also excluded as prior art, for the
> same reasons as the material in table 2.  This citation states, in part
> "[d]ose modifications have been emphasized ***in the package insert***
> among patients who are poor CYP2D6 metabolizers or on
> concomitant CYP2D6 or CYP3A4 inhibitors . . . ." (emphasis
> added).

(Ex. 27 (the '057 patent file history) at June 8, 2015 Applicant
Arguments/Remarks Made in an Amendment at 11.)

224.    Applicant further wrote:

> On its face, *Gopalakrishna* was published in "Summer 2013" and
> thus was necessarily disclosed "1 year or less before the effective
> filing date" of the present application (September 24, 2013).  In the
> context of *Gopalakrishna,* which is directed to administration of
> aripiprazole depot *(i.e.,* ABILIFY MAINTENA), the disclosure at
> page 91, column 2, lines 1-11 of *Gopalakrishna* can reasonably
> only be interpreted as derived from the ABILIFY MAINTENA
> package insert.

> The inventor, Arash Raoufinia, is an employee of Otsuka
> Pharmaceutical Development and Commercialization, Inc.
> (OPDC), a subsidiary of Otsuka Pharmaceutical Company Ltd.
> (OPC). The subject matter relied upon by the Examiner in the
> rejection *(i.e.,* at page 91, column 2, lines 1-11 of *Gopalakrishna)*
> was obtained from the ABILIFY MAINTENA package insert

published by OPC, which at least indirectly obtained such subject matter from the inventor (who provided the dose adjustment information used in the label for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors). Accordingly, the disclosure at page 91, column 2, lines 1-11 of *Gopalakrishna* relied upon by the Examiner cannot be prior art under the exception of 35 USC 102(b)(1)(A).

Alternatively, since the ABILIFY MAINTENA package insert was published by OPC less than 1 year the effective filing date of the present invention prior to the disclosure at page 91, column 2, lines 1-11 of *Gopalakrishna,* and OPC at least indirectly obtained such subject matter from the inventor *(132 Declaration* filed April 3, 2014, paragraph 7), this and other disclosures of *Gopalakrishna* related to dose adjustments for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors, relied upon by the Examiner, cannot be prior art under the exception of 35 USC 102(b)(1)(B).

(Ex. 27 (the '057 patent file history) at June 8, 2015 Applicant Arguments/Remarks Made in an Amendment at 12-13.)

225.    Applicant further wrote:

As the disclosures in *Gopalakrishna* related to dose adjustments for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 and/or CYP3A4 inhibitors are not prior art, the rejection under 35 USC § 102(a)(l) necessarily fails, as neither the remaining disclosure of *Gopalakrishna* nor that of *Fleischhacker* disclose treatment of the four specific patient populations claimed:

1. A patient who is an extensive metabolizer of aripiprazole and is concomitantly administered a strong CYP2D6 inhibitor or a strong CYP3A4 inhibitor (claim 31);

2. A patient who is a CYP2D6 poor metabolizer not concomitantly administered a strong CYP3A4 inhibitor or a strong CYP2D6 inhibitor (claim 40);

3. A patient who is an extensive metabolizer of aripiprazole and is concomitantly administered a strong CYP2D6 inhibitor and a strong CYP3A4 inhibitor (claim 47); and

4. A patient who is a CYP2D6 poor metabolizer concomitantly administered a strong CYP3A4 inhibitor or a strong CYP2D6 inhibitor.

Furthermore, neither the remaining disclosure of *Gopalakrishna*

nor that of *Fleischhacker* discloses the claimed dose adjustments for such patients.

Accordingly, Applicant respectfully submits that the present claims are not anticipated by either *Gopalakrishna* or *Fleischhacker.* Applicants respectfully request that the rejection be withdrawn.

(Ex. 27 (the '057 patent file history) at June 8, 2015 Applicant Arguments/Remarks Made in an Amendment at 13.)

226. Regarding the obviousness rejection, Applicant wrote:

As discussed above, none of the disclosures in *Gopalakrishna* related to poor metabolizers, or concomitant administration of strong inhibitors are properly prior art. Accordingly, as a matter of law *Gopalakrishna* cannot be relied upon by the Examiner as disclosing any method of administering to the claimed patient populations, let alone as disclosing adjusting the recommended dose administered to such patients.

(Ex. 27 (the '057 patent file history) at June 8, 2015 Applicant Arguments/Remarks Made in an Amendment at 15.)

227. On June 1, 2015 (and published June 11, 2015), Applicant had an interview with the Examiner, with the Examiner summarizing the interview as: "*The Gopalakrishna reference and 102 rejection based on that reference was discussed; applicant indicated that they would also exclude the section with regard to dosage adjustments on page 91 of Gopalakrishna in addition to table 2.*" (Ex. 28 (the '057 patent file history) at June 11, 2015 Applicant Initiated Interview Summary.)

228. On November 3, 2015, the Examiner issued a non-final rejection, rejecting all pending claims in light of various prior art. (Ex. 29 (the '057 patent file history) at Nov. 3, 2015 Non-Final Rejection.)

229. On January 4, 2016, Applicant filed an Amendment/Request for Reconsideration After Non-Final Rejection. (Ex. 30 (the '057 patent file history) at Jan. 4, 2016 Amendment/Request for Reconsideration After Non-Final Rejection.)

230.    On January 29, 2016 (published February 11, 2016), Applicant and Examiner discussed various "prior art of record."  (Ex. 31 (the '057 patent file history) at Feb. 11, 2016 Applicant Initiated Interview Summary.)

231.    On February 17, 2016, Applicant filed Applicant Arguments/Remarks Made in an Amendment.  (Ex. 32 (the '057 patent file history) at Feb. 17, 2016 Applicant Arguments/Remarks Made in an Amendment.)

232.    On February 17, 2016, Applicant filed a supplemental declaration of Arash Raoufinia.  (Ex. 33 (the '057 patent file history) at Feb. 17, 2016 Affidavit Traversing Rejections or Objections Rule 132.)

233.    On information and belief, Raymond S. Parker, III (of Cooley LLP) was involved in preparing Raoufinia's February 17, 2016 Supplemental Declaration, which he submitted with the February 17, 2016 Applicant Arguments/Remarks Made in an Amendment.  (Ex. 32 (the '057 patent file history) at Feb. 17, 2016 Applicant Arguments/Remarks Made in an Amendment at 7.)

234.    The Raoufinia Supplemental Declaration states:

> I also had the responsibility to draft the clinical pharmacology sections related to ABILIFY MAINTENA, a long-acting aripiprazole suspension intended for monthly administration.

(Ex. 33 (the '057 patent file history) at Feb. 17, 2016 Affidavit Traversing Rejections or Objections Rule 132 at ¶ 2.)

235.    The Raoufinia Supplemental Declaration further states: "This Declaration is intended to supplement the matters raised in my Declaration submitted on April 3, 2014."  (Ex. 33 (the '057 patent file history) at Feb. 17, 2016 Affidavit Traversing Rejections or Objections Rule 132 at ¶ 4.)

236.    The Raoufinia Supplemental Declaration further states: "I have reviewed the specification, pending claims, and Office Action dated November 3, 2015, in the above-

captioned application, as well as the references cited therein." (Ex. 33 (the '057 patent file history) at Feb. 17, 2016 Affidavit Traversing Rejections or Objections Rule 132 at ¶ 3.)

237.    The Raoufinia Supplemental Declaration further states:

As one of skill in the art, I submit the following:

- none of the art cited discloses a pharmacokinetic/pharmacodynamic (PK/PD) relationship for a dose regimen using a long acting aripiprazole suspension formulation in an enzyme impaired patient population;

- the release profile for short acting oral aripiprazole tablets or injectable short-acting aripiprazole solutions is substantially different from that of the long acting suspension formulation used in the claimed invention;

- none of the art discloses that there is a way to correlate PK/PD information about short acting oral aripiprazole tablets or injectable short-acting aripiprazole solutions to PK/PD information for a dose regimen using a long acting suspension formulation in an enzyme impaired patient population;

- without the conducting of an appropriately designed clinical trial using the long acting aripiprazole suspension formulation in an enzyme impaired patient population one would not have known what, or if any, dose adjustment needed to be made; and

- the particular claimed adjustment to the normal dose regimen could not have been predicted based on the cited art, particularly art related to short-acting, daily dosed aripiprazole dosage forms, but was only determined from the analysis of the clinical trial results.

(Ex. 33 (the '057 patent file history) at Feb. 17, 2016 Affidavit Traversing Rejections or Objections Rule 132 at ¶ 5.)

238.    The Raoufinia Supplemental Declaration further states:

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true and further that these statements are made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under § 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the above-referenced application or

any patent issuing thereon.

(Ex. 33 (the '057 patent file history) at Feb. 17, 2016 Affidavit Traversing Rejections or Objections Rule 132 at ¶ 6.)

239.    On March 10, 2016, the Examiner issued a Final Rejection. (Ex. 34 (the '057 patent file history) at Mar. 10, 2016 Final Rejection.)

240.    On June 10, 2016, Applicant filed a Notice of Appeal to the Patent Trial and Appear Board. (Ex. 35 (the '057 patent file history) at June 10, 2016 Notice of Appeal Filed.)

241.    On March 12, 2019, PTAB reversed the Examiner, and cited "the Declaration of Arash Raoufinia" as part of its evidence. (Ex. 36 (the '057 patent file history) at Mar. 12, 2019 Patent Board Decision, at 8-10) (finding that "Declaratory evidence as to issues of fact is entitled to substantial weight.").

242.    On August 30, 2019, Applicant filed a Power of Attorney, switching prosecution counsel from Thomas A. Blinka (of Cooley LLP) to Adriana L. Burgy (of Finnegan). (Ex. 37 (the '057 patent file history) at Aug. 30, 2019 Power of Attorney.) Burgy continued prosecution for all remaining CYP Patents.

243.    On September 17, 2019, the Examiner issued a Notice of Allowance. (Ex. 38 (the '057 patent file history) at Sept. 17, 2019 Notice of Allowance and Fees Due.)

### 4.    Claims

244.    The '057 patent has 20 claims (3 independent claims and 17 dependent claims). (Ex. 12 (the '057 patent) at col. 9, l. 44 – col. 10, l. 57.)

245.    Independent claim 1 is directed to:

> A method of initiating systemic aripiprazole treatment in a patient, comprising initially intramuscularly administering to the patient 66% to 75% of a 300 or 400 mg weight equivalent dose of aripiprazole in the form of a long-acting drug-containing suspension which systemically releases aripiprazole, wherein the dose is released over a period of about one month, and wherein the patient is a CYP2D6 and CYP3A4 extensive metabolizer and is

concomitantly administered a strong CYP2D6 inhibitor or a strong CYP3A4 inhibitor.

(Ex. 12 (the '057 patent) at claim 1.)

246.    Independent claim 9 is directed to:

A method of initiating systemic aripiprazole treatment in a patient, comprising initially intramuscularly administering to the patient 75% of a 300 or 400 mg weight equivalent dose of aripiprazole in the form of a long-acting drug-containing suspension which systemically releases aripiprazole, wherein the dose is released over a period of about one month, and wherein the patient is a CYP2D6 poor metabolizer not concomitantly administered a strong CYP3A4 inhibitor or a strong CYP2D6 inhibitor.

(Ex. 12 (the '057 patent) at claim 9.)

247.    Independent claim 15 is directed to:

A method of initiating systemic aripiprazole treatment in a patient, comprising initially intramuscularly administering to the patient 53% of a 300 mg or 50% of a 400 mg weight equivalent dose of aripiprazole in the form of a long-acting drug-containing suspension which systemically releases aripiprazole, wherein the dose is released over a period of about one month, and wherein the patient is a CYP2D6 and CYP3A4 extensive metabolizer and is concomitantly administered a strong CYP2D6 inhibitor and a strong CYP3A4 inhibitor.

(Ex. 12 (the '057 patent) at claim 15.)

**B.    U.S. PATENT NO. 10,980,803**

**1.    Background**

248.    The '803 patent is titled "Method of providing aripiprazole to patients having impaired CYP2D6 or CYP3A4 enzyme function."  (Ex. 39 (the '803 patent) at Title.)

249.    The inventor listed on the face of the '803 patent is "Arash Raoufinia."  (Ex. 39 (the '803 patent) at Inventor.)

250.     The Abstract of the '803 patent states: "The disclosed embodiments relate to methods of initiating aripiprazole treatment in a patient who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, or both."  (Ex. 39 (the '803 patent) at Abstract.)

251.     There are two Figures in the '803 patent specification.  (Ex. 39 (the '803 patent) at Figures 1, 2.)  Figure 1 is:



Figure 1

(Ex. 39 (the '803 patent) at Figure 1.)

252.     Figure 2 is:



Figure 2

(Ex. 39 (the '803 patent) at Figure 2.)

253.     The title, inventor, abstract, and figures of the '803 patent are identical to the '057 patent.

**2.     Specification**

- 91 -

254.    The '803 patent is a "continuation of U.S. application Ser. No. 14/034,727, filed

Sep. 24, 2013, now U.S. Pat. No. 10,525,057," and therefore otherwise has a substantially

identical specification to the '057 patent except for the first paragraph of the specification, which

discusses that the '803 patent is a continuation application.  (Ex. 39 (the '803 patent) at col. 1, ll.

5-6.)

### 3.    Prosecution History

255.    U.S. Application No. 16/710,495 (the "'495 application") was filed on December

11, 2019.  (Ex. 39 (the '803 patent) at (21) Appl. No., (22) Filed.)  The '495 application would

mature into the '803 patent, which issued on April 20, 2021.  (Ex. 39 (the '803 patent) at (45)

Date of Patent.)

256.    On December 11, 2019, Arash Raoufinia submitted his "Declaration (37 CFR

1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)."  (Ex.

40 (the '803 patent file history) at Dec. 11, 2019 Oath or Declaration Filed.)

257.    This Declaration provided that: "I believe I am the original inventor or an original

joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful

false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or

imprisonment of not more than five (5) years, or both."  (Ex. 40 (the '803 patent file history) at

Dec. 11, 2019 Oath or Declaration Filed.)

258.    On August 6, 2020, the '495 application's claims were amended.  (Ex. 41 (the

'803 patent file history) at Aug. 6, 2020 Claims.)

259.    On August 6, 2020, Adriana L. Burgy provided "Remarks" based on the

amendments to the specification and claims filed and wrote: "By this amendment, Applicant

cancels claims 1-20 without prejudice or disclaimer of the subject matter, adds new claims 21-

45, and amends the specification to incorporate the priority claim.  Claims added herein find

support in the original claims and as-filed specification.  No new matter is added."  (Ex. 42 (the

'803 patent file history) at Aug. 6, 2020, Applicant Arguments/Remarks Made in an

Amendment.)

260.    On August 24, 2020, Otsuka Pharmaceutical Co., Ltd. filed its "Power of

Attorney by Applicant," with the document signed by Masaki Sobe, the "Director of Intellectual

Property Department" on April 16, 2020.  (Ex. 43 (the '803 patent file history) at Aug. 24, 2020

Power of Attorney.)

261.    On December 24, 2020, the USPTO issued its Notice of Allowance and Fee(s)

Due to the '495 application.  (Ex. 44 (the '803 patent file history) at Dec. 24, 2020 Notice of

Allowance and Fees Due.)

262.    In the "Reasons for Allowance," the Examiner wrote:

> The Examiner has considered the decision of the PTAB in parent
> application No. 14/034,727 dated March 12, 2019, particularly at
> pages 8-10 thereof relating the criticalness of IM administration of
> aripiprazole in the claimed patient population, and conducted a
> thorough search of the appropriate data bases for the claimed
> subject matter and did not discover any reference which anticipates
> that claimed subject matter or would form a basis for concluding
> that the claimed subject matter would have been obvious. Also, all
> pending claims, claims 21-45, are presented in an enabled, definite
> manner.

(Ex. 44 (the '803 patent file history) at Dec. 24, 2020 Notice of Allowance and
Fees Due.)

263.    In the List of References Cited by Examiner, the "Search Notes" states "Parent

application/board decision reviewed."  (Ex. 45 (the '803 patent file history) at Dec. 24, 2020 List

of References Cited by Examiner.)

264.    On February 8, 2021, the USPTO filed a Miscellaneous Communication with an

Examiner's Amendment because the claim number "21" appeared twice.  (Ex. 46 (the '803

patent file history) at Feb. 8, 2021 Miscellaneous Communication to Applicant – No Action

Count.)

265.    On March 3, 2021, the USPTO issued its Notice of Allowance and Fee(s) Due to the '495 application.  (Ex. 47 (the '803 patent file history) at Mar. 3, 2021 Notice of Allowance and Fees Due.)

266.    On March 3, 2021, the USPTO issued its Issue Notification for the '495 application and that it issued as the '803 patent.  (Ex. 48 (the '803 patent file history) at Mar. 3, 2021 Issue Notification.)

### 4.    Claims

267.    The '803 patent issued with 26 claims (6 independent claims and 20 dependent claims).  (Ex. 39 (the '803 patent) at col. 9, l. 50 – col. 11, l. 31.)

268.    Independent claim 1 is directed to:

> A method of treating schizophrenia in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of about 300 mg or of aripiprazole prodrug of about 441 mg, wherein the dose is systemically released over a period of about one month, and the patient is a CYP2D6 poor metabolizer.

(Ex. 39 (the '803 patent) at claim 1.)

269.    Independent claim 19 is directed to:

> A method of treating schizophrenia in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 198 mg, wherein the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor, where an initial recommended dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 300 mg, and the dose is systemically released over a period of about one month.

(Ex. 39 (the '803 patent) at claim 19.)

270.    Independent claim 23 is directed to:

> A method of treating schizophrenia in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 159 mg, wherein the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors, where an initial recommended dose for a patient with

normal CYP2D6 or CYP3A4 enzyme function is 300 mg of aripiprazole, and the dose is systemically released over a period of about one month.

(Ex. 39 (the '803 patent) at claim 23.)

### C.    U.S. PATENT NO. 11,154,553

#### 1.    Background

271.    The '553 patent is titled "Method of providing aripiprazole to patients having impaired CYP2D6 or CYP3A4 enzyme function."  (Ex. 49 (the '553 patent) at Title.)

272.    The inventor listed on the face of the '553 patent is "Arash Raoufinia."  (Ex. 49 (the '553 patent) at Inventor.)

273.    The Abstract of the '553 patent states: "The disclosed embodiments relate to methods of initiating aripiprazole treatment in a patient who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, or both."  (Ex. 49 (the '553 patent) at Abstract.)

274.    There are two Figures in the '553 patent specification.  (Ex. 49 (the '553 patent) at Figures 1, 2.)  Figure 1 is:



Figure 1

(Ex. 49 (the '553 patent) at Figure 1.)

275.    Figure 2 is:

Figure 2

(Ex. 49 (the '553 patent) at Figure 2.)

276.    The title, inventor, abstract, and figures of the '553 patent are identical to the '057 and '803 patents.

### 2.    Specification

277.    The '553 patent is a "a continuation of U.S. application Ser. No. 17/206,241, filed on Mar. 19, 2021, which is a continuation of U.S. application Ser. No. 16/710,495, filed Dec. 11, 2019, now U.S. Pat. No. 10,980,803, issued Apr. 20, 2021, which is a continuation of U.S. application Ser. No. 14/034,727, filed Sep. 24, 2013, now U.S. Pat. No. 10,525,057," and therefore otherwise has a substantially identical specification to the '057 and '803 patents except for the first paragraph of the specification, which discusses that the '553 patent is a continuation application.  (Ex. 49 (the '553 patent) at col. 1, ll. 5-10.)

### 3.    Prosecution History

278.    U.S. Application No. 17/304,610 (the "'610 application") was filed on June 23, 2021.  (Ex. 49 (the '553 patent) at (21) Appl. No, (22) Filed.)  The '610 application would mature into the '553 patent, which issued on October 26, 2021.  (Ex. 49 (the '553 patent).)

279.    On June 23, 2021, Arash Raoufinia filed his "Declaration (37 CFR 1.63) For Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)."  (Ex. 50 (the '553 patent file history) at June 23, 2021 Oath or Declaration Filed.)

280.    Arash Raoufinia wrote: "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful

false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both." (Ex. 50 (the '553 patent file history) at June 23, 2021 Oath or Declaration Filed.)

281.    On June 23, 2031, the '610 application's claims were amended. (Ex. 51 (the '553 patent file history) at June 23, 2021 Claims.)

282.    On June 23, 2021, Applicant wrote: "Upon entry of the Amendment, Applicant amends the specification to include the claim for priority and amends the claims. Applicant cancels claims 1-20 without prejudice and/or disclaimer of subject matter. Applicant presents new claims 21-50; support for these new claims can be found in the as-filed specification and now cancelled claims." (Ex. 52 (the '553 patent file history) at June 23, 2021 Applicant Arguments/Remarks Made in an Amendment.)

283.    On June 23, 2021, applicant submitted the Information Disclosure Statement and stated that "The listed documents are of record in prior U.S. Application No. 17/206,241, filing date March 19, 2021, upon which Applicant relies for the benefits provided in 35 U.S.C. § 120[.]" (Ex. 53 (the '553 patent file history) at June 23, 2021 Letter Specifying the Conditions for Filing.)

284.    On June 23, 2021, Otsuka Pharmaceutical Co., Ltd. filed its "Power of Attorney by Applicant," with the document signed by Masaki Sobe, the "Director of Intellectual Property Department" on April 16, 2020. (Ex. 54 (the '553 patent file history) at June 23, 2021 Power of Attorney.)

285.    On July 21, 2021, the USPTO issued a Notice of Allowance to the '610 application. (Ex. 55 (the '553 patent file history) at July 21, 2021 Notice of Allowance and Fees Due.)

286.    In the "Examiner Comments/Reasons For Allowance," the Examiner wrote:

The Examiner has considered the decision of the PTAB in parent application No. 14/034,727 dated March 12, 2019, particularly at pages 8-10 thereof relating the criticalness of IM administration of aripiprazole in the claimed patient population, and conducted a thorough search of the appropriate data bases for the claimed subject matter and did not discover any reference which anticipates that claimed subject matter or would form a basis for concluding that
the claimed subject matter would have been obvious.

The possibility of double patenting over the claims of the parent application, now U.S. Patent No. 10,980,803, has also been visited by the Examiner. No double patenting issue is deemed present because nothing in the claims of the parent application teaches or suggests to orally administer an antipsychotic agent after the first IM administration of aripiprazole. Also, all pending claims, claims 21-45, are presented in an enabled, definite manner.

(Ex. 55 (the '553 patent file history) at July 21, 2021 Notice of Allowance and Fees Due.)

287.    In the "List of References Cited by Examiner," the "Search Notes" state: "Parent application/board decision reviewed."  (Ex. 56 (the '553 patent file history) at July 21, 2021 List of References Cited by Examiner.)

288.    On September 2, 2021, Applicant Filed its Amendment After Notice of Allowance, amending claims 27, 28, 42, and 43 because "Applicant noted that in claims 27, 28, 42, and 43, the dependency was incorrect.  The requested amendment is submitted to correct the dependency of those claims."  (Ex. 57 (the '553 patent file history) at September 2, 2021 Amendment after Notice of Allowance; Ex. 58 (the '553 patent file history) at September 2, 2021 Claims; Ex. 59 (the '553 patent file history) at September 2, 2021 Applicant Arguments/Remarks Made in an Amendment.)

289.    Applicant further wrote: "Each of the requested amendments is fully supported by the specification and drawings, will not require an additional search, and does not raise new issues.  Therefore, Applicant respectfully requests that this Amendment be entered and the

requested changes made." (Ex. 59 (the '553 patent file history) at September 2, 2021 Applicant Arguments/Remarks Made in an Amendment.)

290.    On September 17, 2021, the Examiner entered the September 2, 2021 amendment. (Ex. 60 (the '553 patent file history) at September 17, 2021 Response to Amendment.)

291.    On October 6, 2021, the Examiner issued its Issue Notification, noting that the '610 application would issue as the '553 patent. (Ex. 61 (the '553 patent file history) at October 6, 2021 Issue Notification.)

### 4.    Claims

292.    The '553 patent has 30 claims (4 independent claims and 26 dependent claims). Ex. 49 (the '553 patent) at col. 9, l. 51 – col. 12, l. 30.)

293.    Independent claim 1 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg or 160 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension, wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors.

(Ex. 49 (the '553 patent) at claim 1.)

294.    Independent claim 10 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg or 160 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension, wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors, wherein the dose is systemically released over a period of about one month, the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension, the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and the step of intramuscularly administering is in the patient's deltoid or

gluteal muscle.

(Ex. 49 (the '553 patent) at claim 10.)

295.    Independent claim 16 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension,
> wherein the dose is systemically released over a period of about one month and the patient is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor.

(Ex. 49 (the '553 patent) at claim 16.)

296.    Independent claim 25 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension,
> wherein the dose is systemically released over a period of about one month, the patient is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor, the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension, the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

(Ex. 49 (the '553 patent) at claim 25.).

## D.    U.S. PATENT NO. 11,344,547

### 1.    Background

297.    The '547 patent is titled "Method of providing aripiprazole to patients having impaired CYP2D6 or CYP3A4 enzyme function."  (Ex. 62 (the '547 patent) at Title.)

298.    The inventor listed on the face of the '547 patent is "Arash Raoufinia."  (Ex. 62 (the '547 patent) at Inventor.)

299.    The Abstract of the '547 patent states: "The disclosed embodiments relate to methods of initiating aripiprazole treatment in a patient who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, or both."  (Ex. 62 (the '547 patent) at Abstract.)

300.    There are two Figures in the '547 patent specification.  (Ex. 62 (the '547 patent) at Figures 1, 2.)  Figure 1 is:



Figure 1

(Ex. 62 (the '547 patent) at Figure 1.)

301.    Figure 2 is:



Figure 2

(Ex. 62 (the '547 patent) at Figure 2.)

302.    The title, inventor, abstract, and figures of the '547 patent are identical to the '057, '803, and '553 patents.

## 2.    **Specification**

303.    The '547 patent is "a continuation of U.S. application Ser. No. 17/304,610, filed on Jun. 23, 2021, which is a continuation of U.S. application Ser. No. 17/206,241, filed on Mar. 19, 2021, which is a continuation of U.S. application Ser. No. 16/710,495, filed Dec. 11, 2019, now U.S. Pat. No. 10,980,803, issued Apr. 20, 2021, which is a continuation of U.S. application Ser. No. 14/034,727, filed Sep. 24, 2013, now U.S. Pat. No. 10,525,057," and therefore otherwise has an substantially identical specification to the '057, '803, and '553 patents except for the first paragraph of the specification, which discusses that the '547 patent is a continuation application.  (Ex. 62 (the '547 patent) at col. 1, ll. 5-12.)

### 3.    Prosecution History

304.    U.S. Application No. 17/459,221 (the "'221 application") was filed on September 9, 2021.  (Ex. 62 (the '547 patent) at (21) Appl, No, (22) Filed.)  The '221 application matured into the '547 patent and issued on May 31, 2022.  (Ex. 62 (the '547 patent).)

305.    On August 27, 2021, Otsuka Pharmaceutical Co., Ltd. filed its "Power of Attorney by Applicant," with the document signed by Masaki Sobe, the "Director of Intellectual Property Department" on April 16, 2020.  (Ex. 63 (the '547 patent file history) at Aug. 27, 2021 Power of Attorney.)

306.    On August 27, 2021, Arash Raoufinia filed his "Declaration (37 CFR 1.63) For Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)."  (Ex. 64 (the '547 patent file history) at August 27, 2021 Oath or Declaration Filed.)

307.    Arash Raoufinia wrote: "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both."  (Ex. 64 (the '547 patent file history) at August 27, 2021 Oath or Declaration Filed.)

308.    On August 27, 2021, Applicant filed its Information Disclosure Statement and wrote: "The listed documents are of record in prior U.S. Application No. 17/304,610, filing date June 23, 2021, upon which Applicant relies for the benefits provided in 35 U.S.C. § 120[.]"  (Ex. 65 (the '547 patent file history) at August 27, 2021 Information Disclosure Statement.)

309.    On August 27, 2021, Applicant amended the claims of the '221 application.  (Ex. 66 (the '547 patent file history) at August 27, 2021 Claims.)

310.    Adriana L. Burgy wrote: "Upon entry of the Amendment, Applicant amends the specification to include the claim for priority and amends the claims.  Applicant cancels claims 1-20 without prejudice and/or disclaimer of subject matter.  Applicant presents new claims 21-44; support for these new claims can be found in the as-filed specification and now cancelled claims."  (Ex. 67 (the '547 patent file history) at Aug. 27, 2021 Applicant Arguments/Remarks Made in an Amendment.)

311.    On December 17, 2021, the Examiner issued a Non-Final Rejection for the '221 application.  (Ex. 68 (the '547 patent file history) at Dec. 17, 2021 Non-Final Rejection.)

312.    The Examiner rejected pending claims 21-35 under 35 U.S.C. § 112(b) "as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor . . . regards as the invention."  (Ex. 68 (the '547 patent file history) at Dec. 17, 2021 Non-Final Rejection at 2.)

313.    The Examiner wrote:

> The term "strong" in the expression "strong CYP2D6 or CYP3A4 inhibitor" of claims 21, 27 and 28 is a relative term which renders the claim indefinite. The term "strong" is not defined by the claim, the specification, while setting forth this expression at paragraphs [0023]-[0024], does not provide a standard for ascertaining the requisite degree, and one of ordinary skill in the art would not be reasonably apprised of the scope of the invention.

(Ex. 68 (the '547 patent file history) at Dec. 17, 2021 Non-Final Rejection at 2-3.)

314.    On December 17, 2021, the Examiner issued its Search Information and the

"Search Notes" provided that "Parent application/board decision reviewed."  (Ex. 69 (the '547

patent file history) at Dec. 17, 2021 Search Information.)

315.    On March 17, 2022, Applicant responded to the Non-Final Rejection and wrote:

> Applicant's as-filed specification provides several examples of "strong CYP2D6 or CYP3A4 inhibitors" providing meaning to the term "strong."  That is, Applicant's explain that Strong CYP3A4 inhibitors are known in the art and include [a list of inhibitors.] Strong CYP2D6 inhibitors are also known in the art and include [a list of inhibitors].

(Ex. 70 (the '547 patent file history) at Mar. 17, 2022 Applicant Argument/Remarks Made in an Amendment at 3-4. (emphasis omitted))

316.    Applicant further wrote:

> Additionally, in the parent application (i.e., US Application No. 14/034,727, filed September 24, 2013, now US Patent No. 10,525,057) in response to a final Office Action dated May 8, 2014, Applicant noted that "the terms 'strong CYP2D6 inhibitor,' and 'strong CYP3A4 inhibitor' are well understood in the art to refer to substrates (e.g., concomitantly administered drugs) which strongly inhibit the activity of the CYP2D6 and CYP3A4 enzymes." Amendment/Response to Office Action dated June 18, 2015, at page 10. Further, "[e]xamples of such inhibitors are well known in the art" citing the "*Abilify Label* [dated February 12, 2012] at page 2, under 'DRUG INTERACTIONS' and Section 2.6 (disclosing inhibitors such as ketoconazole, clarithromycin, quinidine, fluoxetine, paroxetine, etc.)" that was art cited against the parent application. *Id.* This is further evidence that the term "strong" CYP3A4 and CYP2D6 inhibitors are terms of art readily understood by one of skill in the art and recognized in the art as such as noted by the *Abilify Label* cited against the parent application.

(Ex. 70 (the '547 patent file history) at Mar. 17, 2022 Applicant Argument/Remarks Made in an Amendment at 4. (footnote omitted))

317.    On April 4, 2022, the Examiner issued a Notice of Allowance to the '221

application.  (Ex. 71 (the '547 patent file history) at Apr. 4, 2022 Notice of Allowance and Fees

Due.)

318.    On May 11, 2022, the Examiner issued an Issue Notification that the '221 application would issue as the '547 patent.  (Ex. 72 ('547 patent file history) at May 11, 2022 Issue Notification.)

### 4.    Claims

319.    The '547 patent has 24 claims (3 independent claims, and 21 dependent claims). (Ex. 62 (the '547 patent) at col. 9, l. 57 – col. 11, l. 26.)

320.    Independent claim 1 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to a patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg or 300 mg, wherein the dose is released over a period of about one month, the patient is concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor, and administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer.

(Ex. 62 (the '547 patent) at claim 1.)

321.    Independent claim 7 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to a patient a long-acting suspension of an adjusted dose of aripiprazole and co-administering to a patient an oral antipsychotic after a first administration of the adjusted dose of the long-acting suspension, wherein the adjusted dose is 300 mg or 200 mg when the patient is taking a strong CYP2D6 or CYP3A4 inhibitor, the adjusted dose is 200 mg or 160 mg when the patient is taking a CYP2D6 and CYP3A4 inhibitor, and administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer.

(Ex. 62 (the '547 patent) at claim 7.)

### E.    U.S. PATENT NO. 11,400,087

### 1.    Background

322.    The '087 patent is titled "Method of providing aripiprazole to patients having impaired CYP2D6 or CYP3A4 enzyme function." (Ex. 73 (the '087 patent) at Title.)

323.    The inventor listed on the face of the '087 patent is "Arash Raoufinia." (Ex. 73 (the '087 patent) at Inventor.)

324.    The Abstract of the '087 patent states: "The disclosed embodiments relate to methods of initiating aripiprazole treatment in a patient who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, or both." (Ex. 73 (the '087 patent) at Abstract.)

325.    There are two Figures in the '087 patent specification. (Ex. 73 (the '087 patent) at Figures 1, 2.) Figure 1 is:



Figure 1

(Ex. 73 (the '087 patent) at Figure 1.)

326.    Figure 2 is:

Figure 2

(Ex. 73 (the '087 patent) at Figure 2.)

327.    The title, inventor, abstract, and figures of the '087 patent are identical to the '057, '803, '553, and '547 patents.

## 2.    Specification

328.    The '087 patent is "a continuation of U.S. application Ser. No. 17/206,241, filed on Mar. 19, 2021, which is a continuation of U.S. application Ser. No. 16/710,495, filed Dec. 11, 2019, now U.S. Pat. No. 10,980,803, issued Apr. 20, 2021, which is a continuation of U.S. application Ser. No. 14/034,727, filed Sep. 24, 2013, now U.S. Pat. No. 10,525,057," which means it has either an identical or substantially identical specification to the '057, '803, '553, and '547 patents.  (Ex. 73 (the '087 patent) at col. 1, ll. 5-10.)

## 3.    Prosecution History

329.    U.S. Application No. 17/304,606 (the "'606 application") was filed on June 23, 2021.  (Ex. 73 (the '087 patent) at (21) Appl. No., (22) Filed.)  The '606 application matured into the '087 patent and was issued on August 2, 2022.  (Ex. 73 (the '087 patent).)

330.    The Examiner for the '087 patent differed from the Examiner for the other 4 CYP Patents, with this Examiner being Theodore R. Howell, and the prior Examiner being Raymond J. Henley III.

331.    On June 23, 2021, Applicant filed its "Power of Attorney by Applicant," with the document signed by Masaki Sobe, the "Director of Intellectual Property Department" on April 16, 2020.  (Ex. 74 (the '087 patent file history) at June 23, 2021 Power of Attorney.)

332.    On June 23, 2021, Arash Raoufinia submitted his "Declaration (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)."  (Ex. 75 (the '087 patent file history) at June 23, 2021 Oath or Declaration Filed.)

333.    On June 23, 2021, Applicant amended the claims of the '606 application.

334.    On June 23, 2021, Applicant filed Applicant Arguments/Remarks and stated:

> Upon entry of the Amendment, Applicant amends the specification to include the claim for priority and amends the claims. Applicant cancels claims 1 - 20 without prejudice and/or disclaimer of subject matter. Applicant presents new claims 21 - 50; support for these new claims can be found in the as-filed specification and now cancelled claims. Applicant respectfully requests entry.

(Ex. 76 (the '087 patent file history) at June 23, 2021 Applicant Arguments/Remarks Made in an Amendment.)

335.    On June 23, 2021, Applicant submitted the Information Disclosure Statement, which stated:  "The listed documents are of record in prior U.S. Application No. 17/206,241, filing date March 19, 2021, upon which Applicant relies for the benefits provided in 35 U.S.C. § 120[.]"  (Ex. 77 (the '087 patent file history) at June 23, 2021 Information Disclosure Statement.)

336.    On July 19, 2021, the Examiner issued a Non-Final Rejection of the '606 application.  (Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection.)

337.    The Examiner stated:

> Claims 21-25 and 30 are rejected under 35 U.S.C. 103 as being unpatentable over the combination of Kane (J. Clin. Psychiatry Vol. 73 pages 617-624 published 2012) and Abilify Maintena Clinical Pharmacology Review (disclosed to the public on 05/14/2012).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 4.)

338.    The Examiner further stated:

> Abilify Maintena Clinical Pharmacology Review (disclosed to the public on 05/14/2012) teaches treating schizophrenia patients with

aripiprazole who are CYP 2D6 poor metabolizers. Said review teaches that a 400 mg aripiprazole IM depot injection is the recommended dose as taught by Kane above. Said review teaches that the adjusted dose of aripiprazole IM depot formulation is 300 mg for patients who are CYP 2D6 poor metabolizers as said aripiprazole concentration would remain within the therapeutic window (Table 1, pages 10, 17, 38 Figures 4, 8).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 5.)

339.    The Examiner further stated:

Therefore, one of ordinary skill in the art prior to the time of the invention would have found it prima facie obvious to adjust the dose of the intramuscularly administered, long acting suspension of aripiprazole in the regimen of Kane from 400 mg to about 300 mg when the patient is a CYP 2D6 poor metabolizer in view Abilify Maintena Clinical Pharmacology Review, as said review teaches that said 300 mg IM dose is recommended for patients who are CYP 2D6 poor metabolizers.

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 5.)

340.    The Examiner further stated:

Claims 26-29, 31-35 are rejected under 35 U.S.C. 103 as being unpatentable over the combination of Kane (J. Clin. Psychiatry Vol. 73 pages 617-624 published 2012) and Abilify Maintena Clinical Pharmacology Review (disclosed to the public on 05/14/2012) applied to claims 21-25 and 30 above, in view of Kostanski (US2005/148597 published 07/07/2005).

As disclosed above, the combination of Kane and Abilify Maintena Clinical Pharmacology Review disclose the method of treating a schizophrenia patient who is a CYP 2D6 poor metabolizer comprising intramuscularly administering a long acting depot suspension of aripiprazole in a dose of 300 mg in addition to co-administration of oral aripiprazole, in doses of 10-20 mg per day for 14 days following initial IM depot dose to maintain therapeutic plasma concentration of the antipsychotic medication and to ensure a smooth transition between the oral and the extended release formulation.

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 5-6.)

341.    The Examiner further stated:

Claims 36-40 and 45 are rejected under 35 U.S.C. 103 as being

unpatentable over the combination of Kane (J. Clin. Psychiatry Vol. 73 pages 617-624 published 2012) and Abilify Maintena Clinical Pharmacology Review (disclosed to the public on 05/14/2012).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 7.)

342.    The Examiner further stated:

Abilify Maintena clinical pharmacology review (disclosed to the public on 05/14/2012) teaches treating schizophrenia patients with aripiprazole who are also being treated with strong CYP 2D6 inhibitors. Said review teaches that 400 mg aripiprazole IM depot injection is the recommended dose as taught by Kane above. Said review teaches that the adjusted dose of aripiprazole IM depot formulation is 300 mg for patients who are taking strong CYP 2D6 inhibitors as said aripiprazole concentration would remain within the therapeutic window (Table 1, pages 12-14 and Figure 7).

Therefore, one of ordinary skill in the art prior to the time of the invention would have found it prima facie obvious to adjust the dose of the intramuscularly administered, long acting suspension of aripiprazole in the regimen of Kane from 400 mg to about 300 mg when the patient is also receiving a strong CYP 2D6 inhibitor in view Abilify Maintena Clinical Pharmacology Review as said review teaches that said 300 mg IM dose is recommended for patients who are have concomitant use of a strong CYP 2D6 inhibitor.

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 8-9.)

343.    The Examiner further stated:

Claims 41-44 and 46-50 are rejected under 35 U.S.C. 103 as being unpatentable over the combination of Kane (J. Clin. Psychiatry Vol. 73 pages 617-624 published 2012) and Abilify Maintena clinical pharmacology review (disclosed to the public on 05/14/2012) applied to claims 36-40 and 45 above, in view of Kostanski (US2005/0148597 published 07/07/2005).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 9.)

344.    The Examiner further stated:

Claims 21-35 rejected on the ground of nonstatutory double patenting as being unpatentable over claims 9-11, 13 of U.S. Patent No. 10,525,057 in view of Kane (J. Clin. Psychology Vol. 73

pages 617-624. Published 2012).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 12.)

345.    The Examiner further stated:

Claims 21-35 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-2 of U.S. Patent No. 10,980,803 in view of Kane (J. Clin. Psychology Vol. 73 pages 617-624. Published 2012).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 14.)

346.    The Examiner further stated:

Claims 21-35 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-2, 12, 14-15 of copending Application No. 17206241 in view of Kane (J. Clin. Psychology Vol. 73 pages 617-624. Published 2012).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 15.)

347.    The Examiner further stated:

Claims 21-35 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-2, 12, 14-15 of copending Application No. 17304610 in view of Kane (J. Clin. Psychology Vol. 73 pages 617-624. Published 2012).

(Ex. 78 (the '087 patent file history) at July 19, 2021 Non-Final Rejection at 17.)

348.    On October 18, 2021, Applicant filed a Terminal Disclaimer, disclaiming any additional term beyond the expiration of the '057 and '803 patents and the '241 and '610 applications.  (Ex. 79 (the '087 patent file history) at Oct. 18, 2021 Terminal Disclaimer.)

349.    On October 18, 2021, the Examiner approved the Terminal Disclaimer.  (Ex. 80 (the '087 patent file history) at Oct. 18, 2021 Terminal Disclaimer – Electronic Approved.)

350.    On October 18, 2021, Applicant filed an Amendment/Request for Reconsideration After Non-Final Rejection.  (Ex. 81 (the '087 patent file history) at Oct. 18, 2021 Applicant Arguments/Remarks Made in an Amendment.)

351.   Applicant amended certain claims.  (Ex. 82 (the '087 patent file history) at Oct. 18, 2021 Claims.)

352.   Regarding the Abilify Maintena Clinical Pharmacology Review, Applicant wrote:

> As an initial matter, it is unclear what supports the Office's assertion that the line on page 1 of the Abilify Review, i.e., "OCP Required Inter-Division Briefing was held on May 14, 2012," constitutes its public disclosure date of the reference.
> . . .
> The Office fails to make such a showing that the date "OCP Required Inter-Division Briefing was held on May 14, 2012" is the date of public disclosure. As such, the Abilify Review cannot be relied upon as prior art.

(Ex. 81 (the '087 patent file history) at Oct. 18, 2021 Applicant Arguments/Remarks Made in an Amendment at 13-14.)

353.   On November 5, 2021, the Examiner issued a Notice of Allowance for the '606 application.  (Ex. 83 (the '087 patent file history) at Nov. 5, 2021 Notice of Allowance and Fees Due.)

354.   The Examiner wrote:

> The following is an examiner's statement of reasons for allowance: At the time of the invention, the claimed methodology was not anticipated in the prior art. The instant application is continuation of Application 14034727, now U.S. Patent 10,525,057. In the appeal decision of 03/12/2019, the Appellate judges overturned a prima facie case to reduce the long acting aripiprazole intramuscular suspension from 400 mg or 300 mg to 66%-75% of the equivalent dose to a patient who is a CYP2D6 poor metabolizer, as it is not obvious to adjust the dose of a long-acting, once a month injection as there is no way to reduce the amount of the drug that the patient is subject to over the period for which the IM depot is to last, and too high a dose could present serious disadvantages (page 8-9 of PTAB decision of 03/12/2019). In the instant case, said 75% of the 400 mg dose of US Patent 10,525,057 is a 300 mg dose of the long acting aripiprazole intramuscular suspension, which is found within the instant claims.

(Ex. 83 (the '087 patent file history) at Nov. 5, 2021 Notice of Allowance and Fees Due at 3.)

355.     On March 14, 2022, Applicant filed a Request for Continued Examination.  (Ex. 84 (the '087 patent file history) at Mar. 14, 2022 Request for Continued Examination.)

356.     On June 3, 2022, the Examiner issued a Notice of Allowance for the '606 application.  (Ex. 85 (the '087 patent file history) at June 3, 2022 Notice of Allowance and Fees Due.)

357.     On July 13, 2022, the Examiner issued an Issue Notification that the '606 application would issue as the '087 patent.  (Ex. 86 (the '087 patent file history) at July 13, 2022 Issue Notification.)

### 4.     **Claims**

358.     The '087 patent has 30 claims (4 independent claims, 26 dependent claims).  (Ex. 73 (the '087 patent) at col. 9, l. 51 – col. 12, l. 30.)

359.     Independent claim 1 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of about 300 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension, wherein the dose is systemically released over a period of about one month and the patient is a CYP2D6 poor metabolizer.

(Ex. 73 (the '087 patent) at claim 1.)

360.     Independent claim 10 is directed to:

> A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of about 300 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension, wherein the dose is systemically released over a period of about one month, the patient is a CYP2D6 poor metabolizer, the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension, the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

(Ex. 73 (the '087 patent) at claim 10.)

361.    Independent claim 16 is directed to:

A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 300 mg or 200 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension, wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor.

(Ex. 73 (the '087 patent) at claim 16.)

362.    Independent claim 25 is directed to:

A method of treating schizophrenia or bipolar I disorder in a patient comprising: intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 300 mg or 200 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension, wherein the dose is systemically released over a period of about one month, the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor, the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension, the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

(Ex. 73 (the '087 patent) at claim 25.)

## IV.    **THE ORANGE BOOK LISTED PATENTS**

363.    On January 31, 2020, Otsuka listed the '057 patent for Aripiprazole (Abilify Maintena Kit).  (Ex. 87 (Orange Book Screenshot).)

364.    On May 19, 2021, Otsuka listed the '803 patent for Aripiprazole (Abilify Maintena Kit).  (Ex. 87 (Orange Book Screenshot).)

365.    On November 17, 2021, Otsuka listed the '553 patent for Aripiprazole (Abilify Maintena Kit).  (Ex. 87 (Orange Book Screenshot).)

366.   On June 24, 2022, Otsuka listed the '547 patent for Aripiprazole (Abilify Maintena Kit).  (Ex. 87 (Orange Book Screenshot).)

367.   On August 29, 2022, Otsuka listed the '087 patent for Aripiprazole (Abilify Maintena Kit).  (Ex. 87 (Orange Book Screenshot).)

## V.    **THE MYLAN LITIGATION**

368.   Defendants incorporate by reference all relevant pleadings from Otsuka v. Mylan, 22-cv-464-JLH.  At this time, Defendants only have access to the publicly-filed and heavily redacted pleadings, but rely on Mylan's assertions, which are based on discovery that Defendants do not yet have.

369.   In Otsuka v. Mylan, D.I. 200 (Redacted Public Version), Mylan requested "an extension of the schedule to pursue additional fact discovery related to whether certain documents or portions thereof, published within one year before the filing date of several patents-in-suit are prior art[.]"  (Ex. 88 (Otsuka v. Mylan, D.I. 200) at 1.)

370.   Mylan then raised that there were questions regarding whether Raoufinia alone provided the dose adjustments in the label, summary basis of approval, and ultimately in the CYP Patents.  (Ex. 89 (*Otsuka v. Mylan*, D.I. 204) at 1.)

371.   Mylan sought: (1) subpoenas to former Otsuka employees; (2) subpoenas to third parties; (3) five additional interrogatories; (4) relief from the scheduling order's 70 hours of deposition testimony; (5) a privilege log to be produced by Plaintiffs; (6) subpoenas for documents and deposition; and (7) Plaintiffs' complete and full response to certain interrogatories.  (Ex. 89 (*Otsuka v. Mylan*, D.I. 204) at 1-2.)

372.   Mylan further stated that "Plaintiffs produced more than 50% of their documents near or on the close of fact discovery," and in the last few weeks of fact discovery and after the September 1 deadline for substantial completion of document production:

> On the September 1 deadline, Plaintiffs essentially doubled their document production, producing another 8,100 documents comprising approximately 550,000 pages. On October 2, just two weeks before the close of fact discovery, Plaintiffs produced another 5,600 documents totaling approximately 154,000 pages. Then, on October 10, less than a week before fact discovery closed, Plaintiffs produced well over 1,000 documents that identified Raoufinia as their custodian. Finally, after 4 pm ET on October 16—the last day of fact discovery—Plaintiffs produced more than 15,000 additional documents, including 98% of all custodial documents from former named-inventor McQuade and Plaintiff Lundbeck's first and only production. Thus, Plaintiffs produced more than 50% of their documents well more than a month after the substantial completion deadline and produced more than 36% of their documents—almost all from key witnesses—on or near the very last day of fact discovery.

(Ex. 89 (*Otsuka v. Mylan*, D.I. 204) at 2.)

373.    The underlying amended contentions, expert reports, and deposition testimony in these and related filings have been heavily redacted, but the essential information lies uniquely within Plaintiffs' control.

374.    In the hearing discussing these disputes, counsel for Plaintiffs stated: "Those [CYP] patents relate to the use of the product according to the proposed labeling of the defendants[.]"  (Ex. 90 (*Otsuka v. Mylan*, D.I. 284) at 6:19-21.)

375.    The Court denied some of Mylan's requests because "inventorship and inequitable conduct have not been pleaded and that I do think that some of this information could have been asked for earlier in the case."  (Ex. 90 (*Otsuka v. Mylan*, D.I. 284) at 31:22-25.)

## VI.    INEQUITABLE CONDUCT

### A.    Materiality

#### 1.    Failure to Identify Co-Inventors or True Inventors

376.    Arash Raoufinia wrote: "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or

- 116 -

imprisonment of not more than five (5) years, or both." (Ex. 15 (the '057 patent file history) at Sept. 24, 2013 Oath or Declaration Filed.)

377.    But as discussed above, FDA's OCP Review team contained original inventors or original joint inventors of the CYP Patents.

378.    Arash Raoufinia failed to identify to the USPTO that FDA's OCP Review team (at least Huixia Zhang, Satjit Brar, Mike Pacanowski, Atul Bhattaram, and Hao Zhu) were either the true inventors of the CYP Patents, or were true co-inventors of the CYP Patents.

379.    Arash Raoufinia deliberately misrepresented that he invented the CYP Patents, when FDA's OCP Review team contained the proper inventors or co-inventors.

380.    Arash Raoufinia acted in bad faith or with deceptive intent regarding his improper inventorship, and as discussed below, these misrepresentations were also made to improperly overcome material prior art.

381.    As discussed above, around June 4, 2012, FDA's OCP Review team found Otsuka's proposed labeling for Abilify Maintena to not be acceptable, and FDA had to provide (1) a dose adjustment for the 300 mg dose of Abilify Maintena to a 200 mg dose when a patient is on a strong CYP3A4 inhibitor, (2) a dose adjustment for the 300 mg dose of Abilify Maintena to a 200 mg dose when a patient is on a strong CYP2D6 inhibitor, (3) a dose adjustment for the 300 mg dose of Abilify Maintena to a 160 mg dose when a patient is on both CYP2D6 and CYP3A4 inhibitors, (4) avoiding administration when patient is on a CYP3A4 inducer, and (5) patients known to be CYP2D6 poor metabolizers were recommended a dose of 300 mg. *See* Section II.B.1, II.B.2 above.

382.    FDA's OCP Review team's recommendations are reflected in the Abilify Maintena Label, and both predate prosecution of the CYP Patents.

383.    FDA's recommendations regarding these dose adjustments or avoiding administration when a patient is on a CYP3A4 inducer are reflected in the claims of the CYP Patents.

384.    For instance, claim 1 of the '057 patent, claim 19 of the '803 patent, claim 7 of the '547 patent, and claims 16 and 25 of the '087 patent all recite doses of "66% . . . of a 300" mg dose (i.e., 198 mg), "198 mg" or "200 mg" when a patient is also using "a strong CYP2D6 or CYP3A4 inhibitor."  (Ex. 12 (the '057 patent) at claim 1; Ex. 39 (the '803 patent) at claim 19; Ex. 62 (the '547 patent) at claim 7; Ex. 73 (the '087 patent) at claims 16 and 25.)  This is included in FDA's first two label recommendations, and were originally invented by FDA's OCP Review team.

385.    Claims 16 and 25 of the '553 patent are similar and recite a "200 mg" dose when a patient "is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor."  (Ex. 49 (the '553 patent) at claims 16 and 25.)  This is included in FDA's two label recommendations, and were originally invented by FDA's OCP Review team.

386.    Further, claim 15 of the '057 patent, claim 23 of the '803 patent, claims 1 and 10 of the '553 patent, and claim 7 of the '547 patent all recite "53% of a 300 mg," or 159 mg, or 160 mg dose when a patient is on both a CYP2D6 inhibitor and a CYP3A4 inhibitor.  (Ex. 12 (the '057 patent) at claim 15; Ex. 39 (the '803 patent) at claim 23; Ex. 49 (the '553 patent) at claims 1 and 10; Ex. 62 (the '547 patent) at claim 7.)  This is included in FDA's third label recommendation, and were originally invented by FDA's OCP Review team.

387.    Further, claim 9 of the '057 patent, claim 1 of the '803 patent, and claims 1 and 10 of the '087 patent all recite a dose of 75% of a 400 mg dose (i.e., 300 mg) or a "300 mg dose" when a patient is a "CYP2D6 poor metabolizer."  (Ex. 12 (the '057 patent at claim 9; Ex. 39 (the

'803 patent) at claim 1; Ex. 73 (the '087 patent) at claims 1 and 10.)  This is included in FDA's fifth label recommendation, and were originally invented by FDA's OCP Review team.

388.    Further, claims 1 and 7 of the '547 patent all recite "administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer."  (Ex. 62 (the '547 patent) at claims 1 and 7.  This is included in FDA's fourth label recommendation, and were originally invented by FDA's OCP Review team.

389.    Therefore, the inequitable conduct regarding improper inventorship infected at least one independent claim of all CYP Patents.  Had the USPTO known about the improper inventorship, USPTO would not have issued any of these patents.  Therefore, all claims of the CYP Patents should be held unenforceable.

## 2.    Material Prior Art Precluded Due to False Statements

390.    Arash Raoufinia's false statements regarding Otsuka's alleged work on the Abilify Maintena Label prevented the Label from being considered as prior art, despite the Examiners noting that such references would have anticipated or rendered the CYP claims obvious.

391.    The Examiner rejected the pending claims of the '727 application (which would later issue as the '057 patent) as anticipated and obvious over the Gopalakrishna article and Abilify Maintena label.  *See* Section III.A.3 above.

392.    To overcome this rejection, Raoufinia filed his first Rule 1.132 declaration. Raoufinia wrote that he "had the responsibility to draft the clinical pharmacology sections related to ABILIFY MAINTENA," but never discussed FDA's OCP Review team's work on the clinical pharmacology sections.

393.    Raoufinia further wrote that the dose adjustments discussed in the Abilify Maintena Label and in Table 2 of Gopalakrishna "were produced to [Otsuka] by myself and my

coinventor, Robert McQuade."[2]  Raoufinia did not discuss FDA's OCP Review team's work on the dose adjustments in the Abilify Maintena Label or Gopalakrishna.

394.    But the Examiner still rejected subsequent claims as anticipated or obvious over Gopalakrishna, finding that even if Gopalakrishna and the Abilify Maintena label were not prior art under Section 102(b)(1)(B), Gopalakrishna still contained enough information to render the pending claims invalid.

395.    In response to this, Applicant wrote that all other parts of Gopalakrishna were from the Abilify Maintena package insert.  Again, Applicant never discussed FDA's OCP Review team's work on the dose adjustments in the Abilify Maintena Label.

396.    Later on, Raoufinia filed a supplemental declaration noting that the particular claimed adjustments "could not have been predicted," but required an "analysis of the clinical trial results."  Raoufinia's supplemental declaration never mentioned that FDA predicted the claimed adjustments based on modeling and FDA repeatedly faulted Otsuka's clinical trial results for a lack of CYP genotype information, which necessitated FDA's modeling.

397.    The CYP Patents would not have issued but for Raoufinia's material misrepresentations regarding his and Otsuka's work and material omissions regarding FDA's OCP Review team's work on the CYP dosage adjustment.  These material misrepresentations and material omissions were the only means by which Raoufinia could overcome anticipation and obviousness arguments that rendered all pending claims invalid.

398.    Others were involved in perpetuating this fraud, with at least prosecution counsel and their law firms being involved in prosecution and providing these material misrepresentations and material omissions and never correcting Dr. Raoufinia.

---

2 Strangely, Robert McQuade was removed as an inventor on November 7, 2014.  The statement that "Robert McQuade" produced the dose adjustments to Otsuka was never corrected.

3.    **Applicant Side Stepped the Obviousness Rejection over the Clinical Pharmacology Review by Focusing on an Irrelevant Date**

399.    During prosecution of the last CYP patent (the '087 patent), the Examiner rejected various pending claims as obvious over the Abilify Maintena Clinical Pharmacology Review.

400.    Applicant responded that the OCP Review Date of May 14, 2012 was not the public date, such that the Clinical Pharmacology Review document could not be considered prior art.

401.    Applicant did not discuss that the Clinical Pharmacology Review document was publicly available on April 11, 2013, which predated the earliest filing date of the CYP Patents, and this was readily available information.  Moreover, the Clinical Pharmacology Review could not be subject to the Section 102(b) exception because the information therein originated with FDA, not Dr. Raoufinia.

402.    By not providing the actual April 11, 2013 date, Applicant did not need to engage into any substantive patentability analysis with the Examiner regarding the teachings of the Clinical Pharmacology Review.

403.    Had the Examiner been provided the proper date, Applicant would have been confronted with statements from FDA in the Clinical Pharmacology Review that certain dosage limitations were invented by FDA's OCP Review team.  If this had occurred, Applicant would not have been granted the patent because the Clinical Pharmacology Review showed that FDA's OCP Review team was either a true inventor or a co-inventor of the CYP Patents.

404.    This also would have caused the Examiner to reconsider the previously-issued patents to see if they were also improperly granted to Otsuka.

B.    **Intent to Deceive**

405.    The single most reasonable inference able to be drawn from the evidence collected to date is that Dr. Raoufinia made a deliberate decision to withhold the proper inventorship and misrepresent the scope of inventorship to defeat various material invalidity arguments.  These deliberate decisions were so material that, if any of them had been provided to the USPTO, the CYP Patents would not have been allowed.

406.    On information and belief, the single most reasonable inference able to be drawn from the evidence collected to date is that the inequitable conduct that led to these CYP Patents getting issued allowed for Raoufinia's employer Otsuka to extend its monopoly on long-acting injectable aripiprazole drugs because these CYP Patents expire in 2033-34, while the earlier Abilify Maintena patents expire in 2025.

**VII.    There Is an Immediate and Necessary Relation Between the Inequitable Conduct and All CYP Patents such that Infectious Unenforceability Applies**

407.    The inequitable conduct regarding the CYP Patents would have prevented any of the CYP Patents from being issued for the reasons stated above.  The inequitable conduct has infected all the CYP Patents, and they should also be held unenforceable.

408.    As discussed above, all CYP Patents share the same title, inventor, abstract, figures, and specifications.

409.    The Information Disclosure Statements for the '803 patent, '553 patent, '547 patent, and '087 patent cite to the list of documents of record during prosecution of the '057 patent.

410.    The Notices of Allowance for the '803 patent, '553 patent, '547 patent, and '087 patent cite back to prosecution of the '057 patent.

411.    All CYP Patents are all family members, with all CYP Patents being continuations ultimately descending from the '057 patent.

412.    All CYP Patents are in the Orange Book for Abilify Maintena, and Abilify Maintena is discussed in the Abilify Maintena label, the Gopalakrishna article, and the Abilify Maintena Clinical Pharmacology Review.

413.    In view of the foregoing facts, the CYP Patents are highly inter-related and bear an immediate and necessary relation to the inequitable conduct plaguing any of the CYP Patents (but notably the '057 patent) due to the improper inventorship and misrepresentations to overcome the material prior art such that this inequitable conduct has infected these subsequent patents.  These subsequent patents should be held unenforceable pursuant to the doctrine of infectious unenforceability.

### COUNT XIV:
### (Declaratory Judgment of Unenforceability of the '057 Patent, the '803 Patent, the '553 Patent, the '547 Patent, and the '087 Patent Due to Improper Inventorship)

414.    Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

415.    The claims of the CYP Patents are unenforceable for improper inventorship.

416.    Chapter 2157 of the Manual of Patent Examining Procedure states:

> Although the AIA eliminated pre-AIA 35 U.S.C. §102(f), the patent laws still require the naming of the actual inventor or joint inventors of the claimed subject matter. . . . In the rare situation where it [is] clear that the application does not name the correct inventorship and the applicant has not filed a request to correct inventorship under 37 CFR § 1.48, Office personnel should reject the claims under 35 U.S.C. § 101 and 35 U.S.C. § 115.

417.    35 U.S.C. § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

418.    35 U.S.C. § 115(a) states: "An application for patent that is filed under 111(a) . . .
shall include, or be amended to include, the name of the inventor for any invention claimed in
the application."

419.    The CYP Patents fail to meet these statutory requirements, because, to the extent
they claim any inventive subject matter, such invention was not made by the named inventor,
Arash Raoufinia.

A.    **Prosecution of the '727 Application**

420.    As discussed above, FDA's OCP Review team contained original inventors or
original joint inventors of the CYP patents.

421.    Arash Raoufinia failed to identify to the USPTO that FDA's OCP Review team
were either the true inventors of the CYP Patents, or were true co-inventors of the CYP Patents.

422.    Dr. Raoufinia deliberately misrepresented that he invented the CYP Patents, when
FDA's OCP Review team contained the true inventors or co-inventors of the CYP Patents.

423.    The dosage adjustments and administration instructions conceived by FDA's OCP
Review team were clearly defined such that only ordinary skill was necessary to reduce the
invention to practice without extensive research or experimentation.

424.    Otsuka adopted the dosage adjustments and administration instructions provided
by FDA's OCP Review team, incorporating them into the Abilify Maintena label with no further
modification and with no further testing.

425.    FDA's OCP Review team provided a specific, settled idea that solved the problem
at hand, which was ensuring proper dosing and administration in specific patient populations.

426.    FDA's OCP Review team provided specific dose adjustments and instructions
tailored to certain patient populations, and faulted Otsuka for missing critical data regarding
certain patient populations.

427.    FDA's OCP Review team did not merely suggest a result to be accomplished, but provided the means of accomplishing it: specific dose adjustments and administration instructions for specific patient groups.

428.    The contribution of FDA's OCP Review team was the key to the CYP Patents and certainly significant in quality when measured against the full dimension of the invention.

429.    The dosage adjustments and administration instructions contributed by FDA's OCP Review team were expressly incorporated into at least one independent claim of each CYP Patent, with no further modification by Dr. Raoufinia.

430.    Fifteen months after FDA's OCP Review team's labeling changes, Otsuka began prosecution of the CYP Patents, claiming that Arash Raoufinia had invented these dose adjustments and administration instructions.

431.    The dosage adjustments and administration instructions conceived by FDA's OCP Review team were incorporated, unchanged, into the claims of the '727 application, just as they had been incorporated, unchanged, into the Abilify Maintena Label.

432.    The '057 patent issued on or about January 7, 2020, and when subsequent CYP Patents issued, Dr. Raoufinia never informed the USPTO that he was not the true sole inventor.

**B.    Raoufinia Made Material Misrepresentations to the USPTO with an Intent to Deceive**

433.    Dr. Raoufinia made material misrepresentations to the USPTO regarding inventorship of the CYP Patents, beginning with the '057 patent, with the intent to deceive.

434.    On or about September 24, 2013, the Applicant filed a Declaration signed by Arash Raoufinia in connection with the '727 application.  (Ex. 15 (the '057 patent file history) at Sept. 24, 2013 Oath or Declaration Filed.)

435.    In signing the Declaration, Dr. Raoufinia made the following acknowledgment:

> The above-identified application was made or authorized to be made by me.
>
> I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.
>
> I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

436. But as discussed above, it was FDA's OCP Review team that provided dose adjustments and administration instructions that Arash Raoufinia incorporated, unchanged, into the Abilify Maintena Label.

437. FDA's OCP Review team thus contributed to the conception of the subject matter of at least one claim of each of the CYP Patents.

438. Dr. Raoufinia was misjoined to the CYP Patents because he did not invent the dose adjustments and administrations instructions that he claimed to have invented.

439. FDA's OCP Review team was non-joined to the CYP Patents because FDA's OCP Review team was not properly credited as inventors for their contributions.

440. Had the Examiner of the '727 application been presented with full and accurate information regarding inventorship of the claimed subject matter, neither the '057 patent, nor any of the later-issued CYP Patents would have been granted.

### 1. Raoufinia Knowingly Misrepresented Material Information to the USPTO

441. Contrary to the representations contained in his Declarations and Affidavit, Dr. Raoufinia was not the "original" inventor of the invention claimed in the '057 patent.

442. At the time he signed his September 24, 2013 Declaration, Dr. Raoufinia was not an "original" inventor of the invention claimed in the '057 patent.

443. At the time he signed his April 2, 2014 Declaration, Dr. Raoufinia had not provided the dose adjustments and administration instructions in the Abilify Maintena Package

insert, but rather those dose adjustments and administrations were provided by FDA's OCP Review team.

444.    On or about June 4, 2012, FDA's OCP Review team found Otsuka's proposed labeling for Abilify Maintena unacceptable, and FDA provided (1) a dose adjustment for the 300 mg dose of Abilify Maintena to a 200 mg dose when a patient is on a strong CYP3A4 inhibitor, (2) a dose adjustment for the 300 mg dose of Abilify Maintena to a 200 mg dose when a patient is on a strong CYP2D6 inhibitor, (3) a dose adjustment for the 300 mg dose of Abilify Maintena to a 160 mg dose when a patient is on both CYP2D6 and CYP3A4 inhibitors, (4) avoiding administration when patient is on a CYP3A4 inducer, and recommended (5) a dose of 300 mg for patients known to be CYP2D6 poor metabolizers.  *See* Section II.B.1, II.B.2 above.

445.    FDA's OCP Review team's recommendations regarding these dose adjustments or avoiding administration when a patient is taking a CYP3A4 inducer were incorporated into the Abilify Maintena Label, published on February 28, 2013.

446.    Thus, both FDA's recommendations and the Abilify Maintena Label predate prosecution of the CYP Patents.

447.    Despite claiming responsibility for drafting the clinical pharmacology sections of the Abilify Maintena Label, it was FDA's OCP Review team who provided the relevant clinical pharmacology sections, or the resulting dose adjustments and administration instructions, while also faulting Otsuka for omitting certain data relevant to these dose adjustments.

448.    FDA's recommended dose adjustments and administration instructions form the basis for at least one independent claim of each of the CYP Patents.

449.    Not only did Dr. Raoufinia's false statements regarding the source of the dose adjustments on the Abilify Maintena Label prevent it from being considered as prior art, but they

deliberately concealed that FDA's OCP Review team – not Dr. Raoufinia – provided the dose adjustments and administration instructions in the Abilify Maintena Label and the CYP Patents.

450.    At the time of filing of the '727 application, particularly when Dr. Raoufinia signed his Declaration, Dr. Raoufinia knew that his certification that he was the "original" inventor of the subject matter claimed in the '727 application was false, and that the statement was a highly material misrepresentation to the USPTO.

451.    Dr. Raoufinia's Declaration was unmistakably false and constitutes egregious misconduct before the USPTO, and is therefore *per se* material to the patentability of the '057 patent, and the later-issued CYP Patents.

452.    Dr. Raoufinia knowingly and with specific intent to deceive the USPTO, falsely represented to the USPTO in his Declaration that he was the "original" inventor of the subject matter claimed in the '727 application.

453.    Otsuka's decision to commence this Action against Alvogen despite knowing that Dr. Raoufinia is not the "original" inventor of the subject matter claimed in the '727 application makes this case exceptional under 35 U.S.C. § 285.

> **2.    Raoufinia's False Representations Were Material and Raoufinia Had Specific Intent to Deceive the USPTO**

454.    The question of whether Dr. Raoufinia is the "original" inventor of the subject matter claimed in the '057 patent is information that is highly material to the USPTO's consideration of the '057 patent.

455.    At no time during prosecution of the '727 application did Dr. Raoufinia inform the USPTO that he did not invent the claimed dosage adjustments.

456.    Likewise, at no time during the prosecution of the '727 application did Dr. Raoufinia inform the USPTO that FDA's OCP Review team had invented certain claim elements of the '727 application, including certain dosage adjustments.

457.    Dr. Raoufinia withheld this information because its disclosure would have proven that he was not the original inventor, which would have belied his statements to the USPTO that various art originated with him and could not be used by the Examiner to invalidate the '727 application.

458.    Accordingly, not only is Dr. Raoufinia's Declaration unmistakably false and constituting egregious conduct, but it is also but-for material to the patentability of the '057 patent.

459.    The '803 patent, the '553 patent, the '547 patent, and the '087 patent are all continuations of the '057 patent, and thus are equally infected as the '057 patent by the misrepresentations of Dr. Raoufinia during prosecution of the '727 application.

460.    The single most reasonable inference to be drawn from these facts is that Dr. Raoufinia's misrepresentations about inventorship were intentionally designed to deceive the USPTO.

461.    Dr. Raoufinia knowingly and with specific intent to deceive the USPTO, falsely represented to the USPTO that he invented the subject matter claimed in the '057 patent.

462.    FDA's OCP Review team conceived of dosage adjustments and administration instructions for certain patient populations.

463.    Dr. Raoufinia concealed FDA's conception of the claimed subject matter from the USPTO.  Had the USPTO known of FDA's conception of and contribution to the claimed subject matter, the USPTO would not have granted the '057 patent to Dr. Raoufinia.  Nor would the USPTO have granted any of the '803 patent, the '553 patent, the '547 patent, or the '087 patent, which are continuations of the '057 patent.

464.    Accordingly, Dr. Raoufinia committed inequitable conduct before the USPTO, thereby rendering the '057 patent, which issued from the '727 application, unenforceable.  The

inequitable conduct that renders the '057 patent unenforceable also renders unenforceable the '803 patent, the '553 patent, the '547 patent, and the '087 patent.

465.    To resolve the legal and factual questions raised by Plaintiffs, and to afford relief from the uncertainty and controversy that Plaintiffs' accusations have precipitated, Alvogen is entitled to a declaratory judgment that the claims of the CYP Patents are unenforceable for improper inventorship.

### C.    There Is an Immediate and Necessary Relation Between Raoufinia's Intentional, Material Misrepresentations and All CYP Patents such that Infectious Unenforceability Applies

466.    The inequitable conduct due to improper inventorship regarding the '057 patent would have prevented any of the subsequent CYP Patents from being issued for the reasons stated above.  The inequitable conduct due to improper inventorship has infected all the CYP Patents, and they should also be held unenforceable.

467.    The Notices of Allowance for the '803 patent, '553 patent, '547 patent, and '087 patent cite back to prosecution of the '057 patent.

468.    All CYP Patents are family members, with all CYP Patents being continuations ultimately descending from the '057 patent.

469.    In view of the foregoing facts, the CYP Patents are highly inter-related and bear an immediate and necessary relation to the inequitable conduct plaguing any of the CYP Patents (but notably the '057 patent) due to improper inventorship.  Accordingly, all CYP Patents should be held unenforceable pursuant to the doctrine of infectious unenforceability.

### COUNT XV:
### (Declaratory Judgment of Invalidity of the '057 Patent, the '803 Patent, the '553 Patent, the '547 Patent, and the '087 Patent Due to Improper Inventorship)

470.    Alvogen incorporates by reference the allegations in the previous paragraphs of its counterclaims.

471.    The claims of the CYP Patents are invalid for improper inventorship.

472.    As discussed above, FDA's OCP Review team contained original inventors or original joint inventors of the CYP Patents.

473.    Because Dr. Raoufinia neither conceived of nor reduced to practice the subject matter of the claims of the '057 patent, the '803 patent, the '553 patent, the '547 patent, or the '087 patent, those patents are invalid for improper inventorship.

474.    There exists an actual controversy between Plaintiffs and Alvogen regarding the validity of the'057 patent, the '803 patent, the '553 patent, the '547 patent, and the '087 patent, and a declaration of invalidity is necessary and appropriate at this time.

## DEMAND FOR JUDGEMENT

WHEREFORE, Alvogen requests that the Court enter Judgment in their favor and against Plaintiffs as follows:

A.    Ordering that Plaintiffs' Complaint be dismissed with prejudice and judgment entered in favor of Alvogen;

B.    Denying the relief sought in Plaintiffs' Complaint in its entirety;

C.    Declaring each of the Asserted Patents invalid and/or unenforceable;

D.    Declaring that Alvogen's Proposed Products do not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid claim of the Asserted Patents;

E.    Declaring that Plaintiffs are not entitled to any injunctive remedy related to the Asserted Patents;

F.    Ordering that judgment be entered in favor of Alvogen on each of its affirmative defenses and any additional defenses discovery may reveal;

G.    Enjoining Plaintiffs and their respective officers, employees, agents, representatives, attorneys, and others acting on their behalf from representing to anyone, either

directly or indirectly, that Alvogen's Proposed Products have infringed, are infringing, or will infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the Asserted Patents;

      H.     Awarding Alvogen its costs and expenses in this action;

      I.     Declaring this case exceptional and awarding Alvogen its reasonable attorneys' fees and costs pursuant to 35 U.S.C. § 285; and

      J.     Awarding Alvogen any further relief this Court may deem just, proper, and equitable.

|  |  |
|---|---|
|  | /s/ Nathan R. Hoeschen |
|  | Karen E. Keller (No. 4489) |
|  | Nathan R. Hoeschen (No. 6232) |
| OF COUNSEL: | SHAW KELLER LLP |
| Matthew J. Becker | I.M. Pei Building |
| Matthew S. Murphy | 1105 North Market Street, 12th Floor |
| Thomas K. Hedemann | Wilmington, DE 19801 |
| AXINN, VELTROP & HARKRIDER LLP | (302) 298-0700 |
| 90 State House Square | kkeller@shawkeller.com |
| Hartford, CT 06103 | nhoeschen@shawkeller.com |
| (860) 275-8100 | *Attorneys for Defendant Alvogen, Inc.* |

Dated: July 7, 2025